IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| HITT CONTRACTING, INC.,<br>Plaintiff,<br>v.<br><br>THE UNITED STATES,<br>Defendant. | Civil Action No. 07-823C<br>(Chief Judge Damich) |

**PLAINTIFF'S MEMORANDUM IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiff Hitt Contracting, Inc. states the following in support of its Motion for Partial Summary Judgment:

## I. INTRODUCTION

This case arises out of a contract between The Architect of the Capitol ("AOC") and Hitt Contracting, Inc. ("Hitt") for the construction of the West Refrigeration Plant Expansion of the Capitol Power Plant located in Washington, DC. More specifically, it relates to the excavation and removal of soil from the site, a task which Hitt subcontracted to The Anderson Company, LLC ("Anderson").[1]

Pursuant to the terms of the general contract between Hitt and AOC, all vehicles entering or leaving United States Government property during the performance of work on the project, including the trucks which Anderson used to remove soil, were subject to clearance and inspection.

[1] The facts on which this motion is based and the evidence in support of these facts are included in the Proposed Findings of Uncontroverted Fact filed with the motion.

When Anderson commenced work on the project on or about May 22, 2003, its vehicles were inspected at the entrance to the project. On or about June 12, 2003, however, the inspection requirements changed. On that day, The United States Capitol Police directed Anderson to send all vehicles entering the West Refrigeration project site to the Capitol Police inspection station for the Capitol Visitor Center project located at 3rd St. and Constitution Avenue NW, several blocks from the West Refrigeration project.

Because Anderson was hauling the material to dump sites located in southern Maryland, the change in inspection location required Anderson's truckers to take a substantially different and longer route to the project site. As a result, the time required to dispose of each load of material increased. Because Anderson paid the trucks by the hour, its direct costs increased as well. Anderson informed Hitt that it was entitled to additional compensation as a result of this change. Hitt passed the claim on to AOC.

By final decision dated April 11, 2005, the contracting officer denied the claim. The contracting officer's final decision was premised on the contention that the contract did not require security inspections to take place on-site and that the claim was barred by the "No Damages for Delay" provision of the general contract and by the *Severin* doctrine. Hitt appealed the decision to the House Office Building Committee Board of Contract Appeals.

By decision dated May 30, 2007, The Board granted summary judgment in favor of AOC against Hitt.[2] The basis of the decision was that "the solicitation and resulting contract could not afford Hitt any basis for assuming that the vehicle security inspections provided for under the solicitation and resulting contract would only occur at the project site," and that therefore "there [was] no basis for finding that AOC changed the contract

[2] The Board's rules do not provide a procedure for summary judgment.

so as to entitle Hitt to an equitable adjustment." Hitt filed the present appeal pursuant to the Wunderlich Act, 41 USC §321 *et seq*.

The dispositive question in this case is whether the government's decision to move vehicle security inspections for the West Refrigeration Plant Expansion project from the entrance to the project site to a remote inspection site located many blocks away constituted a change to the specifications for the project. Because no reasonable person would conclude from the specifications that vehicles entering the project site would be required to undergo inspection at an off-site location many blocks from the project site before being released into the streets of Washington, DC with no further monitoring for up to 15 minutes before entering the project site, the decision to move the inspections off-site was a change to the contract entitling Hitt to an equitable adjustment in the price. This entitlement is not affected by the contract's "No Damages for Delay" provision or the Severin doctrine.

## II. <u>ARGUMENT</u>

### A. Standard for Summary Judgment

Summary judgment is appropriate if " the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." United States Court of Federal Claims Rule 56. Summary judgment may be entered on the issue of liability alone. *Id.* Hitt is entitled to summary judgment with respect to liability in this case because the decision to move the security inspection station was a change to the contract.

### B. The Contract Specified on Site Security Inspections.

The only reasonable interpretation of the specifications is that they provide for on site security inspections. The idea that security inspections would be anywhere but at the entrance to the secured area is absurd. Nothing in the specifications provides for off-site inspections, and no bidder could have been expected to infer such a counterintuitive requirement.

The relevant contract provisions are set forth below[3]. Article 3.5 of the Supplementary Conditions provides that:

> All vehicles, and contents, used by the Contractor or his subcontractors, which enter or leave United States Government property during performance of the work, will be subject to clearance, inspection and identification procedures conducted by the United States Capitol Police. Instructions and map(s) will be provided to the contractor upon award.

Article 1.6 of the Conditions to the contract provides that:

> Clearance: Special arrangements for deliveries shall be arranged a minimum of 48 hours in advance of arrival to permit inspection by the United States Capitol Police. ~~The Police inspection station is on P Street and South Capitol Street S.E.~~ (over-strike in original)
> **Coordinate deliveries with the US Capital (sic) Police by contacting them at 202-224-0908 (emphasis in original).**

Article 1.4 of the conditions to the contract provides that**:**

> Site access for the Contractor shall primarily occur from Virginia Avenue with limited use of the service entrance from E Street. All access shall be through guarded gates and allowed only to secure personnel.

**1. A reasonable person would interpret the contract to provide for on-site inspections.**

In order to interpret this contract language, the court must "[determine] what a reasonable person in the position of the parties would have thought the disputed language

[3] These provisions are also attached hereto as Exhibit 1

meant." *Washington Properties, Inc. v. Chin, Inc*., 760 A.2d 546 (D.C. 2000). The provisions quoted above could only lead a reasonable person preparing to undertake construction of the West Refrigeration Plant Expansion project to the conclusion that the security inspections were to be conducted on site.

The fact that the contract does not use the words "on-site" in describing the location of inspections does not mean that AOC was entitled to conduct them in any location it chose. If this were the case, AOC could have required Hitt to undergo vehicle inspections in Pittsburgh, Pennsylvania. Or it could have required Hitt to use covered wagons to move the material, as the specifications do not explicitly allow the use of trucks. While these examples are extreme, they illustrate the real issue in this case. The question is not whether the specifications explicitly provided for on-site inspections. The question is whether a reasonable person would interpret the specifications to provide for anything but on-site inspection. The answer to this question is no. The only reasonable interpretation of the specifications is that they require on-site inspection

Article 3.5 provides for inspection of all vehicles "which enter or leave United States Government property during performance of the work." Article 1.4 informed the contractor that site access would be through guarded gates located at Virginia Avenue and E Street. While these provisions do not explicitly say that inspections will take place on the site, no reasonable person would interpret them to mean anything else.

Conducting security inspections many blocks from the project site before leaving the inspected vehicles unsupervised on the streets of Washington, DC for up to 15 minutes is ridiculous. A driver with one accomplice could easily pick up explosives, weapons, or just about anything else on the way from the inspection station to the project

site. While AOC would have been entitled to explicitly mandate such a procedure, it did not do so.

No contractor could be expected to infer such a requirement from the contract specifications. Contrary to the conclusion in the contracting officer's final decision, the reference in article 3.5 to instructions and maps which would be provided to the contractor is not rendered meaningless if inspections were to occur on-site. The maps and instructions could have shown any number of things other than an off-site inspection location, including the location of the on-site inspections, the procedure for lining up for inspections, and the procedure and directions for leaving the inspection station.

Nor does the fact that the original version of Article 1.6 referenced the Capitol Police inspection station at P Street and S. Capitol Street indicate that inspections would occur off site. This language was stricken from the contract as part of addendum 3.[4] Hitt could not possibly be expected to make inferences concerning its contractual obligations based on language which had been removed from its contract. In fact, the removal of this language from the contract would only bolster the conclusion that inspections would be conducted on-site by demonstrating that AOC would explicitly specify the location of inspections if they were to be at a remote site.

Likewise, the direction in Article 1.6 to "coordinate" deliveries with the Capitol Police also supports the conclusion that inspections were to be conducted on-site. There would be no need to coordinate inspections if they were to take place at an established, permanently manned facility. In fact, Anderson never had to coordinate deliveries with the Capitol Police. The inspection station was open during defined hours, and Anderson's trucks simply had to report for inspection.

[4] See Exhibit 1

Nor was there any reason for Hitt205 or Anderson to contact the Capitol Police to find out where the inspections would be before entering the contract. The direction to coordinate deliveries with the Police does not imply that there is any need to contact them prior to award, but only when deliveries are to be scheduled. There was no direction to contact the Capitol Police to find out where inspections would be. If this had been required, AOC should have said so in the specification.

### C. Hitt's Claim Is Not Barred by the "No Damages for Delay" Clause

The contracting officer's final decision also relied on the "No Damages for Delay" clause contained in Article 14 of the contract's general conditions. Article 14 provides in relevant part that:

> **14.1** The Architect shall not be obligated or liable to the Contractor for, and the Contractor hereby expressly waives any claims against the Architect on account of any damages, of any nature whatsoever, which the Contractor, or its subcontractor at any tier may incur as a result of delays, interferences, disruptions, suspensions, changes in sequence or the like arising from or out of any act or omission of the Architect, it being understood and agreed that the Contractor's sole and exclusive remedy in such event shall be a reimbursement of direct costs necessarily incurred as a result of the foregoing causes, and an extension of the contract time, but only in accordance with the provisions of the Contract Documents.
>
> **14.2** For purposes of this Article, the term "Damages" shall include all indirect and/or impact costs which shall include, without limitation: Unabsorbed Home-Office Overhead (including calculations under the "Eichleay Formula"), Idle Labor and Equipment, Loss of Productivity, and Interest; the term "Damages" shall not include on-site direct costs, which shall include direct labor (superintendence, labor, time-keeping, and clerical work) direct materials and supplies (including material handling), direct equipment, restoration and cleanup, overhead and profit …

This provision does not bar Hitt's claim for additional trucking expenses because the claim is not for damages arising from delay, interference, disruption, or some similar cause. Even if it were, however, the direct equipment costs it claims are recoverable under the terms of the clause.

Article 14 is not a true No Damages for Delay clause, but only limits the types of costs that can be recovered. The costs which make up Anderson and Hitt's claim are not excluded by the terms of Article 14.

The exculpatory provisions of Article 14 apply only to damages resulting from "delays, interferences, disruptions, suspensions, changes in the sequence or the like." The damages claimed by Hitt and Anderson do not arise from any of these causes, but rather from a change in the contract specifications. Thus, Article 14 does not apply.

Even if it were applicable, however, Article 14 would not prevent Hitt and Anderson from recovering the damages claimed in this appeal. The only costs Hitt and Anderson claim in this appeal are the additional monies paid by Anderson to its trucking subcontractors as a result of the change in inspection location and a $.50 per ton premium charged to Anderson by its contaminated soil disposal subcontractor for the same reason. The only additions to these direct costs are Anderson's markup.[5] There is no field or home office overhead. There is no charge for idle labor or equipment. There is no interest. There are only direct equipment costs. Article 14.2 specifically excludes direct equipment costs such as these from the exculpatory provision of the No Damages for Delay clause. Hitt is entitled to recover these costs.

**D. Hitt's Claim Is Not Barred by the Severin Doctrine**

[5] Hitt also seeks a markup on Anderson's claim in accordance with the contract.

The contracting officer's final decision also cites *Severin v. United States, 99 Ct. Cl. 435 (1943)* as a basis for denying Hitt's claim. While *Severin* did hold that a general contractor could not pursue claims on behalf of a subcontractor unless it was liable to the subcontractor, the doctrine is limited and not applicable to this case. A long line of cases holds that prime contractors may pursue claims on behalf of their subcontractors even when they are only liable to the subcontractor if and to the extent that they are able to recover from the government. *See e.g. Keydata Corp. v. United States, 202 Ct. Cl. 467, 504 F.2d 1115 (1974); J.L Simmons Co. v. United States, 158 Ct. Cl. 393, 304 F.2d 886 (1962); Donovan Constr. Co. v. United States, 138 Ct. Cl. 97, 149 F.Supp. 898 (1957).*

*Donovan* is the most instructive of these cases. In it, the Court held that the general contractor could pursue a claim on behalf of its subcontractor where the subcontract provided that the contractor would pay the subcontractor for extra work "as and when" it received payment from the government.

This is precisely the arrangement that exists between Hitt and Anderson. Article 6 of the subcontract between Hitt and Anderson (Appeal File, Exhibit 2, pp. 6-7)[6] provides that Anderson will be entitled to an equitable adjustment "according to the same provisions as Contractor's equitable adjustment from the Owner," (Article 6.B.) and that Hitt "shall not be liable to [Anderson] on account of any adjustments or changes in the Subcontract Agreement price or time unless and until [Hitt] shall receive payment from Owner, which is an express condition precedent to payment to [Anderson]" (Article 6.D).

**E. CONCLUSION**

The only reasonable interpretation of the contract between Hitt and AOC is that vehicle inspections were to take place upon entrance to the project site. Conducting the

[6] Article 6 is attached as Exhibit 2

inspections at a remote location defeats their purpose. As a result, the government's decision to move the inspection station to a location several blocks away was a change to the contract entitling Hitt to an equitable adjustment. Hitt's claim is not barred by the contract's "No Damage for Delay" clause or the Severin doctrine. Hitt is entitled to summary judgment as to AOC's liability for the claim.

Respectfully Submitted,

/s/ M. Joseph Pierce________

M. Joseph Pierce, Esq.
Kasimer & Annino, P.C.
7653 Leesburg Pike
Falls Church, VA 22043
Phone: (703) 893-3914
Fax: (703) 893-6944

## CERTIFICATE OF FILING

I hereby certify that on the 26th day of March, 2008 a copy of the foregoing Plaintiff's Motion for Partial Summary Judgment, Plaintiff's Statement of Proposed Uncontroverted Facts and Memorandum was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ M. Joseph Pierce________

P:\Docs\Anderson\Hitt Contracting\AOC\Court of Claims\pleadingss\memo motion summary judgment.032508.doc

# EXHIBIT 1

2.1.3 The Contractor shall deliver the following submittals no later than 45 days of proposed installation or use:

2.1.3.1 "As-Built or Installed" wiring and piping diagrams (Specification Section 14212, Article 1.4.E)
2.1.3.2 Electronic Schematics
2.1.3.3 Maintenance Manuals
2.1.3.4 Electronic media submittal
2.1.3.5 Keys
2.1.3.6 Accessories
2.1.3.7 Redundant Parts
2.1.3.8 Project Warranty

## 3. SPECIAL SECURITY REQUIREMENTS

3.1 All personnel provided by the Contractor and employed on the site of the work will be subject to a security background investigation. Each employee will be required to fill out an I.D. Request Form and U.S. Capitol Police Request for check of Criminal History Records and each employee will be photographed and fingerprinted. The Contractor shall provide any assistance required by any of its employees in completing the forms.

3.2 Prior to commencement of work, the contractor and all designated on-site employees will be required, on a one-time basis, to be fingerprinted in Washington D.C. The location for the Electronic Fingerprinting Service is the U.S. Capitol Hill Police Headquarters, 119 D Street, N.E.

3.3 While security background investigations are in process, the Contractor's employees will NOT be allowed temporary permission to work at the site. Any of the Contractor's employees who are perceived by the Contracting Officer as a security risk as a result of evidence discovered in the background security investigation, will not be issued an Identification Card, will be denied access to the site of the work, and the Contractor will be directed to remove such employee from performance of any of the contract work, whether it be on or off the work site.

3.4 An identification card, with photograph, will be prepared for each employee of the Contractor requiring access to the site. The identification card shall be dated to indicate the period of time for which it is to remain valid - from the date the employee reports for duty until the applicable date which occurs first: the expiration of the contract, or the last date of the employee's tour of duty with the Contractor.

3.5 All vehicles, and contents, used by the Contractor or his subcontractors, which enter or leave United States Government property during performance of the work, will be subject to clearance, inspection and identification procedures conducted by the United States Capitol Police. Instructions and map(s) will be provided to the contractor upon award.

3.6 All persons entering the Legislative Branch Buildings shall gain access to the building by passing through a magnetometer. In addition, all handbags and all hand-carried items shall be screened by x-ray devices prior to their entry into the building.

3.7 The Contractor is fully responsible to return:

- The ID badge of any individual employee, including subcontractor personnel, who is removed for any reason including but not limited to illness, or dismissal:

H. Staging Plan: The A/E has indicated in plan where the Contractor can stage the construction and locate the construction trailer. Submit a Staging plan indicating specifically location of the superintendent's trailer, storage and loading of materials, traffic direction and control concept and signage, security perimeter of staging area, locations of informational construction signage, locations of temporary toilets and other temporary construction, emergency facilities and resources and any other construction facilities required.

I. Storage of Materials: Materials shall be stored in a dry location, off the ground and in such manner as to prevent damage or intrusion of foreign matter and avoid interference with the activities of the Government. All materials which, in the opinion of the CM or A/E, have become damaged or otherwise unfit for use during delivery or storage shall be immediately removed from the site of the work and replaced by the Contractor at no additional cost to the Government.

1. Materials, equipment, tools and appliances shall only be stored at locations previously approved by the CM.

J. Signs and Advertising: No signs, other than safety signs, may be erected at the site. The Contractor agrees not to refer to awards in commercial advertising in such manner as to state or imply that the product or service provided is endorsed or preferred by the Federal Government or is considered by the Government to be superior to other products or services.

1.6 SITE SECURITY

A. Use of the Site: During the construction period, the Contractor shall have use of the premises for construction activities as described below and elsewhere in the specifications.

1. All personnel entering the Capitol Power Plant grounds will be required to check in at a security gate.
2. Clearance: Special arrangements for all deliveries shall be arranged a minimum of 48 hours in advance of arrival to permit inspection by the United States Capitol Police. ~~The Police inspection station is on P Street and South Capitol Street S.E.~~ **Coordinate deliveries with the US Capital Police by contacting them at 202-224-0908.**
3. All temporary security entrances established by the contractor must be coordinated with the United States Capitol Police.

B. All personnel working at the site shall display an identification badge. Badging shall be provided by the Government.

1.7 WORK UNDER OTHER CONTRACTS

A. Currently there are two other contracts under way at this site. They are the Interim Coal

B. Temporary shutdown or isolation of portions of systems may be allowed when appropriately planned and requested. Appropriate planning shall include insuring adequate heating and cooling services as required by seasonal demands throughout the duration of the project.

C. The primary construction completion requirement shall be to have new chilled water generation capacity, Chiller Nos. 7, 8 and 9 fully operational as well as the supporting equipment available for continuous use on or before 30 April 2005.

D. The Contractor area of work is defined on the Contract Drawings. The area has been defined to allow the daily operation of the plant with minimal disruption due to construction activities; however, the Contractor shall cooperate to the fullest extent to avoid disruption of plant operations.

E. Ongoing plant operations shall include, but ~~out~~ not be limited to the following:

1. Generation and distribution of adequate chilled water capacity.
2. Generation and distribution of adequate steam capacity.
3. Firm electric capacity to serve all systems required to generate and distribute adequate chilled water and steam capacity. A primary source of power as well as an alternate source shall always be available for use in case of primary source failure.
4. Fuel oil delivery and storage to the existing underground bulk storage tank. Transfer from the bulk tank to the boiler plant.
5. Coal delivery and storage.
6. Coal Ash processing and removal.
7. Sewer main operation
8. Domestic Water Service.
9. Comprehensive Site Security
10. Delivery of Materials

## 1.4 SITE USE BY CONTRACTOR AND SITE ACCESS

A. The construction drawings indicate space available for Contractor use.

B. Site access for the Contractor shall primarily occur from Virginia Avenue with limited use of the service entrance from E Street. All access shall be through guarded gates and allowed only to secure personnel.

## 1.5 OPERATING HOURS FOR CONSTRUCTION ACTIVITIES

A. Typical construction period operating hours shall commence at 7:00 a.m. and continue until 6:00 p.m. Monday through Friday. Extended hours of operations, Saturday and Sunday working hours may be requested in writing. Requests will be reviewed and approval may be granted based on project benefit.

# EXHIBIT 2

E. If the Subcontractor shall fail to make full and timely payment of all monies due to its subcontractors, suppliers, or creditors, HITT may, at its option, withhold funds from Subcontractor's entitlement under this Agreement or any other funds owing to Subcontractor from any or all other contracts or agreements between Subcontractor and Contractor.

F. Pending final resolution of claims or disputes arising under this agreement, unless otherwise agreed in writing by Contractor, subcontractor shall proceed diligently with performance of the Subcontract and Contractor shall continue to make payments of undisputed sums in accordance with the Subcontract documents.

4. WORKMANSHIP

A. The Subcontractor warrants that all of its work shall be in strict conformity to all Contract Documents, building codes, applicable laws and regulations, performed in a first class workmanlike manner and that all of the Work will be free of defects in materials, workmanship or design for a period of one (1) year after the issuance of Final Certificate of Completion of the Project or such longer period of time as the Contract Documents shall require. Subcontractor agrees to correct any defect, latent or patent, arising within the warranty period, without additional cost.

B. The Subcontractor warrants that its shop drawings and design submittal shall be in compliance with the Contract Documents, building codes, and all applicable safety regulations and are prepared using the best engineering practices to produce a safe, functioning and efficient component of the Project.

C. Subcontractor agrees to immediately remove and replace any work or component which is determined nonconforming or defective.

D. Material which has become damaged in any way during storage, delivery and installation shall not be used and shall be replaced by subcontractor at no additional cost.

5. SUPERVISION.

The Subcontractor agrees to furnish a fit, experienced and competent supervisor, acceptable to the Contractor and authorized by Subcontractor to act on its behalf on all job matters at all times when the Work is in progress.

6. CHANGES.

A. Contractor or Owner may by written order, without invalidating the Agreement, make any changes within the general Scope of the Work at any time without notice to sureties. Subcontractor agrees to promptly execute such changes, additions, deletions or revisions without delay. If such changes cause an increase or decrease in the cost of the Work or in the time required for completion, Subcontractor shall submit to Contractor its claim for adjustment in cost or time within ten (10) days or such shorter time as the Contract Documents may require.

HITT



B. The Subcontractor acknowledges that he has visited and/or become familiar and informed as to the conditions of the premises and the extent of the work required. No consideration will be granted for any alleged oversight or misunderstanding of the work to be done. It is understood that all required items contained in the contract documents as well as that which is intended to provide a complete job in every respect, whether specifically stated or not, is included in the contract sum.

C. Subcontractor shall be entitled to an equitable adjustment of the Contract sum or time of performance only to the same extent and according to the same provisions as Contractor's equitable adjustment from the Owners. Subcontractor's allocable share of Contractor's equitable adjustment shall be fairly and reasonably determined by Contractor after allowance for Contractor's cost of presenting and recovering the claim including legal fees, normal overhead and profit and apportionments to other affected Subcontractors. Under no circumstances shall Subcontractor's entitlement exceed the Contractor's entitlement after deduction of the expenses and costs described above.

D. No claim of Subcontractor for additional compensation or time shall be allowed unless said change was expressly issued in writing by Owner and/or Contractor. In no case shall any adjustment of change in the Subcontract Agreement price be binding on Contractor unless accepted or approved by Owner, and Contractor shall not be liable to Subcontractor on account of any adjustments or change in the Subcontract Agreement price or time unless and until Contractor shall receive payment from Owner, which is an express condition precedent to payment to Subcontractor.

E. Under no circumstances shall Contractor be liable to Subcontractor for damages resulting from delays or acceleration of the work or loss of productivity. Contractor's liability to Subcontractor is strictly limited to allocation of damages recovered from and time extensions allowed by the Owner for the Subcontractor Scope of Work. Time extensions shall be Subcontractor's sole remedy for delays caused solely by the Contractor.

7. TERMINATION.

A. If the Subcontractor shall 1) fail to diligently prosecute the Work and to comply with all provisions of the Contract Documents, 2) cause directly or indirectly any stoppage or interference with the Work, 3) become insolvent or unable to pay all its debts as they become due, Contractor may, after giving 48 hours written notice, terminate this contract and take control over all materials and equipment on site and take all steps reasonably required to complete the work at Subcontractor's cost. Costs which shall be charged against the Subcontractor shall include, without limitation, all reasonably necessary materials, labor and supervision, equipment, rentals, transportation and lodging, indirect, field, general and administration costs reasonably related to the work including additional engineering fees, accounting fees, legal fees, liquidated damages, field and home office overhead and interest.