CONTRACT APPEALS BOARD
HOUSE OFFICE BUILDING COMMISSION
441 G Street, N.W.
Washington, D.C. 20548

| | |
|---|---|
| APPEAL OF: | : |
| | : |
| HITT CONTRACTING, INC. | : |
| (The Anderson Company, L.L.C., Subcontractor) | : |
| AOC Contract No. 0300012 | : CAB No. 2006-1(HOPC) |

# SUPPLEMENT TO APPEAL FILE

*Kasimer & Annino, PC*
*7653 Leesburg Pike*
*Falls Church, Virginia 22043*
*(703) 893-3914*

CONTRACT APPEALS BOARD
HOUSE OFFICE BUILDING COMMISSION
441 G Street, N.W.
Washington, D.C. 20548

APPEAL OF: :

HITT CONTRACTING, INC. :
(The Anderson Company, L.L.C., Subcontractor) :
AOC Contract No. 0300012 : CAB No. 2006-1 (HOPC)

**SUPPLEMENT TO APPEAL FILE**

Pursuant to Rule 4(b) of the Rules of the Contract Appeals Board, Hitt Contracting, Inc., and its subcontractor, The Anderson Company, L.L.C. submit the following documents to be included in the appeal file:

1. October 6, 2006 claim update from The Anderson Company, L.L.C. to Hitt Contracting, Inc.

2. May 2, 2006 claim update from The Anderson Company, L.L.C. to Hitt Contracting, Inc.

Respectfully submitted,

By: ______________________

Joseph H. Kasimer, Esq.
M. Joseph Pierce, Esq.
Kasimer & Annino, P.C.
7653 Leesburg Pike
Falls Church, VA 22043
Phone: (703) 893-3914
Fax: (703) 893-6944
Attorney for Appellant

By: ______________________

Mark S. Dachille, Esq.
Huddles & Jones, P.C.
5457 Twin Knolls Road
Columbia, MD 21045
Phone: (301) 621-4120
Fax: (301) 621-4473
Attorney for Appellant

CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing Supplement to Appeal File was mailed via overnight mail this 21st day of July, 2006 to:

Peter F. Kushner, Esq.
William T.K. Dolan, Esq.
Office of General Counsel
265A Ford House Office Building
c/o Architect of the Capitol
U.S. Capitol
Washington, D.C. 20515-8000

Vivian Katsantonis, Esq.
Mark A. Sgarlata, Esq.
Watt, Tieder, Hoffar & Fitzgerald
7929 West Park Drive
Suite 400
McLean, VA 22102

M. Joseph Pierce

THE ANDERSON COMPANY, L.L.C.
9469 HAWKINS DRIVE
MANASSAS, VIRGINIA 20109

06 October 2005

Mr. Jerry Brandmueller
Hitt Contracting, Inc.
2704 Dorr Avenue
Fairfax, VA 22031

Re: West Refrigeration Plant Expansion TAC Job # A2315
Subject: Updated Truck Inspections Claim

Dear Jerry,

The Anderson Company, LLC is pleased to provide our updated truck inspections claim to Hitt Contracting for The West Refrigeration Plant Expansion Project. Per our last update which covered all loads of material and equipment through the end of December 2004, the cost of the claim was $243,256.50. Per the attached spread sheet, the additional cost incurred between January 2005 and September 2005 is $20,180.00. This brings the total claim amount through the end of September 2005 to $263,436.50.

Should you have any questions or require any further clarification, please do not hesitate to call.

Very Truly Yours,

Jason Brown
PM Division Manager
The Anderson Company, LLC

JB/lls

Cc: File 2315-19



PHONE:(703) 393-4000
FAX: (703) 393-4010

WEST REFRIGERATION PLANT
TAC JOB # 2315
MONTHLY BREAKDOWN OF LOADS TO & FROM PROJECT

| MONTH | DESCRIPTION | LOADS | IMPACT | ADDITIONAL TIME | UNIT | RATE | TOTAL |
|---|---|---|---|---|---|---|---|
| 1/1/2005 | TOTAL LOADS TO AND FROM SITE IN JANUARY 2005 | | | | | | |
| | BORROW LOADS (DUMP TRUCKS) | 13 | 30 MINUTES | 6.5 | HRS | 65.00 | 422.50 |
| | | | | | SUBTOTAL = | | 422.50 |
| 2/1/2005 | TOTAL LOADS TO AND FROM SITE IN FEBRUARY 2005 | | | | | | |
| | REGULAR DEMOLITION LOADS (DUMP TRUCKS) | 21 | 30 MINUTES | 10.5 | HRS | 85.00 | 892.50 |
| | | | | | SUBTOTAL = | | 892.50 |
| 4/1/2005 | TOTAL LOADS TO AND FROM SITE IN APRIL 2005 | | | | | | |
| | REGULAR DEMOLITION LOADS (DUMP TRUCKS) | 6 | 30 MINUTES | 3 | HRS | 65.00 | 195.00 |
| | BORROW LOADS (DUMP TRUCKS) | 172 | 30 MINUTES | 86 | HRS | 65.00 | 5,590.00 |
| | | | | | SUBTOTAL = | | 5,785.00 |
| 5/1/2005 | TOTAL LOADS TO AND FROM SITE IN MAY 2005 | | | | | | |
| | REGULAR DEMOLITION LOADS (DUMP TRUCKS) | 20 | 30 MINUTES | 10 | HRS | 65.00 | 650.00 |
| | BORROW LOADS (DUMP TRUCKS) | 20 | 30 MINUTES | 10 | HRS | 65.00 | 650.00 |
| | | | | | SUBTOTAL = | | 1,300.00 |
| 6/1/2005 | TOTAL LOADS TO AND FROM SITE IN JUNE 2005 | | | | | | |
| | REGULAR DEMOLITION LOADS (DUMP TRUCKS) | 26 | 30 MINUTES | 13 | HRS | 65.00 | 845.00 |
| | BORROW LOADS (DUMP TRUCKS) | 44 | 30 MINUTES | 22 | HRS | 65.00 | 1,430.00 |
| | | | | | SUBTOTAL = | | 2,275.00 |
| 7/1/2005 | TOTAL LOADS TO AND FROM SITE IN JULY 2005 | | | | | | |
| | BORROW LOADS (DUMP TRUCKS) | 24 | 30 MINUTES | 12 | HRS | 65.00 | 780.00 |
| | | | | | SUBTOTAL = | | 780.00 |
| 9/1/2005 | TOTAL LOADS TO AND FROM SITE IN SEPTEMBER 2005 | | | | | | |
| | REGULAR DEMOLITION LOADS (DUMP TRUCKS) | 10 | 30 MINUTES | 5 | HRS | 85.00 | 425.00 |
| | | | | | SUBTOTAL = | | 425.00 |
| | SERVICE TRUCK FOR FUEL & SERVICE PROJECT HAS WORKED 87 DAYS FROM JANUARY 2005 TO SEPTEMBER 2005 | 87 | 30 MINUTES | 43.5 | HRS | 100.00 | 4,350.00 |
| | | | | | SUBTOTAL = | | 4,350.00 |
| | EQUIPMENT MOVES THERE HAVE BEEN 79 EQUIPMENT MOVES FROM JANUARY 2005 TO SEPTEMBER 2005 | 79 | 30 MINUTES | 39.5 | HRS | 100.00 | 3,950.00 |
| | | | | | SUBTOTAL = | | 3,950.00 |
| | | | | | TOTAL = | | $20,180.00 |

THE ANDERSON COMPANY

9469 Hawkins Drive
Manassas, Virginia 20109
Phone: 703-393-4000
Fax: 703-393-4010
www.TheAnderco.com

May 2, 2006

Mr Jerry Brandmueller
Hitt Contracting, Inc.
2704 Dorr Avenue
Fairfax, VA 22031

Re: West Refrigeration Plant Expansion TAC Job # A2315
Subject: Updated Truck Inspections Claim (Final)

Dear Jerry,

The Anderson Company, LLC is pleased to provide our updated truck inspections claim to Hitt Contracting for The West Refrigeration Plant Expansion Project. Per our last update which covered all loads of material and equipment through the end of September 2005, the cost of the claim was $263,436.50. Per the attached spread sheet, the additional cost incurred between October 2005 and April 2006 is $14,895.00. This brings the total claim amount through the end of April 2006 to $278,331.50.

Should you have any questions or require any further clarification, please do not hesitate to call.

Very Truly Yours,

Jason Brown
PM Division Manager
The Anderson Company, LLC

Cc: File 2315-19

07/20/2006 07:52 7033934980 THE ANDERSON COMPANY PAGE 03/09

WEST REFRIGERATION PLANT
TAC JOB # 2315
MONTHLY BREAKDOWN OF LOADS TO & FROM PROJECT

| MONTH | DESCRIPTION | LOADS | IMPACT | ADDITIONAL TIME | UNIT | RATE | TOTAL |
|---|---|---|---|---|---|---|---|
| 10/1/2005 | *TOTAL LOADS TO AND FROM SITE IN OCTOBER 2005* | | | | | | |
| | BORROW LOADS (DUMP TRUCKS) | 0 | 30 MINUTES | 0 | HRS | 65.00 | - |
| | SPOIL LOADS (DUMP TRUCKS) | 63 | 30 MINUTES | 31.5 | HRS | 65.00 | 2,047.50 |
| | | | | | SUBTOTAL = | | 2,047.50 |
| 11/1/2005 | *TOTAL LOADS TO AND FROM SITE IN NOVEMBER 2005* | | | | | | |
| | SPOIL LOADS (DUMP TRUCKS) | 42 | 30 MINUTES | 21 | HRS | 65.00 | 1,365.00 |
| | REGULAR DEMOLITION LOADS (DUMP TRUCKS) | 3 | 30 MINUTES | 1.5 | HRS | 65.00 | 97.50 |
| | | | | | SUBTOTAL = | | 1,462.50 |
| 12/1/2005 | *TOTAL LOADS TO AND FROM SITE IN DECEMBER 2005* | | | | | | |
| | REGULAR DEMOLITION LOADS (DUMP TRUCKS) | 11 | 30 MINUTES | 5.5 | HRS | 65.00 | 357.50 |
| | BORROW LOADS (DUMP TRUCKS) | 17 | 30 MINUTES | 8.5 | HRS | 65.00 | 552.50 |
| | SPOIL LOADS (DUMP TRUCKS) | 77 | 30 MINUTES | 38.5 | HRS | 65.00 | 2,502.50 |
| | | | | | SUBTOTAL = | | 3,412.50 |
| 1/1/2006 | *TOTAL LOADS TO AND FROM SITE IN JANUARY 2006* | | | | | | |
| | REGULAR DEMOLITION LOADS (DUMP TRUCKS) | 0 | 30 MINUTES | 0 | HRS | 65.00 | - |
| | BORROW LOADS (DUMP TRUCKS) | 0 | 30 MINUTES | 0 | HRS | 65.00 | - |
| | | | | | SUBTOTAL = | | - |
| 2/1/2006 | *TOTAL LOADS TO AND FROM SITE IN FEBRUARY 2006* | | | | | | |
| | SPOIL LOADS (DUMP TRUCKS) | 27 | 30 MINUTES | 13.5 | HRS | 65.00 | 877.50 |
| | BORROW LOADS (DUMP TRUCKS) | 80 | 30 MINUTES | 40 | HRS | 65.00 | 2,600.00 |
| | | | | | SUBTOTAL = | | 3,477.50 |
| 3/1/2006 | *TOTAL LOADS TO AND FROM SITE IN MARCH 2006* | | | | | | |
| | BORROW LOADS (DUMP TRUCKS) | 6 | 30 MINUTES | 3 | HRS | 65.00 | 195.00 |
| | | | | | SUBTOTAL = | | 195.00 |
| 4/1/2006 | *TOTAL LOADS TO AND FROM SITE IN APRIL 2006* | | | | | | |
| | REGULAR DEMOLITION LOADS (DUMP TRUCKS) | 0 | 30 MINUTES | 0 | HRS | 85.00 | - |
| | | | | | SUBTOTAL = | | - |
| | *SERVICE TRUCK FOR FUEL & SERVICE* | | | | | | |
| | PROJECT HAS WORKED 44 DAYS FROM OCTOBER 2005 TO MARCH 2006 | 44 | 30 MINUTES | 22 | HRS | 100.00 | 2,200.00 |
| | | | | | SUBTOTAL = | | 2,200.00 |
| | *EQUIPMENT MOVES* | | | | | | |
| | THERE HAVE BEEN 42 EQUIPMENT MOVES FROM OCTOBER 2005 TO MARCH 2006 | 42 | 30 MINUTES | 21 | HRS | 100.00 | 2,100.00 |
| | | | | | SUBTOTAL = | | 2,100.00 |
| | | | | | TOTAL = | | $14,895.00 |

1

CONTRACT APPEALS BOARD
House Office Building Commission
411 G Street
Washington, D.C. 20548

--------------x
:
APPEAL OF: :
:
HITT CONTRACTING INC. : CAB No. 2006-1 (HOBC)
(The Anderson Company, :
L.L.C., Subcontractor) :
:
AOC Contract No. 030012 :
:
--------------x

Deposition of JASON BROWN
McLean, Virginia
Thursday, December 28, 2006
9:30 a.m.

Job No. 1-93850
Pages 1 - 177
Reported by: Paula J. Eastes

2

Deposition of JASON BROWN, held at the offices of:

WATT, TIEDER, HOFFAR & FITZGERALD, L.L.P.
8405 Greensboro Drive
Suite 100
McLean, Virginia 22102

Pursuant to agreement, before Paula J. Eastes, Court Reporter and Notary Public in and for the Commonwealth of Virginia.

3

APPEARANCES

ON BEHALF OF THE ARCHITECT OF THE CAPITOL

C. WILLIAM GROSCUP, ESQUIRE
Watt, Tieder, Hoffar & Fitzgerald, L.L.P.
8405 Greensboro Drive
Suite 100
McLean, Virginia 22102
(703) 749-1000

ON BEHALF OF THE ANDERSON COMPANY, LLC:

M. JOSEPH PIERCE, ESQUIRE
Kasimer & Annino, P.C.
7653 Leesburg Pike
Falls Church, Virginia 22043
(703) 893-3914

4

APPEARANCES

ALSO PRESENT:

CHARLES H. ILIFF, JR., P.E.
Engineer's Office
U.S. Capitol Power Plant
Senior Project Manager
Architect of the Capitol

JERRY BRANDMUELLER (TELEPHONIC)
HITT Contracting Inc.

5

CONTENTS


| EXAMINATION OF JASON BROWN | PAGE |
|---|---|
| By Mr. Groscup | 7 |


EXHIBITS

(Exhibits attached to the transcript.)


| DEPOSITION EXHIBITS | PAGE |
|---|---|
| No. 1 Report of Hugh McGee | 40 |
| No. 2 Photographs | 67 |
| No. 3 Subcontract | 72 |
| No. 4 Section 01100 Specification dated September 30, 2002 | 83 |
| No. 5 Section 01100 Specification dated January 6, 2003 - Amendment 3 | 88 |
| No. 6 Contract Provisions | 108 |
| No. 7 Letter to Stephen Schoenefeldt from Jason Brown dated June 13, 2003 | 108 |
| No. 8 Letter to Stephen Schoenefeld from Stuart Himelfarb dated November 25, 2003 | 108 |
| No. 9 Document and Map - 40 P Street, S.E. | 134 |
| No. 10 Letter to Stephen Schoenefeld from Jason Brown dated October 14, 2003 | 146 |


6

EXHIBITS

(Exhibits attached to transcript.)


| DEPOSITION EXHIBITS | PAGE |
|---|---|
| No. 11 Letter to Mr. Mologne of HILL International from Stephen Schoenefeldt dated September 11, 2003 | 154 |
| No. 12 Letter to Jerry Brandmueller from Mike Keegan dated May 25, 2004 | 161 |
| No. 13 Letter to Mike Keegan from Jerry Brandmueller dated September 22, 2004 | 161 |
| No. 14 Letter to Mark Dachille from Mr. Pierce | 167 |


7

PROCEEDINGS

JASON BROWN

having been duly sworn, testified as follows:

EXAMINATION BY COUNSEL FOR THE ARCHITECT OF THE CAPITOL

BY MR. GROSCUP:

Q Good morning, Mr. Brown.
My name is Bill Groscup and I represent the Architect of the Capitol. Sometimes we abbreviate that as AOC.
You understand when I am saying AOC I am referring to the Architect of the Capitol, right?
A **Yes. I do.**
Q You have been to a number of these depositions before.
MR. GROSCUP: Actually before we get to some of the ground rules, Joe, we will do all the standard stipulations. All objections except as to form are reserved until the time of the hearing.
Is that fair?
MR. PIERCE: Yes.
MR. GROSCUP: And as I understand it,

8

Mr. Brown wants to read and sign his transcript.
Is that right?
MR. PIERCE: That is correct.
BY MR. GROSCUP:
Q With regard to the ground rules, Mr. Brown you have been to some of these earlier depositions.
Have you ever yourself had a deposition taken before?
A **Yes. I have.**
Q How many times?
A **Once.**
Q Was that a construction matter?
A **Yes. It was.**
Q How many years ago was that?
THE WITNESS: Two? A year-and-a-half? Two?
MR. PIERCE: I think it was like two.
BY MR. GROSCUP:
Q And Kasimer & Annino was representing Anderson in that matter as well?
A **That is correct.**
Q Was that a schedule delay claim or what wa

9

the nature of that dispute?
A **I guess a non-payment Change Order issue.**
Q Non-payment by a general contractor?
A **General contractor and owner.**
Q Was that on this project?
A **No.**
Q Nothing to do with the Architect of the Capitol?
A **No. It was not.**
Q With regard to the ground rules, I know that you have sat for a number of these depositions.
You understand that I am going to be asking you questions and you need to answer my questions audibly?
A **Yes.**
Q And that the Court Reporter will be taking down everything that I say, everything you say, everything that Mr. Pierce may say in terms of objections and so forth and so on.
Okay?
A **Yes.**
Q And you understand that unless Mr. Pierce

10

instructs you not to answer the question, he may object, but you can go ahead and answer the question.
Is that fair?
A **Yes.**
Q If you need to take a break at any time for any reason, if you smoke, if you need to use the restroom, if you need to grab a cup of coffee, simply let me know and I will be glad to accommodate you. The only caveat to that is if there is a question pending, I will ask that you answer my question and then take a break.
Is that fair?
A **Yes.**
Q Are you on any medication or anything of that nature that will prevent you from offering your best testimony here today?
A **No.**
Q What is your current title at Anderson?
A **I am a Division Manager.**
Q How long have you been with Anderson?
A **Approximately six and a half years.**
Q How old are you, Mr. Brown?

11

A **28.**
Q Did you come to Anderson fresh out of college?
A **Yes. I did.**
Q Where did you go to college?
A **Virginia Military Institute.**
Q Were you in construction prior to going to college?
A **Yes. Through summer work and stuff.**
Q How about prior to college? Were you working in the construction field?
A **Yes.**
Q In the summers?
A **Yes. Summers.**
Q What type of construction work were you doing?
A **I did signal lights, signage structures, underground stuff like that.**
Q How long have you been a Division Manager for Anderson?
A **I would say a little over two years I believe.**

12

Q What was your prior position?
A **Project Manager.**
Q You were Project Manager on the West Refrigeration Plant Expansion Project; is that right?
A **That is correct.**
Q Were you Anderson's only Project Manager on that job?
A **After I was promoted to Division Manager I had a Project Manager who kind of took care of some of the paperwork things for it, but essentially I still oversaw that project as the Project Manager.**
Q From Anderson's perspective that project started in roughly what?
June of 2003; is that right?
A **That is correct.**
Q Has Anderson been closed out on that project by the general contractor HITT?
A **No. We have not.**
Q What is Anderson's current contract value, if you recall, on the West Refrigeration Plant Expansion Project?
A **It is close to $4 million I believe.**

Q Your original contract value was in the neighborhood of $2.076 million; is that right?
A **Yes.**
Q And so there have been roughly what? $2 million of Change Orders?
A **Approximately. A little less than that. But approximately.**
Q Have any of those Change Orders related to contaminated soil?
A **Yes. They have.**
Q What is the approximate value of the contaminated soil Change Orders?
A **I would say somewhere of a million and a half, I believe, if I am doing the numbers right in my head.**
Q The West Refrigeration Plant Expansion, so I don't have to keep on saying that whole deal, you understand what I am talking about, the project I am talking about, the West Refrigeration Plant Expansion Project built by HITT and Anderson for the Architect of the Capitol?
A **That is correct.**



Q With regard to the project, do you recall that originally there was only going to be approximately 140 tons of contaminated soil?
A **That was included in our contract. Yes.**
Q So, in your base scope there was approximately 140 tons of contaminated soil; is that right?
A **That is correct.**
Q And the amount of contaminated soil increased probably substantially from 140 tons of contaminated soil to ultimately in excess of 42,000 tons; is that right?
A **That is correct.**
Q And the mod that Anderson received for contaminated soil in the neighborhood of $1.5 million was that mod in relation to the increase of contaminated soil from approximately 140 tons to in excess of 42,000 tons?
A **That is correct.**
Q Were there a series of mods related to that or was it just one mod?
A **I believe there was a couple.**



**I can check, but I believe there was more than one.**
Q You believe there was more than one mod that related to the contaminated soil?
A **I believe so.**
Q Was Anderson aware of the fact that HITT was receiving mods from the owner relative to the contaminated soil issue?
A **I am not sure if we were aware. We assumed that it was a known change.**
Q Did HITT ever disclose to Anderson the negotiated rate it was receiving from AOC relative to contaminated soil?
A **Not to my knowledge.**
Q There was nothing they ever disclosed to you at any rate, right?
A **Not that I can remember. No.**
Q Did you ever ask them?
A **No, sir.**
Q You recall that your unit rate for contaminated soil excavation and removal was $35 a ton in your subcontract?



A **That is correct.**
Q Did that rate change pursuant to the job modifications?
A **No. It did not. Not that I recall.**
Q Did HITT ever ask Anderson to lower its unit rate for contaminated soil excavation and removal from $35 a ton down to some lower number?
A **I don't remember if they did.**
Q Were there negotiations between Anderson and HITT relative to contaminated soil modifications?
A **There were numerous discussions about the modifications I am sure.**
Q Were you part of those discussions?
A **Yes. The majority of them.**
Q Were you taking a lead role on behalf of Anderson relative to the negotiations with HITT on those contaminated soil mods?
A **Yes.**
Q Was anybody else from Anderson involved in those negotiations?
A **Stuart Himelfarb would have been.**
Q Mr. Himelfarb, does he have an ownership

17

interest in Anderson?
A **Yes. He does.**
Q What percentage, if you know?
A **I am not exactly sure.**
Q Who else owns Anderson?
A **Jim Anderson and Mike Holupka.**
Q So, the owners of Anderson are Stuart Himelfarb, Jim Anderson and Michael Holupka?
A **Yes.**
Q That is it?
A **Yes.**
Q But you don't know the respective ownership interest of any of these gentlemen in the company?
A **I am not exactly sure of the percentages. I have known from time to time, but they have been changing.**
Q Now, when you were negotiating these modifications with HITT relative to contaminated soil I take it you were already aware of the fact that the truck inspections were going to be off-site; is that right?
A **Once we were doing the project we were**

18

**aware. Yes.**
Q And the modifications came about after doing the project, right?
A **That is correct.**
Q So, at the time you were entering the negotiations with HITT relative to these modifications for contaminated soil you already knew that the truck inspection locations were going to be done by the Capitol Police off-site.
Is that fair?
A **That is correct.**
Q Did you factor the location of the truck inspections into your negotiations with HITT on the contaminated soil?
A **No, sir. We did not.**
Q Why not?
A **We were handling that separate because there is a claim that the contract unit rate was used for the modifications.**
Q I appreciate the fact that it is Christmas and you may not have been back to the office and you have family in town, as I understand it from your

19

counsel. But we don't have those modifications here.
You didn't bring those with you, did you?
A **No. I did not.**
Q Do you recall whether those modifications have release language in them?
Do you understand what I am asking about?
A **I do.**
**I don't recall the exact language. I am sure it has some form of language on it.**
Q Do you recall whether those modifications have language in them in terms of the release language which would indicate that this would be payment in full for the contaminated soil?
A **I don't recall the exact language. Most of them have something similar to that, but I don't recall the exact language.**
Q Do you recall including in the modification language any carve out indicating that you were exempting out the truck inspection claim from those modifications?
A **No. I don't recall.**
Q You don't recall that being in there or you

20

don't recall whether it is in there one way or the other?
A **I don't recall it being in there.**
Q Do you recall ever expressly discussing with anyone at HITT that you were intending to carve out from the contaminated soil mods the truck inspection claim issue?
A **I am sure we probably at some point had discussions about it. They knew, we were pretty clear, that every truck that came in and out of the site we were seeking additional compensation for on the separate issue. The claim I guess you would call it.**
Q Did you regard the additional quantity of contaminated soil, meaning the 42,000 tons of contaminated soil, to be a change to the contract?
A **Yes.**
Q And at the time the contract was being changed through these modifications you were aware that the Capitol Police would be inspecting your trucks off-site, right?
A **That is correct.**

Q Do you recall whether HITT was aware of Anderson's claim concerning truck inspections at the time the contaminated soil mods were being negotiated with Anderson?
MR. PIERCE: Objection. Calls for speculation.
BY MR. GROSCUP:
Q Just if you know.
**A Could you repeat that one more time?**
Q It was a little wordy. I apologize.
You said that you had taken a lead role in negotiating the contaminated soil mods with HITT.
Is that fair?
**A That is correct.**
Q At the time you were negotiating that issue with HITT, do you know whether HITT was aware of your claim concerning the truck inspection issue?
MR. PIERCE: Same objection.
Go ahead.
THE WITNESS: Yes. I believe they were aware. Yes.
BY MR. GROSCUP:



Q So, you believe that HITT was aware of your truck inspection claim at the time that they were negotiating the contaminated soil mods with Anderson.
Is that fair?
**A The actual modifications which were just based on the unit rate, yes.**
Q Mr. Brown, did you do, or did Anderson do, any take-off in terms of the total quantity of tons of material that was excavated and removed from the project?
**A The total tonnage?**
Q Yes.
**A No. We don't. We deal in cubic yards. We don't do tonnages except for contaminated soil which has to be manifested and weighed via tons.**
Q Anderson would be aware of the tonnage for contaminated soil because of the manifesting requirements.
Is that fair?
**A That is correct. That is the only reason we would track tonnages. It would be because it was manifested material.**



Q Do you recall whether contaminated soil ended up being approximately two-thirds of the total amount of material that was removed from the project?
**A No. I don't believe it was that high.**
Q Do you believe it was over half?
**A I could get the information for you easily. I don't recall off the top of my head. I don't believe it was.**
Q How would you go about getting that information?
**A We have a take-off on how much volume and material that we remove from the site.**
Q A take-off prepared as part of the bid?
**A That is correct.**
Q Were you involved in the bidding process on this project?
**A No. I was not.**
Q Was that Mr. Himelfarb?
**A That would have been Stuart and his estimators. Yes.**
Q Who were Mr. Himelfarb's estimators on this project?



**A Yun Kim and Mo Tavousi are his two estimators. They could have both had a part in the project or one of them could have done a take-off on it.**
**Then Pete Couture also assisted in it with the demolition inspection.**
Q Are all three of those individuals you just mentioned in terms of Mr. Kim, Mr. Tavousi and Mr. Couture still employed by Anderson?
**A Mr. Kim and Tavousi still are. Mr. Couture is no longer employed by the company.**
Q Are you aware of whether the bid package, the estimates, the take-offs, things of that nature, still exist?
**A We have a green book that contains all the estimated information. As far as the actual estimate itself, I am not aware if it still exists.**
Q You mentioned this green book. What is contained in the green book that contains this type of bid information?
**A Basically all of our budget for the project, all the quantities and stuff and how we**

figure, what we figured on it.
Q In terms of all the quantities, that would include all the estimated quantities of excavation?
A **Of excavation. Yes.**
Q Now, when the contract was changed in terms of the amount of contaminated soil was increased, did that alter the total amount of scope of material to be excavated from the project?
A **No. It did not.**
Q So, the total amount of material remained fixed, but the percentage between the non-contaminated and the contaminated changed.
Is that fair?
A **Yes.**
Q When the amount of contaminated material went up from roughly 140 tons to in excess of 42,000 tons, then the amount of non-contaminated material would have decreased commensurately.
Is that fair?
A **Yes.**
Q Did Anderson offer HITT a credit from its base contract relative to the approximately 42,000 ton



decrease in the amount of non-contaminated material?
A **I don't recall if we did.**
Q You have no recollection of Anderson having offered a credit to HITT on that issue?
A **No.**
Q Did HITT ever ask for one?
A **I vaguely recall, but I wouldn't be able to swear to it, I vaguely recall them asking if there was anything we could do at the time possibly.**
Q Do you recall how much profit Anderson has earned to date on this contract, this subcontract?
A **No. I don't. I don't know the exact numbers. I did know before, but I don't recall anything now.**
Q What documents within Anderson would show that information?
A **We have cost reports.**
MR. GROSCUP: Jeff, for the record I would like a copy of the cost reports and also all the information in the green book and any other information that would pertain to the bid that Anderson prepared on the West Refrigeration Plant



Expansion Project.
MR. PIERCE: I will look at it. I am not agreeing to produce it at this time.
MR. GROSCUP: I just want to make the request.
MR. PIERCE: Sure.
BY MR. GROSCUP:
Q Regardless of what the exact amount of profit has been to date for Anderson on the West Refrigeration Plant Expansion subcontract, you do recall this is a profitable job for Anderson, correct?
A **Marginally.**
Q When you say this job was marginally profitable, do you recall whether the profit earned on this job thus far has exceeded the profit projected when Anderson estimated this job?
A **I believe that it did at one point, but it has been steadily decreasing since that. So, I am not exactly sure of what it is at this point in time. It is close I believe.**
Q When you say it has been steadily decreasing recently, do you know what is causing that?



A **There is multiple reasons causing it. You know, all the increased trucking stuff. It was a tough project all in all.**
Q In terms of the trucking issue, you are talking about the claim that we are here talking about today?
A **That is correct.**
Q So, the $185,000 claim that Anderson has submitted to HITT and to AOC is what you are referring to that has caused the job not to be as profitable as it once was?
A **That is the main factor. That is correct.**
Q And the bulk of those costs were incurred by Anderson several years ago.
Is that fair?
A **Yes. The bulk of them were. That is correct.**
Q A year ago was this job more profitable from Anderson's perspective than it is today?
A **I would say yes just because of legal fees.**
Q The legal fees are being taken out of your overall project budget?

A I am not sure exactly how they apply them. In my eyes that is where they would come from.
Q Other than the take-off, are there any other documents that would show us the total haul-off on the project?
A That would all be included in that. The daily reports would show how much material was removed from the project.
Q Do you recall when Anderson first learned that the Capitol Police would be inspecting Anderson's trucks off-site?
A Roughly around June 13th of 2003. Somewhere within a couple of days of that day.
Q And we will get to that.
You have a letter dated June 13th, 2003 where you notified HITT of Anderson's claim relative to the truck inspection issue; is that right?
A That is correct.
Q Do you recall how many days in advance of that letter you learned about the off-site location of the Capitol Police's truck inspection location?
A I believe the inspection occurred, the



first inspection occurred, on a Saturday I believe and the letter was written on a Monday.
Q With regard to the haul-off issue, Mr. Brown, we were talking about a moment ago, would your dailies differentiate between the estimated quantity of haul-off versus the actual quantity of haul-off?
A No. They would not.
Q Would there be any document within Anderson that would illustrate or show the estimated quantity of the haul-off versus the actual quantity of haul-off?
A No. There wouldn't.
Q There is nothing within Anderson that tracks that information?
A It would be a standard spreadsheet of just tracking the actual quantity if it was kept up-to-date of how much went off. I am not aware that that was completed on this one.
Q You don't believe that was kept up-to-date on this project?
A I know they ended up very close, the



actuals versus the estimated. I don't have an up-to-date one through the end of the project that shows the total number of loads hauled off versus what was estimated.
Q So, you believe that the actual quantity of haul-off roughly approximated the estimated quantity on this job?
A It was close.
Q You indicated a moment ago that your June 13th, 2003 letter to HITT was written on a Monday and that the first inspection off-site occurred on a Saturday; is that right?
A I think so, if memory serves me right. The first date was noted in our daily reports.
Q How is it that the truck ended up going to the 3rd and Constitution location on that particular Saturday?
Somebody must have told Anderson to go there, correct?
A That is correct. Someone at the site told our superintendent where the truck would have to go to.



Q Who was the superintendent?
A At that time I believe it was Pete Couture.
Q Mr. Couture is the same individual who may have been involved in preparing the estimate?
A He assisted in the estimate. He assisted on demolition estimates.
Q Were you on site the day that Anderson learned where the truck inspections were to occur?
A No. I was not.
Q Who did you hear about this from?
A From Pete Couture and from Henry Hernandez.
Q Who is Henry Hernandez?
A He would be the general superintendent for that area at the time.
Q And what was Mr. Couture's job title?
A Superintendent.
Q So, was Mr. Couture above Mr. Hernandez?
A No. Pete Couture worked for Henry.
Q Was it Mr. Couture or Mr. Hernandez that was told as to where the trucks were to be inspected?
A I don't recall. I believe it was Mr. Couture. He was on site. More than likely it

**would have been him.**
Q Was it something that Mr. Couture learned about before that Saturday, like the day before?
A **I am not aware. I know I got a phone call saying where it was going to be.**
Q Did Mr. Couture indicate to you that somebody at AOC told him this, somebody at HITT told him this, somebody at Capitol Police told him this?
How did he learn?
A **I don't recall. I don't know if it was the police or a combination. I don't know.**
Q As you sit here today, you have no knowledge as to actually how Mr. Couture came to learn that the Capitol Police would be inspecting Anderson's trucks at 3rd and Constitution?
A **No.**
**I believe on his daily he wrote that the Capitol Police are telling them that they had to go downtown for the inspection I believe.**
Q Has Anderson produced Mr. Couture's dailies?
A **Yes. We have.**



Q You believe that Mr. Couture's dailies indicate the Capitol Police told him that the trucks would have to go downtown?
A **He has a note on the side of it of now being told by police, I believe is what it says, if memory serves me right. It would have been the daily before June 13th in the set.**
Q It would have been the June 11th daily since that was a Saturday?
A **If that is what the dates were. It would have been the first daily before the letter.**
Q Do you recall any other dailies in around that time that pertained at all to the truck inspection claim issue?
A **No.**
Q After Anderson learned that the truck inspections by Capitol Police were to occur at 3rd and Constitution Avenue rather than on the project site, were you tasked with analyzing the prime contract to determine whether that was a change?
A **With analyzing the prime, we felt it was a change to our contract. We didn't really have any**



**further information besides what we were provided in our contract documents.**
Q Were you tasked with analyzing Anderson's subcontract in terms of determining whether this was a change to the subcontract?
A **Yes.**
Q Who asked you to do that?
A **I probably took it upon myself. I would have discussed it with Stuart obviously.**
Q You indicated that you took it upon yourself to analyze the Anderson/Hitt subcontract in terms of determining whether the off-site inspection requirement was actually a change to your subcontract.
Is that fair?
A **Yes.**
Q In doing so did you look at the prime contract to determine whether it was a change to the AOC/Hitt prime contract?
A **I don't believe I had a copy of the prime contract.**
Q So, at the time you were analyzing the issue you did not have a copy of the prime contract



between HITT and AOC?
A **I don't believe so.**
Q As part of the bidding process Anderson was provided with a copy of all of the contract documents, meaning the prime contract documents.
Is that fair?
A **I believe we did. We might have had their contract. I did not use that as far as determining there was a change to our contract.**
Q So, it would be your position then, Mr. Brown, that it would be a change to Anderson's subcontract irrespective of whether it was a change to the Hitt/AOC prime contract?
MR. PIERCE: Objection. Calls for a legal conclusion.
Go ahead.
THE WITNESS: I don't believe so.
Well, from what I have seen, I believe it was a change to both. But I believe it affirmatively was a change to ours. Yes.
BY MR. GROSCUP:
Q Well, let me ask you is it relevant in

37

terms of determining whether the truck inspection issue was a change to the subcontract, is it relevant as to whether it was a change to the prime contract?
MR. PIERCE: Objection. Calling for a legal conclusion.
Go ahead.
THE WITNESS: I am not sure that it is relevant.
BY MR. GROSCUP:
Q Does Anderson intend to pursue HITT on the truck inspection claim irrespective of whether the Board ultimately determines that the truck inspection requirement is a change to the AOC/Hitt contract?
MR. PIERCE: Objection. No foundation.
THE WITNESS: Possibly.
BY MR. GROSCUP:
Q Has Anderson told HITT that it intends to pursue a claim against HITT irrespective of whether the Board determines that the truck inspection requirement was a change to the prime contract?
A **I am not sure what discussion Stuart has had with them. We vaguely talked about it. So, I am**

38

**not sure if they think that we are coming after them after this. I don't know.**
Q What have you vaguely talked about with them about that?
A **Well, we think it is a change obviously and we are leaving the door open for any way we can to come after the money.**
Q Meaning that you leave the door open to go after HITT on the subcontract irrespective of whether it is deemed to be a change to the prime?
A **Potentially.**
Q Have you yourself communicated that to HITT?
A **Not directly.**
Q Indirectly?
A **I mean, I am not sure what their interpretations would be from our conversations. They might suspect that. I am not sure.**
Q What conversations, if any, have you had with them about that issue?
A **I believe we probably had some that if it was found to be through their fault, that we would**

39

**come after them, if possible, for the recovery.**
Q How could this be Hitt's fault?
A **I am not sure how it could be.**
Q Has anyone at HITT ever told you, Mr. Brown, that the truck inspections by the Capitol Police were to occur on site?
A **No.**
Q To your knowledge, has anyone at HITT told anyone at Anderson that the truck inspections were to occur on site?
A **No.**
Q So, to the extent that this was a change to the contract, you strictly would be relying upon what is written in the contract documents.
Is that fair?
A **Essentially.**
Q When you say essentially, is there anything other than what is in the contract?
A **Not that I can think of. No.**
Q Has anybody at AOC or any other agent of AOC ever told you that the truck inspections were to occur on site?

40

A **No.**
Q To your knowledge, has anybody at AOC or any of its agents ever told anyone at Anderson that the truck inspections were to occur on site?
A **No.**
MR. GROSCUP: Mark this as 1.
(Exhibit No. 1 was marked for identification and was attached to the deposition transcript.)
BY MR. GROSCUP:
Q Mr. Brown, I am handing you what has been Exhibit 1 to your deposition.
Could you take a moment and look over the first few pages of that document and let me know whether you have ever seen it before?
A **Yes. I have.**
Q You have seen it?
A **Yes.**
Q And you recognize this as the expert report of Hugh McGee, who has been retained, I take it, by your firm to analyze the truck inspection claim and particularly the amount of time it may have taken, the

41

amount of additional time it may have taken, in view of the truck inspection claim, for lack of a better phraseology?
A **That is correct.**
Q Did you yourself contact Mr. McGee with regard to this claim or was he retained by Kasimer & Annino?
A **He was retained by Kasimer & Annino.**
Q Who found Mr. McGee? Was that Anderson or was that Kasimer & Annino?
A **Kasimer & Annino.**
Q Had you yourself, or to your knowledge anybody else at Anderson, had any dealings with Mr. McGee prior to this project?
A **No.**
Q Have you ever met with Mr. McGee?
A **Yes.**
Q When did you first meet with Mr. McGee?
A **I don't remember the exact time frame. It was prior to this obviously.**
Q So, prior to preparation of Mr. McGee's November 21st, 2006 report you met with him?

42

A **Yes.**
Q Do you recall how far in advance of November 21st you would have met with him?
A **It was a couple of weeks before I believe.**
Q What was the purpose of meeting with Mr. McGee?
A **To go through our claim and have him analyze what we had done.**
Q Did you provide Mr. McGee background information relative to this claim?
A **Yes. We did.**
Q Other than yourself, was there anybody else at Anderson who provided Mr. McGee with background information?
A **No.**
Q Other than yourself, was there anybody at the meeting with Mr. McGee?
A **I believe Mr. Pierce and Mr. Kasimer.**
Q Other than counsel, was there anybody else from Anderson present at that meeting with Mr. McGee?
A **No. There was not.**
Q With the exception of this one meeting with

43

Mr. McGee which was several weeks before November 21st, were there any other meetings with Mr. McGee?
A **I think we might have had a couple. Maybe one. Maybe two.**
Q Were these meetings over the phone? Were they in person?
A **In person.**
Q Did you meet at Kasimer & Annino's office?
A **Yes. We did.**
Q Each time?
A **Yes. We did.**
Q And so the individuals involved, you don't need to go into what was discussed at this point, but the individuals involved in those meetings would have been you, Mr. McGee, Mr. Pierce and perhaps Mr. Kasimer.
Is that fair?
A **Yes.**
Q And you think there was somewhere between one and three meetings?
A **I believe so. I believe it was two. But I**

44

**have been to a lot of meetings.**
Q Do you recall how long either of those two meetings were?
A **Less than an hour.**
Q Each one was less than an hour?
A **I believe so.**
Q Was the purpose of those two meetings the same?
A **Yes.**
Q Simply to provide Mr. McGee with background information relative to your claim?
A **And have him analyze what we had come up with so far. Yes.**
Q When you say analyze what you have come up with so far, what do you mean by that?
A **Just review what we provided him as part of our claim.**
Q You provided Mr. McGee with the results of Anderson's travel time survey?
A **That is correct.**
Q And so in terms of what is reflected on page 2 of Mr. McGee's report, these test results would

have been furnished by Anderson to Mr. McGee.
Is that fair?
A Yes. That is fair.
Q Walk me through how you prepared the survey information in terms of how the testing was done.
A The testing was done. We picked the first commonplace that we could find on the main truck route and started two trucks there at the exact same time and sent one truck directly to the project and sent one truck to the inspection station, back to the project, and did it multiple times, alternating which truck went to each place each time and alternating which truck the person reporting the times was sitting in.
Q And this was done for the first time on September 5, 2006?
A I am going to take your word for it.
Q If you look at page 3 of the letter, of the report, while the survey that was conducted on September 5, 2006 appeared to be a proper procedure.
Do you see that?
A Yes.



Q Does that refresh your recollection?
A I believe it was. There is a date on the inspection sheet. That is the date.
Q Actually that seems to be the day after Labor Day.
Is that consistent with your recollection?
A I believe so.
Q Were you involved in that testing?
A I was involved. Yes.
Q What was your involvement?
A I just kept track on the phone with my engineer throughout the day tracking the truck times.
Q Were these Anderson forces that were doing the testing or were they your trucking suppliers?
A They were two of our independent trucks with one of my engineers.
Q Who were the two independent trucking companies who were involved in that?
A They are listed. I believe it was Meece and Stephen.
Q I'm sorry. Where are they listed?
A If you look at the truck sheets, there on



the far left hand side it is Stephen and Meece.
Q Stephen and Meece were two of your independent truck companies that you used during the course of this project?
A That is correct.
Q Who were the other independent trucking companies that Anderson used on the West Refrigeration Plant Expansion Project?
A That would be a long list. We have about 40 or so, 40 to 60 independent trucks that work directly for us. And then we also go through broker trucks through Dockett & Sons, RSI, which is Reed Services. We use truckers all over town.
Q Do these trucking companies, given the multiple of them being over 40, do they originate from different locations?
A Yes.
Q The fact that these trucking companies would be originating from different locations, was that factored into your claim?
A The fact of where they originate from would have no effect on the claim.



Q So, irrespective of whether it was coming from the north or coming from the south, the claim would be no different?
A That is correct.
Q Why not?
A The trucks are signed in at the project once they get to the project.
Q But the trucks are inspected by the Capitol Police empty, correct?
A That is correct.
Q Were any of the trucks inspected full in terms of bringing in say, for example, borrowed material from another job site and coming on to the West Refrigeration Plant Project?
Were any of them inspected full?
A Yes.
Q Do you recall what percentage of the trucks were inspected full?
A I don't recall the percentage. Again that would be part of the estimate. They had a certain amount of material they had to bring back on to the project.

49

Q Would it be fair to say that the majority of them were inspected empty?
**A Yes. There was more material that left the project than was brought on to it.**
Q I want to make sure I understand this correctly.
Certain of the inspections performed by Capitol Police of Anderson's trucks would have been on trucks that were full with material and certain of those inspections would have been on trucks that were empty.
Is that fair?
**A Yes. Depending on how they were coming to the site, whether they were coming to be loaded or coming to dump material.**
Q Do you recall whether any of those trucks were hauling material for a different client and then dropping off that material and coming over empty?
**A No. I don't.**
Q You don't know one way or the other?
**A Could you rephrase your question?**
Q Yes.

50

Being in the excavation business you are aware that you use lots of different trucking resources, correct?
**A That is right.**
Q Is it the case on occasions in any event that a trucking company will double dip essentially in terms of their taking material perhaps off of your site and then taking that material just a few blocks away to a different client?
**A I don't recall any of those instances on this project. No.**
Q You indicated a moment ago that the origin in terms of where these trucks were starting out from would be irrelevant for purposes of your truck inspection claim?
**A For the initial showing up to the project. Yes.**
Q And you said that because the trucks would check in at the project first?
**A Once they came to the inspection station they were signed into the project.**
Q But as I understand your claim, your claim

51

relates to the additional time it took the trucks to get to the project site.
**A I am talking about the first initial. When they showed up for the first round in the morning, once they showed up to the project they were signed into the project and then they would stay on the project for that day.**
**So, for the first initial time they showed up in the morning, whether it be 5:30 or 7:00 o'clock, that is when they would be signed into the project once they got there.**
**At certain points some trucks we had to provide additional compensation for them to come to the project because they were complaining about having to go to the inspection facility first.**
Q Were these trucking companies, the more than 40 that you were utilizing on the West Refrigeration Expansion Plant Project, did you have a contract with these companies?
Were they doing the work on a time and materials basis?
**A We had a per hour contract.**

52

Q So, they were essentially doing this on a time and materials basis?
**A Essentially.**
Q There was an hourly charge by these trucking companies which was a direct cost to Anderson.
Is that fair?
**A That is correct.**
Q Would Anderson's take-off have prepared an estimate as to the numbers of hours of trucking resources involved in the haul-off?
**A Yes. It would.**
Q Have you ever compared the Anderson estimate in terms of the numbers of hours involved in the haul-off estimated versus the actual?
**A Yes. We have.**
Q What has that shown?
**A It did take substantially longer for us to make the runs than we estimated.**
Q Do you recall how many minutes longer per run it took you relative to what was estimated?
**A No. I don't. Because it was varied. We**

**went to several different dump locations. They didn't all go to the same location.**
Q So, the amount of additional time varied upon the location of the dump location?
A **Sure.**
Q Would there be a way of utilizing that information in terms of your estimate versus your actual time to prepare a claim in the nature of what you submitted to AOC?
A **It would be a rough estimate. They figure when they estimate the job on what they think it would take the trucks to get to and from the site to the dump location that they estimated it would go to.**
Q When they do the estimate do they figure the amount of time it is going to take the truck to get to and from the site?
Is that what you said?
A **That is correct.**
Q Meaning from their original point of embarkation to the ultimate point where they are dropping off their load; is that right?
A **Yes.**



Q The ultimate point that they were dropping off the loads, did that vary depending upon which trucking resource you were utilizing?
A **Not so much on the trucking resource, just on multiple reasons affecting that, the dump fees, the locations.**
Q If I recall correctly, the contaminated soil was all going to Baltimore; is that right?
A **That is correct.**
Q Where in Baltimore were those trucks going?
A **To Soil Safe.**
Q Did Soil Safe move all of your contaminated dirt?
A **Yes. They did.**
Q You mentioned a moment ago that the trucking resources were essentially on a time and materials basis?
A **That is right.**
Q Was Soil Safe also on a time and materials basis?
A **They were on a per ton basis.**
Q Was that a negotiated rate with Soil Safe?



A **Yes. It was.**
Q When was that rate negotiated?
A **I don't recall the exact date, but it was prior to them starting.**
Q Was it renegotiated after the exponential increase in the volume of contaminated soil?
A **No. It was not.**
Q Do you recall what Soil Safe's per ton rate was to Anderson?
A **Not off the top of my head. I don't recall the exact rate.**
Q Earlier in your deposition, Mr. Brown, you mentioned your price for contaminated soil was $35 a ton in your subcontract with HITT; is that right?
A **That is right.**
Q Does that $35 a ton represent the cost for excavating, for hauling the material off, for treating the material, or is it strictly one aspect?
A **That was an all inclusive end rate.**
Q That was the haul end rate?
A **That is correct.**
Q Do you recall where in Baltimore Soil Safe



was taking the material?
A **To their facility. I don't know the exact location off the top of my head.**
**I believe it is White House Road, if memory serves me correct, but it is on the manifest.**
Q After Soil Safe learned that the location of the Capitol Police inspections was to be at 3rd and Constitution Avenue they asked for an increase of 58 cents a ton to their unit rate.
Is that fair?
A **50 cents.**
Q 50 cents?
A **That is correct.**
Q Do you recall whether your claim value for the contaminated soil was actually 58 cents a ton?
A **I believe it was with my mark-up on it.**
Q What is your mark-up on that?
A **15 percent.**
Q So, Soil Safe was charging you 50 cents a ton and you marked that up by 15 percent to arrive at a 58 cents a ton unit rate for contaminated soil relative to the truck inspection claim?

57

A **That is correct.**
Q In terms of potentially mitigating Anderson's impact relative to the off-site inspection location, did you ever contemplate utilizing Soil Safe for haul-off of the non-contaminated soil?
A **No. They don't deal in that. Those trucks run specifically by the ton and that is what they do.**
Q Did you ever ask Soil Safe whether they could haul-off the non-contaminated material?
A **Soil Safe does not haul non-contaminated material.**
Q Do you know whether Soil Safe hauls off non-contaminated soil for anyone?
A **I am not aware if they do.**
Q Did you ever ask Soil Safe if they could haul non-contaminated material?
A **Specifically, no. Their trucks are from the Baltimore area. So, they are dealing in our world down here.**
Q Are you aware that if you compute this on a tonnage basis, that the dollar value of impact in terms of your claim value for non-contaminated soil

58

would be vastly in excess of 50 cents a ton?
A **That is correct.**
Q So, in terms of the increase you are seeking to the subcontract, you would be looking at a rate of 58 cents a ton if you are moving contaminated soil, but a rate of perhaps over $3 a ton if you are moving non-contaminated soil?
A **The 58 cents for the contaminated soil was correct, but that was what was actually paid as a premium for that. I am not exactly sure what the premium would be by the ton for non-contaminated, but it is more. It would be more than 58 cents.**
Q Are you aware whether it is actually more than six-fold more than the contaminated rate?
A **No. I am not aware of that.**
**The numbers would be easy enough to come up with.**
Q How would you be able to come up with the numbers?
A **I would just estimate the volume on a truck by the ton and just use the amount of time they charged and divide the two.**

59

Q You are aware that you are claiming approximately $185,000 relative to the truck inspection issue?
A **That is correct.**
Q And of that $185,000 roughly $25,000 relates to contaminated soil moved by Soil Safe.
Is that fair?
A **Roughly. Yes.**
Q Leaving approximately $160,000 relating to the movement of the non-contaminated soil?
A **Approximately.**
Q And so you would agree with me then to derive the unit rate per ton you would take the $160,000 and divide it by the tonnage of non-contaminated material?
A **It would have to be the number of loads. There are a couple of factors in the claim. But yes, that is essentially the way you would do it.**
Q You said that it might depend on the number of loads and other factors in the claim.
Could you explain to me what you mean by that?

60

A **Well, there was also mobilization charges that were covered in the claim as well as service charges.**
Q Explain to me mobilization charges and service charges.
A **Every time we had to move a machine in and out of the project our load would have to go to the inspection facility and every service truck to come in to service the machines and fuel them would also have to do the same thing.**
Q The service trucks that would come in, one example would be like a fuel truck.
Would that be fair?
A **That is correct.**
Q Any other type of service truck that would be serving the machinery on site?
A **For the purpose of the claim I don't think it was covered. It was covered mainly for the fueling. And every day the project worked the project had to be fueled, all the machines had to be fueled.**
Q In your claim for the service trucks are you claiming for each day that the service truck had

to go through the inspection facility?
A I am claiming for each day the project work and just assuming that every day of work the truck had to go through inspections.
Q So, if the project worked say for 200 days, I am just picking a number, you would have claimed for each of those days for the service truck?
A Yes. For the impact time.
Q But once per day?
A Just once per day. That is correct.
Q So, my example of the 200 days, you would take the 200 days and you would multiply that by the hourly rate of the service truck?
A That is correct.
Same thing for the mobilization, for the equipment use.
Q And you would assume then that the service truck is going through the inspection station each of those days, right?
A That is correct.
Q Did you do any analysis of whether the service truck was actually going through the



inspection station at 3rd and Constitution each day in coming up with your claim?
A I didn't do an analysis, but it had to go there before it could come to the project.
Q It had to go before coming to the project. But isn't it the case that the service truck would maintain enough fuel to perhaps service your vehicles on multiple days?
A No. Our machines will run out of fuel. They can't go multiple days. If it was a full workday, they could not go multiple days on the same amount of fuel. On one tank of fuel it could not go multiple days.
Q Let me ask a better question.
There is a gasoline truck or a fuel truck that is on site, right?
A It comes to the site every day.
Q Right.
And you are saying it comes to the site every day?
A Yes.
Q There is not an instance in which there is



enough fuel in that fuel truck to service the different vehicles, trucks, backhoes, excavators and so forth for multiple days?
A There is enough fuel in it, but the machines can't hold that much fuel. They can only hold a certain amount of fuel in the tanks and they use the fuel that they hold in the tanks throughout the day.
Q But couldn't the service truck only perhaps come every other day if it could hold enough fuel to service the other vehicles?
A No. The equipment on site would burn the fuel that it could hold in a day.
Q Right. And then they would turn to the service truck and get refilled, right?
A The service truck would refill them every day so they could work.
Q Right.
And if the service truck was there on site, it wouldn't necessarily have to leave every day to replenish the supply of the other vehicles?
A The service truck wouldn't stay there all



day. The service truck would just come to fuel the machines and then leave.
Q Did you look through Exhibit 1 before this was sent out to AOC?
A Yes. I did.
Q Were you at all involved in the drafting of this document or the editing of this document?
A No. I was not.
Q Did you provide any comments relative to this document?
A We provided the load sheets and stuff and our information we came up with.
Q When you say you provided the load sheets, can you point me to where you are talking about?
A It would be Attachments 1 and 2, Truck Travel Time Surveys.
Q So, Attachments 1 and 2 would be information that came from Anderson?
A That is correct.
Q These sheets would not have been sheets prepared by Mr. McGee?
A No. These sheets were prepared by our

65

guys, by my guy.
Q Under Background it states in the first paragraph there: As explained to me, at the outset of the contract to haul excavation material from the West Refrigeration Plant Expansion trucks were required to be inspected, for security reasons, at the job site, which is located within the borders of South Capitol Street, E Street, Southeast, New Jersey Avenue and Virginia Avenue.
Do you see that?
A Yes.
Q And then do you see the next sentence?
It states: Subsequently, the inspection site was changed to another station located south of Constitution Avenue.
A Yes.
Q Did you tell Mr. McGee that originally the trucks were inspected for security reasons at the job site?
A Yes. I did.
Q Were there Anderson dump trucks that were inspected at the job site at the outset of this job?

66

A Yes. There were.
Q How many days did that go on?
A I don't know the exact number of days. I believe it was probably about a two-week period I believe. And I don't think we were trucking every day. But initially up until the 13th they were inspected at the project.
Q Actually until about the 11th, if that is a Saturday?
A Yes. Whichever day.
Q Do you recall what Anderson's first day on the job site was?
A No. I don't.
Q Roughly June 4th, would that be a fair approximation?
A Possibly.
Possibly it is in the information that we provided in the dailies. It would be the first day of the report.
Q Between June 4th and June 13th Anderson would not have been doing any bulk excavation, right?
A We were hauling off demolition debris.

67

Q Utilizing the same type of dump trucks that you would utilize for the purpose of bulk excavation?
A Similar.
Q And up through those two weeks you are saying that the Capitol Police was conducting the inspections on site?
A That is correct.
Q Where exactly were those inspections taking place?
A When I observed it, it was at the intersection of Virginia and South Capitol, that entrance coming into the project.
MR. GROSCUP: Mark this as 2 please.
(Exhibit No. 2 was marked for identification and was attached to the deposition transcript.)
BY MR. GROSCUP:
Q Could you take a pen, Mr. Brown, and indicate to me where the Capitol Police inspections to the best of your recollection were occurring from early June until June 13th?
A Does it matter which sheet I mark on?

68

Q Perhaps the first sheet seems to be the furthest away view.
A It is different obviously than it was, but it was in this location.
Q So, for identification purposes, on Exhibit 2 you have marked with an X where the Capitol Police were conducting inspections during the early days of Anderson's work on the West Refrigeration Plant Expansion Project?
A Roughly at that location. Yes.
Q Would it be the case that Anderson would contact the Capitol Police to advise them as to when trucks were to arrive at the job site?
A I am not sure. They were there every day I believe at that location.
Q The Capitol Police were there every day?
A I believe so. Yes.
Q Were they utilizing x-ray equipment there at that particular location where you have marked with the X?
A No. They were walking around with mirrors and they had dogs.

Yes. I believe they had dogs as well.
Q So, they weren't using any x-ray equipment?
A No. They were not. Not there.
Q And you say that you believe they had dogs?
A I believe so. I don't recall exactly off the top of my head. They walked around the truck with mirrors and stuff.
Q Did you personally observe any of the inspections occurring there at the location where you have marked with an X?
A Yes. I did.
Q Would the trucks that were coming into the job site to get to that location have to travel along Virginia Avenue?
A No. I believe --
Q Or would they take a left off of South Capitol?
A Most of them I believe came off of South Capitol.
I don't recall at the beginning of the project if they could come all the way down Virginia Avenue and get in or not.



Q So, you believe the trucks were taking a left off of the southbound lane for South Capitol Street?
A No. I believe that most of them were coming in and making a right off of South Capitol I believe.
Q So, you believe the trucks were coming northbound on South Capitol and taking a right on to Virginia Avenue to the X?
A I believe so, but I am not 100 percent sure.
Q And you believe that the Capitol Police were maintaining a permanent canine team here at this location?
A I believe it was a canine team. Yes. I can't remember exactly off the top of my head, but I do remember them walking around with the mirrors and I believe they had dogs with them I believe.
Q Okay.
Do you recall how many such inspections occurred during roughly June 4th to June 11th, 2003?
A No. I don't. Whichever days we were



running trucks, it would have occurred then.
Q Do you recall whether it was more than five such inspections?
A No. I don't recall how many. They would be shown in the dailies how many days they ran and they were inspected.
Q In terms of the days that you were working between June 4th and June 11th, in light of the nature of the work that was being performed would these have been trucks that would have been coming in every hour or every two hours to haul-off the material?
A Probably every couple of hours is typical for the project.
Q At the time that this was occurring had Anderson already submitted and had approved its site utilization plan?
A I don't recall.
Q Do you recall whether the dogs had to sweep each truck before they were allowed on site?
A I don't recall. I believe they did, but I am not 100 percent sure.
Q To the best of your recollection, it



shifted from the location you have marked on Exhibit 2 with an X to the 3rd and Constitution Avenue inspection facility roughly June 11th, 2003?
A Roughly.
Q And on June 11th, 2003 Anderson had not yet signed its subcontract with HITT.
Is that fair?
A I don't know.
Can I run to the restroom real quick?
Q Sure.
(Recess.)
MR. GROSCUP: Why don't you mark this as Exhibit 3?
(Exhibit No. 3 was marked for identification and was attached to the deposition transcript.)
BY MR. GROSCUP:
Q Just to backtrack a little bit in terms of a couple of questions I forgot to ask you.
You mentioned that Soil Safe was going back to Baltimore, which is where their facility was for contaminated soil.

73

A That is correct.
Q Obviously the other trucking resources you were utilizing weren't going to Baltimore.
Is that fair?
A That is correct.
Q Where was your dump location for those other trucking resources?
A Most of the facilities were located in Southern Maryland down in the Palmer Road vicinity.
Q When you say that most of the facilities are located there, is that where they are actually hauling the dirt back to?
A That is where the majority of the dirt went to is in that general vicinity down there. There was a couple of different dumps that we utilized down there.
Q Where in Southern Maryland?
A In the Palmer Road vicinity down there.
Q I am not familiar with Palmer Road. Is there a town?
A I don't exactly know.
Palmer Road is a dump where a large volume

74

of the material went to.
Q Near Solomon Island?
A No.
I am not extremely familiar. It is down 210. Down that way I believe. 210 I think.
Q In non-rush hour from the U.S. Capitol, is that an hour drive, an hour and a half drive?
A I wouldn't be sure in non-rush hour.
Q Roughly?
A Roughly somewhere between an hour and an hour and 45 minutes to make a round trip. I don't know the exact one way time. I have never driven the route.
Q Do you think it is somewhere between an hour to an hour and 45-minutes?
A For a round trip, yes.
Q One way would it be --
A I am not exactly sure. To get to the actual dump and get in there and dump and stuff, I am not exactly sure.
Q Is it closer or further than Baltimore?
A It is closer. I believe. I am not that

75

familiar with it. I believe it is closer.
Q You could have just told Soil Safe treat all that is contaminated, take it all away?
A No. I could not have.
Q Why not?
A Because the cost of the job would have been enormous.
Q So, the rate you were paying to Soil Safe in terms of moving the contaminated soil was a higher rate than you were paying to these other trucking companies for moving the non-contaminated soil?
A Yes.
Q Do you know what your per ton rate would be for moving the non-contaminated soil?
A We don't break it down into tons. I could give you an estimate, but we don't break it down into tons.
Q What would be an estimate?
A The total would be -- it depends -- somewhere around $10 plus a ton possibly. I would have to go back and run the exact numbers on it.
Q So, in your view then it would not have

76

made sense to just simply have Soil Safe do all the work?
A It is not feasible.
Q From a cost perspective?
A From really any perspective.
I mean, the material wasn't contaminated. So, from a cost perspective it would be ludicrous to have them haul.
Q You are aware that not necessarily all of the material that was deemed contaminated soil was actually contaminated on this job, right?
A No. I am not aware of that.
We don't distinguish the contamination.
Q When Anderson prepared its original estimate was that predicated upon this Palmer Road Southern Maryland disposal facility?
A You would have to ask Stuart, but I believe so.
Q Before we broke for a break we talked about the fact that on roughly June 11th, 2003 Anderson became aware of the fact that the Capitol Police would be conducting their inspections at 3rd and

Constitution Avenue.
Is that fair?
A That is true.
Q Earlier I asked you whether you recall as to whether on June 11th, 2003 HITT and Anderson had already executed their subcontract.
Do you recall that?
A Yes.
Q And you said you don't recall whether as of June 11th, 2003 Anderson had signed the subcontract?
A That is correct.
Q Could you look at Exhibit 3 to your deposition?
A (Witness complies.)
Q Could I get you to turn to page 10 in the lower right hand corner? It is part of the Rule 4 file and in terms of the page numbers 10 is what is designated in the Rule 4 file.
Turn to page 10 of that subcontract.
Do you see that is the signature page of the subcontract?
A That is correct.



Q Mr. Himelfarb is the individual who executed the subcontract, correct?
A Yes.
Q So Mr. Himelfarb executed the subcontract on Anderson's behalf on June 13th, 2003, correct?
MR. PIERCE: Objection. Lack of foundation.
You can answer.
THE WITNESS: Yes.
BY MR. GROSCUP:
Q So, Mr. Himelfarb executed the subcontract after Anderson already knew of the off-site inspection location, correct?
A Apparently. Yes.
Q Turning to page 4, which is actually the second page of the exhibit, do you see, Mr. Brown, under the Recitals it states under paragraph C, the Subcontractor has examined and is familiar with the Contract Documents comprising the General Contract all of which are available to the Subcontractor?
A Yes.
MR. GROSCUP: Off the record for a second.



(Recess.)
MR. GROSCUP: Back on the record.
BY MR. GROSCUP:
Q Mr. Brown, did Anderson examine and familiarize itself with the contract documents?
MR. PIERCE: Objection. Lack of foundation.
THE WITNESS: Yes. I assume that we did
BY MR. GROSCUP:
Q Turning to page 11 in the lower right-hand corner of the Anderson subcontract -- actually befor we get to that, you yourself, as Project Manager on this job, I take it you were familiar with the terms and conditions of the contract, were you not?
A Yes.
Q And you are familiar also with the requirements of the prime contract as well insofar as they related to Anderson.
Is that fair?
A Yes.
Q And attached or incorporated within the Anderson contract do you see on page 11 there is a



listing of various drawings?
A Yes.
Q And I take it that HITT made these drawings available to Anderson as part of its work on this project?
MR. PIERCE: Objection. Lack of foundation.
THE WITNESS: Yes.
BY MR. GROSCUP:
Q And then you see on page 16 there is Volume II Drawings and it lists next to that on the right-hand side for information only.
Do you see that?
A Yes. I do.
Q These drawings would have been provided for information purposes only because they really don't relate per se to Anderson's scope of work.
Is that fair?
MR. PIERCE: Objection. Calls for speculation and conclusion.
You may answer.
THE WITNESS: That is correct.

BY MR. GROSCUP:
Q Turning to page 33, do you see where it lists Specifications there?
A **Yes. I do.**
Q Were these specifications which are dated 9/30/03, but I will represent to you I believe that to be a misprint because the specifications on this job were actually dated 9/30/02, were these specifications provided to Anderson as indicated here in the subcontract to the best of your knowledge?
A **I am sure they were.**
MR. PIERCE: Objection. Lack of foundation.
BY MR. GROSCUP:
Q And was it part of Hitt's responsibility, based upon what we saw in Recital paragraph C, to review those specifications and to familiarize themselves with them?
A **It was part of Hitt's responsibility?**
Q I'm sorry. I may have misspoke.
Under paragraph C on page 4, the Recitals.
A **Yes.**



Q Do you see where Anderson represented it examined and familiarized itself with the contract documents?
Do you see that?
A **Yes.**
Q So, one of the items for which they would have been responsible to examine and familiarize themselves with would have been say, for example, the Specification Section 01100 summary?
A **Yes.**
MR. PIERCE: Objection. Calling for a legal conclusion.
BY MR. GROSCUP:
Q In arriving at the conclusion that the truck inspection claim was a change to the Anderson subcontract, did you ask anybody at Anderson whether they had reviewed the September 30th, 2002 specification provision?
A **We had reviewed them. I reviewed them.**
Q You reviewed them?
A **Yes.**
Q Did you review the September 30, 2002



specifications for 01100?
A **I believe so. I don't recollect specifically off the top of my head. But I did review the specs.**
Q That would have been something you would want to look at to determine whether this was a change to your subcontract, right?
A **That is correct.**
**(Exhibit No. 4 was marked for identification and was attached to the deposition transcript.)**
**BY MR. GROSCUP:**
Q Mr. Brown, I am handing you what has been marked as Exhibit No. 4 to your deposition.
You see that this is the Section 01100 specification dated September 30th, 2002 on the West Refrigeration Plant Expansion Project?
MR. PIERCE: Objection to characterizing it as such. There is no foundation for that and it actually appears to me that it is not.
MR. GROSCUP: Why does it appear to you it is not?



MR. PIERCE: Well, everything I have ever seen on this.
On page 01100-4, in paragraph A, it has the language that says the police inspection station is on P Street and South Capitol Street, Southeast, and has that crossed out.
MR. GROSCUP: We will get to that in a moment.
BY MR. GROSCUP:
Q Mr. Brown, I will represent to you that this is the September 30th, 2002 specification section for Section 01100 on the West Refrigeration Plant Expansion.
Okay?
A **Okay.**
Q I will also represent to you that in Amendment Number 3 it was modified, as your counsel indicated a moment ago, and certain language was interlinear in the paragraph that Joe was referring to.
Okay?
A **Okay.**

Q And we will get to that version of the specification section in a moment, that subsequent amendment.
Have you ever seen the original specification section which is reflected in your subcontract dated 9/30/02?
**A I don't recall it.**
Q This was a document though in terms of original specifications that you were supposed to familiarize yourself with, correct, under the terms of your subcontract with HITT?
**A Possibly. Yes.**
Q Could you look at page 01100-4, and in particular paragraph 1.6, Site Security?
Do you have that in front of you?
**A Yes. I do.**
Q Under Site Security, under paragraph A-2, it states under Clearance: Special arrangements for all deliveries shall be arranged a minimum of 48 hours in advance of arrival to permit inspection by the United States Capitol Police. The Police inspection station is on P Street and South Capitol Street,



Southeast.
Do you see that?
**A Yes. I do.**
Q P Street and South Capitol Street, Southeast, would be an off-site inspection location, correct?
**A Yes. It would.**
Q But to your knowledge you have never seen this before?
**A No. I have not.**
Q Do you recall whether HITT made this available to you?
**A I don't recall.**
Q Do you know whether HITT made this available to Anderson?
**A I don't recall.**
Q Did you ever ask HITT what its experiences were relative to the Interim Coal Handling Facility Project?
**A No. I did not.**
Q To your knowledge did Anderson ever ask HITT what its experiences were on the Interim Coal



Handling Facility Project?
**A I don't have any knowledge of that.**
Q And certainly Anderson was not involved in that particular project, correct?
**A That is correct.**
Q So, whether Hitt's trucks were inspected on site or off-site on the Interim Coal Handling Facility is absolutely no consequence to you in terms of your claim?
**A That is correct.**
Q In terms of whether Anderson would have been on notice of the possibility of an off-site inspection location, would you at least want to consider what is listed on Exhibit 4 under 1.62, Site Security?
MR. PIERCE: Objection. Calls for speculation.
THE WITNESS: I don't know.
I mean, the one that I saw had this crossed out of it.
BY MR. GROSCUP:
Q So, the only version that HITT ever



provided to you had that language crossed out of it?
MR. PIERCE: Objection. Lack of foundation.
THE WITNESS: The one I saw had that. I am not 100 percent what had been provided to us.
BY MR. GROSCUP:
Q Do you have any reason to believe that HITT did not provide to you the document that I have marked as Exhibit 4 to your deposition here today?
**A I don't have any reason to believe it didn't. I don't know.**
Q You just don't know whether they did one way or the other?
**A That is correct.**
Q But you certainly don't recall having ever seen it before?
**A That is correct.**
MR. GROSCUP: Why don't we mark this as Exhibit 5?
(Exhibit No. 5 was marked for identification and was attached to the deposition transcript.)

BY MR. GROSCUP:
Q Mr. Brown, what I would like to do is look at Exhibit 5 in the context of Exhibit 4.
You see that both documents start out the same way in terms of they are both referring to Section 01100, the West Refrigeration Plant Expansion?
A **Yes.**
Q And earlier on Exhibit 4 we looked at the provision with regard to 1.6 in terms of site security.
Could I get you to turn in Exhibit 5 to that particular section of the specifications?
A **Yes.**
Q Before we get into the details of that particular section, the bottom of this document states Amendment Number 3, January 6, 2003.
Do you see that?
A **Yes. I do.**
Q This is the version of the site security provision that you recall having seen in terms of the interlinear language; is that right?
A **I believe so. Yes.**



Q And this language here is relevant in terms of at least where the Capitol Police inspection location is to be; is that right?
MR. PIERCE: Objection. Calls for a legal conclusion.
Go ahead.
THE WITNESS: Yes.
BY MR. GROSCUP:
Q I am not looking for a legal conclusion. But in terms of determining whether and where the truck inspections are to occur, would this provision be something that you would look at?
A **I would look at it, but it doesn't really say where it is going to be. It doesn't say it is going to be off-site, on site.**
**And it says deliveries. That can also be interpreted in various different ways as well. The trucks showing up to a job site, some people wouldn't consider that to be a delivery.**
Q How about a truck hauling dirt, bringing material on to the job site? Would they consider that to be a delivery?



A **Possibly.**
Q Would you?
A **It probably depends on the situation and the context.**
Q How about the situation and context on the West Refrigeration Plant?
A **I think it could be construed either way.**
Q Do you see that this language here that you are provided and have reviewed before has interlinear language there under paragraph A-2?
A **Yes.**
Q And the interlinear language, the language that has been crossed out, says that the Police inspection station is on P Street and South Capitol Street, Southeast, right?
A **That is correct.**
Q Which would be an off-site location, right?
A **It would have been. Yes.**
Q Do you have any knowledge as to why that particular provision was crossed out?
A **No. I do not.**
Q Did you ever ask anyone?



A **No. I did not.**
Q To your knowledge did Anderson ever ask anyone?
A **I am not aware. I don't know if we ever did or not.**
Q The crossed out language is then replaced with bold language down right below that.
Do you see that?
A **Yes.**
Q And the bold language that has been added states that instead of the Police inspection station being on P Street and South Capitol Street, it states coordinate deliveries with U.S. Capitol Police by contacting them at 202-224-0908.
Do you see that?
A **Yes.**
Q Did Anderson ever contact the U.S. Capitol Police and ask them where the trucks were to be inspected?
A **I am not aware if we did.**
Q You didn't, right?
A **No. I did not.**

93

Q To your knowledge, nobody else at Anderson did either?
A **To my knowledge, I am not aware.**
Q To your knowledge, did anybody at HITT?
A **I am not aware. I don't know.**
Q In terms of bidding the contract, wouldn't that have been an important thing to do?
A **I don't believe so.**
Q Why not?
A **It doesn't say that inspections will be held off-site. We have multiple jobs that were inspected on site.**
Q Sir, it doesn't say that inspections are going to be held off-site, but the interlinear language indicated that they were going to be held off-site and that language was replaced with coordinate with the Capitol Police, right?
A Yes.
Q And don't you believe that would impose a duty upon you to at least ask them where they are going to be?
MR. PIERCE: Objection. Calling for a legal conclusion.

94

THE WITNESS: I don't believe so.
BY MR. GROSCUP:
Q You said this does not indicate that it is going to be off-site, the inspections, right?
A Yes.
Q Does it say that they are going to be on site?
A **No. It doesn't.**
Q Does anywhere in the contract say they are going to be on site?
A **No. It does not. Not specifically.**
Q In terms of it not specifically saying it is going to be on site, can I get you to look back at the subcontract, in particular page 7?
Are you there?
A Yes.
Q And under the changes clause, paragraph B could I get you to read paragraph B to yourself?
A (Witness complies.)
Yes.
Q Do you see where it states that it is

95

understood that all required items contained in the contract documents as well as that which is intended to provide a complete job in every respect, whether specifically stated or not, is included in the contract sum?
A **Yes. I do.**
Q Did you ever indicate any disagreement or disapproval to HITT of that language?
A **No. I don't believe I did.**
Q To your knowledge, did anybody at Anderson?
A **I don't know of anybody.**
Q In terms of this language, did you understand that if there was an implied term in a contract, that Anderson was required to fulfill that implied term?
MR. PIERCE: Objection. Calls for a legal conclusion.
You can go ahead and answer.
THE WITNESS: Potentially.
BY MR. GROSCUP:
Q Well, let me ask you what is your understanding of the phrase whether specifically

96

stated or not? What is your lay understanding of that?
MR. PIERCE: Objection. Calls for legal conclusion.
Go ahead.
THE WITNESS: It is pretty self explanatory. You know, if it is specifically stated or not, if something was covered or not. That was intended to be covered I believe probably.
BY MR. GROSCUP:
Q Then it would be included in the contract sum?
A **As stated here. Yes.**
Q Earlier I was asking you about the bidding process and I believe you testified that you were not directly involved and that was more handled by Mr. Himelfarb.
Is that fair?
A Yes.
Q Prior to becoming Project Manager on the West Refrigeration Plant Expansion for Anderson, did you review certain documents to familiarize yourself

97

with the contract and so forth?
A Yes.
Q Do you recall when it was that Anderson was first furnished certain of the documents that are reflected and noted in Exhibit 3, which is your subcontract?
A **No. I don't recall.**
Q Do you know whether Anderson attended any of the pre-bid meetings hosted by AOC?
A **Yes. We did.**
Q You did?
A **Yes.**
Q Do you recall what the dates were of those meetings?
A **No. I don't.**
Q Did you ask any questions at that pre-bid meeting as to the location of the truck inspection facility?
A **I was not at the meetings. I don't know if they were asked or not.**
Q So, you, Jason Brown, didn't attend, but somebody at Anderson did?

98

A **That is correct.**
Q Who did attend? Mr. Himelfarb?
A **I believe so.**
Q Anyone else?
A **One of the estimators.**
**I believe Jim Anderson might have attended one or two himself.**
Q So, Mr. Anderson, perhaps Mr. Himelfarb and also perhaps one of the estimators may have attended that meeting?
A **That is correct.**
Q Did you ever ask those gentlemen whether they inquired at the pre-bid meeting as to the location of the Capitol Police inspection facility?
A **I don't believe they did.**
Q Earlier you indicated that the subcontract did not expressly state that the truck inspections are to occur on site; is that right?
A **I said it doesn't specifically say that.**
Q Right.
But you read other language to create the suggestion in your mind that the truck inspections by

99

the Capitol Police were going to be on site; is that right?
A **That is how we interpreted it. Yes.**
**We never had a project where the inspection facility was off site.**
Q Have you had any projects on Capitol Hill?
A **I am not aware of any.**
Q Is it routine on your other projects that there be inspection requirements of your trucks coming on to job sites?
A **On some. Various projects.**
Q For which owners were those projects where there was some sort of site security check in? What were the owners on those projects?
A **The airport has some.**
Q Which airport?
A **Dulles Airport.**
**Fort Belvoir.**
**There is a handful of them. Those are a couple.**
Q Dulles Airport and Fort Belvoir are the ones that stand out to you right now?

100

A Yes.
Q You can't recall any others?
A **Not off the top of my head.**
Q Was Anderson's work on the Dulles Airport project and the Fort Belvoir project similar in nature to the work that was being performed on this project?
A Yes.
Q Were the trucks coming to Dulles Airport, for example, empty and there was going to be some sort of inspection facility?
A **I am not specifically aware on that one. That was not one of my jobs.**
**I know on the Fort Belvoir one they were coming to the project.**
Q Fort Belvoir, for example, were you on that job?
A **Yes. I was.**
Q So, you have personal knowledge as to what inspection requirements were on that facility?
A Yes.
Q And Fort Belvoir, that is a military installation, right?