101

A That is correct.
Q Remind me. Is that Army or Navy?
A Army.
Q Was the Army itself conducting the inspections of Anderson's trucks coming on to the project?
A I don't know if they are military personnel or not. They had police officers at a gate entering the project.
Q And so based upon your experience at Fort Belvoir, that was one of the factors you considered in determining that it was likely that the Capitol Police would also be conducting their inspections on site?
A I didn't determine that, but I am assuming. It is not typical for us. It is untypical for us. We have never had a situation where they would have to go off-site. We couldn't imagine why you would have to go off-site to be inspected and come back.
Q When you say you never had a situation like that, the only two projects you can recall are Dulles Airport and Fort Belvoir, right?
A That is correct.

102

Q So, your universe that you are drawing from on that is the total of two projects?
A No. There is more projects than that. I just can't think of them off the top of my head.
Q Do you recall how many more projects there were other than those two?
A No. I don't.
Q Do you have any training in security procedures?
A Training?
Q Yes.
A No.
Q You have no expert knowledge in terms of where inspection locations should be or shouldn't be in terms of the security aspect of it, right?
A No.
Q You are simply just drawing upon your common sense in concluding that the inspection should have been on site; is that right?
A That is correct.
Q Mr. Brown, did you ever go to the 3rd and Constitution inspection facility yourself?

103

A Yes. I did.
Q Did you go there on a regular basis?
A No. I did not.
Q What was your purpose in going?
A Just to see what was involved there at the site.
Q When did you go? In roughly June of 2003?
A It would have been in that neighborhood. Yes.
Q How long did you spend there?
A I don't recall. Probably half-hour to an hour.
Q You simply wanted to familiarize yourself with the inspection procedures that were going on relative to Anderson's trucks?
A I just wanted to see the inspection facility, what was entailed there.
Q And there was more to it than simply dogs sniffing the truck at that inspection facility, right?
A That is correct.
Q Describe for me what those inspection procedures entailed at the 3rd and Constitution location for the Capitol Police.

104

A The truck would pull-up to an x-ray machine and was x-rayed and allowed to pass.
Q Anything else in terms of just the x-ray or was there more to it?
A I don't recall. I believe they walked around with mirrors. I don't recall if the dogs were there or not.
Q So, there were individuals walking around with mirrors, there was an x-ray machine and there may have been dogs there as well?
A I believe. Yes.
Q In terms of the x-ray machine and so forth, was this more elaborate than the procedures that had been conducted at the location which you marked with an X on the project site?
A Yes.
Q None of Anderson's trucks that were inspected perhaps during that first ten days or two weeks or so of June 2003 were inspected with x-ray machines?
A Not to my knowledge. No.

Q Were the trucks for Anderson tagged at the 3rd and Constitution site such that there was a departure time for those trucks and then a radioing ahead to insure that the trucks arrived within a certain period of time?
**A They were given a slip from the police I believe.**
Q A slip showing what?
**A I believe the time that they left the inspection facility.**
Q And then they would take that slip from the Capitol Police showing the time they left the inspection facility, they would give that to the Capitol Police stationed at the on site security gate, right?
**A That is correct.**
Q Would there be further inspection of the trucks there at the on site security gate?
**A I don't believe so.**
Q Did you understand what the purpose was in providing the slips?
**A Yes. I do.**



Q What was your understanding?
**A They had a certain time frame that they were to get from the inspection facility back to the project.**
Q And what would happen if they didn't make it within that time frame?
**A They would have to go back to the inspection facility again.**
Q To be reinspected?
**A That is correct.**
Q Do you know whether the Capitol Police had any surveillance cameras that were tracking the movement of trucks in the area of the Capitol?
**A No. I am not aware.**
Q You don't know one way or the other?
**A No. I don't.**
Q Did you ever see driving in this area of the U.S. Capitol the Capitol Police walking the streets that the trucks would have traveled from the 3rd and Constitution site to the Virginia Avenue job site?
**A I don't recall seeing them. No.**



Q You don't recall seeing any Capitol Police walking the streets?
**A No.**
**I see police on the streets. I don't recall them on a specific route.**
Q This x-ray equipment for these trucks is about the size of this conference room?
**A I am not sure of the exact size. It was large. Dump trucks are very large.**
Q Sure.
And so the dump trucks go through this x-ray equipment, right?
**A Yes.**
Q So, the x-ray machines are effectively a tunnel of some sort that the trucks drive into?
**A I don't remember if there was an exact tunnel or what. But they drove up to it. It is a big facility.**
Q Would it have been feasible in your view to set up that x-ray equipment there at the Virginia Avenue location?
MR. PIERCE: Objection. Calling for an



expert opinion.
You can go ahead and answer.
THE WITNESS: For that machine I am not sure if it would have been feasible or not. I don't believe so.
BY MR. GROSCUP:
Q So, to the extent that they wanted to use x-ray equipment, it may have been necessary to use an off-site location then, correct?
**A Possibly.**
MR. GROSCUP: Could we take a break for a second?
(Recess.)
(Exhibit Nos. 6, 7 and 8 were marked for identification and were attached to the deposition transcript.)
BY MR. GROSCUP:
Q Mr. Brown, while we were off the record I pre-marked 6, 7 and 8. But before we get to that, I just want to ask a few follow-up questions from earlier this morning.
You recall we talked generally about how

the amount of contaminated soil increased from roughly 140 tons to in excess of 42,000 tons on this project?
A **Yes.**
Q But that the overall quantity of dirt to be hauled off remained the same.
Is that fair?
A **That is correct.**
Q And nonetheless there was no credit for the fact that the amount of non-contaminated soil was decreasing substantially by approximately 42,000 tons, right?
A **That is correct.**
Q Why was there no credit given for that?
MR. PIERCE: Objection. Calling for a legal conclusion.
THE WITNESS: There shouldn't have been. There was an added unit rate to remove the contaminated soil. There was no credit provided for it.
BY MR. GROSCUP:
Q Right.
But your base contract scope included



42,000 tons that were no longer there, right?
A **That is correct.**
**There was still excavation and hauling. It was still excavated and hauled off the site which we were required to do.**
Q Your base contract when you originally were estimating this job or when Anderson was estimating this job envisioned 42,000 tons were going to be excavated and hauled off and included within your base scope. It was no longer included in your base scope.
A **It was still included. It was still removed, but it was removed as contaminated soil.**
Q Right. And it was paid for separately as contaminated soil, correct?
A **That is correct.**
Q So, it was paid for separately as contaminated soil, but yet it still remained within your base scope?
MR. PIERCE: Objection. Calling for a legal conclusion.
Go ahead.
THE WITNESS: That is right.



BY MR. GROSCUP:
Q So, in effect isn't it the case then that Anderson was paid twice for that 42,000 tons?
MR. PIERCE: Objection. Calls for a legal conclusion.
THE WITNESS: No. We were paid a premium to remove that material.
BY MR. GROSCUP:
Q You were paid to remove the 42,000 tons at $35 a ton, which is the rate set forth in your subcontract, correct?
A **In addition to our subcontract, yes.**
Q And in addition to your $2.076 million contract price?
A **That is correct.**
Q A portion of the $2.076 million contract price would have included within it the 42,000 tons that were removed, right?
A **That is correct.**
Q And you were paid separately for that at a unit rate of $35 a ton?
A **That is correct.**



Q You mentioned earlier in your deposition that some of the trucking companies complained about the off-site inspection requirement; is that right?
A **Yes. That is correct.**
Q Did all of them complain about it?
A **The majority of them did. Yes.**
Q The majority of them complained about it, but some did not?
A **I don't remember specifics. It was a big issue to us at the time.**
Q The ones that didn't complain, did they get paid a premium or additional costs relative to the off site inspection requirement?
A **We actually had to pay multiple trucks. We had to sign them in earlier at the site.**
Q You mentioned you had to sign them in earlier at the site. Walk me through this, Jason.
Is it the case that a truck is yours for the day? In other words, it reports to the site and then it is devoted to this project during the course of the remainder of the day?
A **That is correct.**

Q So, when you say that the trucks had to come to the site earlier in the day, they arrived what, a half an hour earlier in the day to account for the truck inspection issue to order to do the work?
**A The time varied.**
**I mean, there was a very large back-up at the inspection station first thing in the morning. But the trucks were signed in.**
**The way we typically work trucks are signed in when they get to the job. They are set up for a certain time. If they are there by that time, they are signed in at that time or signed in when they are loaded before that time. If they are there and don't get loaded until after that time, they are still signed in at that time because they were there when they were supposed to be.**
Q So, the first trip to the inspection station would have been --
MR. BRANDMUELLER: Excuse me.
I came in right in the middle of an answer. How long was I off-line there and how much did I miss?
MR. GROSCUP: Why don't we go off the



record for a second?
(Discussion off the record.)
BY MR. GROSCUP:
Q What I was trying to get to, Mr. Brown, is that the first visit to the 3rd and Constitution Capitol Police inspection facility, that first visit, the point of origination for the trucks essentially would have been the project site; is that right?
**A The point of origination?**
Q Sure.
You said that all the trucks had to come to the project site to check in first thing in the day, right?
**A Yes.**
Q At that point they were empty, right?
**A When we were hauling off. Yes. They would show up at whatever time we started loading. Maybe 5:30 or 7:00 o'clock. They were supposed to be there at whenever time we set for them to be there.**
Q You started loading as early as 5:30 in the morning?
**A On certain occasions. Yes.**



Q So, the trucks would come to the job site first, but they wouldn't be allowed into the job site because they had not been inspected, correct?
**A They would go to the inspection facility first and then come to the job.**
Q So, the trucks would start wherever that particular trucking resource was headquartered and then travel from there to the 3rd and Constitution Avenue truck inspection facility and then go from there to the job site; is that right?
**A That is correct.**
Q And that being the case then, in terms of the route that a particular truck would follow in getting to their point of origin, whether it be in Gaithersburg, Maryland, Rockville, Maryland, Richmond, Virginia, wouldn't the route that they would take to that truck inspection station vary depending upon where they were starting out from?
**A Sure.**
Q And to what account does your truck inspection claim make relative to that issue?
**A It does not.**



Q Why not?
**A Possibly an oversight.**
Q So, it could matter whether the truck, for example, is coming from the north, whether the truck was coming from the south, for example, whether the truck was coming from somewhere within Washington, D.C. on a different job?
**A It possibly could.**
Q Now, has Anderson actually paid these trucking resource companies, the 40 plus that you mentioned earlier in your deposition, have you already paid all their cost, all their hauling cost?
**A Yes.**
Q Are there any that remain unpaid as of today as we sit here today in this deposition?
**A None that I am aware. No.**
Q Did you pay them any differential for security or was security based upon an hourly rate?
**A They are paid based on an hourly rate. There was a time frame there that, like I said, we had to sign them in earlier when they got to the job to account for them going to the inspection facility.**

117

Q You mentioned earlier that each truck was essentially yours for the day.
Is that fair?
**A Yes.**
**Let me rephrase my answer.**
**We paid them a little more for the initial trip the first thing in the morning. We signed them in earlier for that. And then they were paid for the hour the rest of the day. So, whether they went to Kentucky or Florida or straight down the road they were paid by the hour.**
Q So, there wasn't per se a premium paid to the trucking company, but rather it was strictly that they were charging you on a time and materials basis and you were paying the additional time.
Is that right?
**A Yes.**
Q And the trucking resource was arriving to the job site one half-hour earlier roughly, I am swagging a bit, a half-hour early relative to when they would have arrived at the job site in view of the trucking inspection requirement?

118

**A They would be signed in earlier because they had to go to the inspection facility. Once they arrived at the site they were loaded.**
Q So, wouldn't it be the case then that the impact on a per truck basis for that day would have been only one 22-minute interval?
Do you see what I am getting at?
**A No. That would not be the case.**
Q The trucks, for example, are arriving 22 minutes earlier than anticipated, right, because of this inspection issue?
**A For the initial loading.**
Q For the initial loading.
And you have the truck for the entire day, right?
**A That is correct.**
Q So, you are going to pay -- I will just pick a number -- $1,000 for the truck for that day. I know it is different than that, but just to pick a number. Let's say $1,000 for the day under my hypothetical. And let's say that is eight hours under my hypothetical for the $1,000 for eight hours.

119

Okay?
**A Okay.**
Q For the trucking resource.
Now you have the truck for eight and a half hours because of this truck inspection requirement and you are going to have to pay them some amount of money above and beyond the $1,000, right, because they have an extra half-hour, right?
**A Okay.**
Q Right?
**A I follow what you are saying.**
Q Right.
So, what I am trying to figure out is wouldn't it be just 8.5 hours?
**A No. It would not. Because every round they would have to go to and from and it would increase the truck time for the day for the truck.**
**Potentially if the inspection wasn't there, they could have gotten an extra round trip for the day.**
Q So, the trucking resource, there would have been a lack of productivity relative to what it would have anticipated had there been no truck inspection requirement, right?

120

**A Yes. There was also a loss of production. Yes.**
Q So, each trucking resource in terms of making its return trips would lose 30 minutes of otherwise productive time?
**A That is correct.**
Q Do you regard that to be a claim for loss of productivity?
MR. PIERCE: Objection. Calls for a legal conclusion.
THE WITNESS: I feel that it could be.
BY MR. GROSCUP:
Q You feel that this claim could be viewed as one for loss of productivity, right?
**A No. I feel that this claim is a straightforward change. I feel that there also could be a claim of loss of productivity associated with the inspection.**
Q But isn't the 22 minutes itself a claim for loss of productivity?

MR. PIERCE: Objection. Calling for a legal conclusion.
THE WITNESS: No. That is a direct increase in cost.
BY MR. GROSCUP:
Q Because the trucking resource for making each trip has to --
**A It incurs an extra distance and extra pay to them to drive the extra time each run.**
Q That additional time in terms of the number of trips that a truck is going to make during the day, isn't that a loss of productivity then?
MR. PIERCE: Objection. Calling for a legal conclusion.
THE WITNESS: Possibly you could try to provide additional trucks to compensate for that or something along those lines.
BY MR. GROSCUP:
Q Turning to Exhibits 6, 7 and 8, Mr. Brown.
Exhibit 6 is from the Rule 4 file and it is a compilation of various contract provisions that bear upon the site security and inspection issue, as I



understand it.
Exhibit 8 is Anderson's claim, one version of several different claim letters that Anderson sent in to HITT, this one being sent on November 25, 2003 from Mr. Himelfarb to Steve Schoenefeldt.
Am I pronouncing that right?
**A Schoenefeldt.**
Q Did you participate in the drafting of Exhibit 8?
**A Yes.**
Q Did you draft Exhibit 8?
**A No. I did not draft it.**
Q What was your involvement?
**A I would have reviewed it with Stuart, gone through it with him.**
Q Did you attempt to include within Exhibit 8 all of the provisions of the contract which bore upon your belief that the truck inspection location was a change to the contract?
**A I believe so.**
Q What I am trying to cull down, Mr. Brown, is to what extent there are any subcontract or



contract provisions other than those reflected in either Exhibit 8 or Exhibit 6 which bear upon the issue as to whether this is a change to the subcontract.
**A I believe that they are included.**
Q As you sit here today, are you aware of any provisions other than those referenced in Exhibit 6 or Exhibit 8 which would be relevant to this issue?
**A Not off the top of my head. No.**
Q Were you the individual tasked with the responsibility for going through the contract documents and finding contract clauses which supported your position on this issue?
**A Yes.**
Q Was there anybody else involved in that?
**A Stuart went through them as well.**
Q It was strictly you and Mr. Himelfarb that were involved in going through that?
**A Yes. I believe so.**
Q You mentioned that you reviewed Exhibit 8 for accuracy and you also provided some editorial commentary on that issue?



**A I am sure I did. I don't recall what I did for it, but I know I reviewed it with him several times.**
Q I would like to quickly walk through these contract clauses referenced here and get an understanding as to why Anderson believes this supports their position relative to its off-site truck inspection claim.
**A Okay.**
Q Starting with the first one which I see is Specification Section 01110, paragraph 1.3(B), it states that defines the contractor area of work, it essentially limits the area of work to the specific site shown on the contract drawings.
Can you explain to me how it is that that specification section supports the proposition that the location of the Capitol Police truck inspection was a change to the contract?
**A Just all access will be through the guarded gates and allowed to secured personnel. It doesn't tell you that they are going to have to go off-site anywhere at any time for that project.**

125

Q Well, you are referring to now 1.4(B)?
A **I guess I was.**
Q With regard to the first clause that you have referenced there, meaning paragraph 1.3(B).
A **I'm sorry. I would have to go back and look at the clause.**
Q As you sit here today, you don't know why paragraph 1.3(B) would support Anderson's position that this is a change?
A **I would have to go back and review the clause. I don't remember the entire specs off the top of my head.**
Q Sure.
How about 1.4(B)? Can you explain to me how that provision supports Anderson's claim?
A **It just denotes where access will be to the site. Nowhere does it say you are going to go off to another site.**
Q It references site access in 1.4(B) in the first two words there.
Do you see that?
A **That is correct.**

126

Q Did you regard site access to be the same as the location for inspection?
A **I believe I regarded site access to be able to inspect on the site.**
Q In your view was site access synonymous with the location for inspection?
A **The inspection we felt would be at the site.**
Q Why?
A **Nothing says it wouldn't be.**
Q So, because nothing said that it wouldn't be, you assumed that it would?
A **That is correct.**
Q The next provision that Mr. Himelfarb included in his letter is paragraph 3.5.
Do you see that?
A **Yes.**
Q Could you read that to yourself and tell me how, if at all, this bears upon Anderson's claim that the location of the truck inspection was a change to the subcontract?
A **It just says it will be subject to**

127

**inspection. Again it doesn't say that it will be at a different location.**
Q And it states that instructions and maps will be provided to the contractor upon award.
A **That is correct.**
Q What did you understand the purpose of providing those instructions and maps to be?
A **It could have been a map of the site saying come in through this gate and leave through this gate and inspection will be at this location on site.**
Q When you read that provision when you originally looked at the contract to familiarize yourself with the contents, is that what you understood that provision to mean?
A **Yes. That is what I understood it to be.**
Q Did you come to that conclusion before or after the contract was signed by Mr. Himelfarb on June 13th, 2003?
A **I don't recall.**
Q Do you see in Mr. Himelfarb's letter just below that he states a review of Section 3.5 could only leave the bidder to understand that inspection

128

would be conducted when the contractor enters or leaves government property?
A **That is correct.**
Q And you say there is nothing in the documents indicating that inspections would be conducted at remote locations, right?
A **That is right.**
Q And based upon that, Anderson assumed that the inspections would occur on the job site, right?
A **Yes. That is correct.**
Q And it had to make an assumption because the contract itself did not specifically indicate that the inspections were to occur on the job site, right?
A **Essentially.**
**There was no reason to believe that they would not be on site in our minds.**
Q Turning back to Exhibit 6, under Interpretations, do you see where it states under 4.1 that prospective offerors shall request the Contracting Officer, in writing, for an interpretation or correction of any ambiguity, inconsistency, or error in the contract documents which they may

129

discover or which should have been discovered by a reasonably prudent offeror?
Do you see that?
A Yes. I do.
Q Did Anderson make any request for interpretation of any ambiguity relative to the site inspection requirements on this job?
A No. We did not.
Q To your knowledge, did HITT?
A To my knowledge, no.
Q Turning to Exhibit 7.
For identification purposes, this is your letter to Steve Schoenefeldt dated June 13th, 2003; is that correct?
A That is correct.
Q And the subject matter of the letter is the truck inspection claim, right?
A That is correct.
Q And this is your first notice to HITT that this is a change to your subcontract?
A That is correct.
Q In your June 13th letter you reference the

130

current method of truck inspections being a change to your contract.
Do you see that in the first two lines?
A Yes. I do.
Q The current method of truck inspections as of June 13th, 2003 was that they be inspected at the 3rd and Constitution location, right?
A That is correct.
Q Down a few sentences in, Mr. Brown, do you see where it states TAC, meaning Anderson, never received any instructions or maps upon the award of our contract which would lead us to believe that the vehicle inspection would not take place on site.
Do you see that?
A Yes. I do.
Q When was the contract awarded to Anderson?
A I am not sure.
From review of the contract, it was signed officially on the 13th apparently by Stuart.
Q If maps had been provided showing the 3rd and Constitution Avenue inspection facility on June 13th, would this still have been a change to your

131

contract?
MR. PIERCE: Objection. Asking for speculation.
Go ahead.
THE WITNESS: If it had been provided then, yes. We would have sought additional reimbursement. Yes.
BY MR. GROSCUP:
Q So, irrespective of whether the maps were provided wouldn't have impacted whether you regarded this to be a change?
Do you want me to try to ask that again? You look puzzled.
A Please.
Q You state in your letter that Anderson never received any instructions or maps upon award of the contract, right?
A That is correct.
Q And you mentioned a moment ago that June 13th is the date that Mr. Himelfarb signs the subcontract, right?
A Apparently. Yes.

132

Q If on June 14th he received instructions and maps indicating that the inspection location is at 3rd and Constitution, is that still a change to the subcontract?
MR. PIERCE: Objection. Calling for speculation.
Go ahead.
THE WITNESS: Yes. I believe so.
BY MR. GROSCUP:
Q So, whether or not the maps were provided would not impact upon whether this was a change to the subcontract in your view?
A A map showing it to be on site would not have been a change to the contract.
Q If there had been a map provided showing the 3rd and Constitution Avenue location and that map had been provided on June 13th or June 14th, would it still have been a change to the subcontract?
A Yes. I believe so.
Q So, whether or not the maps were provided wouldn't have impacted your view as to whether this was a change?

133

A **It depends on what the map showed.**
Q So, if a June 14th map showed the 3rd and Constitution location --
A **It would have still been a change.**
Q It would have still been a change.
If the map had indicated that it would have been on site, then it would not have been a change obviously because it was on site, right?
A **That is correct.**
Q So, to the extent that maps were provided showing 3rd and Constitution, that wouldn't have impacted your decision as to whether this was a change?
A **Could you repeat that one more time?**
Q To the extent that AOC or HITT provided you with a map showing the 3rd and Constitution inspection facility and they gave you that on June 13th, that would not have impacted your decision as to whether this was a change, right?
MR. PIERCE: Objection. Calling for speculation.
Go ahead.

134

THE WITNESS: That is correct.
(Exhibit No. 9 was marked for identification and was attached to the deposition transcript.)
BY MR. GROSCUP:
Q Mr. Brown, have you ever seen this document before?
A **Yes. I have.**
Q Where did you first see it?
A **In previous depositions.**
Q Was this ever provided to you during the course of the project to the best of your recollection?
A **Not to the best of my recollection. No.**
Q Do you know whether this was ever provided to HITT in connection with the West Refrigeration Plant Expansion Project?
A **I don't specifically know.**
Q Could you take a pen and indicate the location of the West Refrigeration Plant Expansion Project?
A **(Witness complies.)**

135

**The triangle between these streets, South Capitol and Virginia Avenue.**
Q Could you shade that out?
A **(Witness complies.)**
**I went down too far. Sorry.**
Q You have shaded out on Exhibit No. 9 the location of the West Refrigeration Plant Expansion on this particular map?
A **That is correct.**
Q During the course of depositions you have seen evidence that on the Interim Coal Handling Facility Project, also built for AOC, the contract at any rate required HITT to have its trucks inspected by the Capitol Police at the 40th and P Street location there at the bottom of the map?
A **That is correct.**
Q And you have heard some testimony that perhaps the Capitol Police may have relaxed that requirement and allowed them to conduct inspections on the job site; is that right?
A **That is correct.**
Q Now, here on this job the inspections that were done of Anderson's trucks were not done at the P Street location, correct?

136

A **That is correct.**
Q It says they were done at the 3rd and Constitution Avenue.
Could you mark 3rd and Constitution and put an "I" next to it.
A **(Witness complies.)**
Q So, the "I" in the upper left hand corner of the document is where Anderson's trucks were actually inspected on this job, right?
A **That is correct.**
Q Does it appear to you that the difference between the 3rd and Constitution Avenue inspection and the job site is roughly the same distance as the job site to the P Street location?
A **It is similar.**
Q Do you know, Mr. Brown, whether any of the other subcontractors on the West Refrigeration Plant Expansion have submitted a similar claim relating to the truck inspection requirement?
A **No. I do not know that.**

Q Have you ever asked HITT?
A **No. Not directly asked HITT.**
Q Have you ever asked any of the other subcontractors whether they felt this was a change?
A **No. I have not.**
Q And none of them have ever expressed that to you?
A **No. They have not.**
Q Do you know whether HITT itself is seeking a change on its own behalf or strictly on behalf of Anderson?
A **I believe it is strictly on behalf of us, but that would be a question for HITT to answer.**
Q You are aware that HITT also went to the 3rd and Constitution inspection facility for inspections, right?
A **Yes.**
Q Have you ever asked HITT why it did not submit a claim relative to that issue?
A **No. I have not.**
Q Have they ever told you?
A **No. They have not.**



Q To your knowledge, have they ever indicated why they didn't submit a claim to anybody at Anderson?
A **No. There could be multiple reasons.**
Q Do you recall at a deposition last week of Mr. Iliff and also Mr. Malone some discussion of a meeting that was held on the job site relative to the truck inspection claim?
A **I do.**
Q And I believe that my people, meaning Mr. Iliff and Mr. Malone, testified they thought that meeting was sometime in the summer of 2003.
A **I believe it was the late summer or possibly fall, wintertime.**
Q I went back and looked at the documents. I think that that meeting might have actually been October 1st, 2003 based upon some letters.
Is that about consistent with your recollection about the meeting?
A **Possibly. It was well into the project. Yes.**
Q Do you recall whether the meeting started out with AOC and HITT and then Anderson was brought into the meeting?
A **I don't recall that.**
**The meeting was not for the inspections claim. The meeting was for a different Change Order in regards to a gasoline change or an issue with the gas line on site.**
**This was kind of a sidebar of that meeting.**
Q The truck inspection issue was a sidebar at that meeting?
A **Yes.**
Q Turning to Exhibit 2 to your deposition, could you go to the third page and tell me where that gas line was to go?
Maybe you can mark it on there.
A **I don't know if it is shown on this. But I believe it is up in this area. It might be somewhere in this area.**
**I would have to go back and look at the drawing. It is hard to tell from this scale of the drawing.**
Q Did that gasoline go within the footprint of the mass excavation of the building?





A **The mass excavation of the building, I don't believe it did. It was within the tunnel excavation.**
Q Was there a tunnel that went underneath the railroad tracks?
A **No. The tunnel went down the road. The tunnel went from -- I could show you on another map.**
**The tunnel came through here.**
Q So, this is the tunnel that is shown on the first page of Brown Exhibit No. 2?
A **That is correct.**
Q Was there excavation associated with that tunnel?
A **Yes. There was.**
Q When was that excavation work being done relative to the bulk excavation?
A **Some of it was simultaneous. Most of it was after the bulk excavation for the building.**
Q And some of that tunnel work, based upon your artistic rendering here on Exhibit 2, looks like it is traversing along Virginia Avenue.
A **That is correct.**

141

Q So, Virginia Avenue, a portion of it was being taken out as part of Anderson's base contract work?
**A Yes. A portion of that came out. Yes.**
Q To the extent that trucks were being inspected here, and I will just draw an "I" on the corner of Virginia Avenue and South Capitol Street, if the trucks were being inspected here on that corner during the course of the job site with x-ray equipment, dogs, whatever, how would the truck have been able to access into the job site in view of this open pit excavation?
**A The trucks also came in on Virginia Avenue down here.**
Q So, in your view then the inspections would have had to have occurred somewhere in the far right-hand side, which I will mark I-2?
Is that right?
**A Those were the two main access points for the project. There was multiple. There were other areas to enter the site.**
Q In terms of feasible inspection locations

142

or potentially feasible inspection locations for your trucks, would I and I-2 have been the most feasible inspection locations or were there others in your view?
MR. PIERCE: Objection. Calling for an opinion.
Go ahead.
THE WITNESS: I and I-2 probably would have been the most feasible. But there was also a gate on South Capitol that allowed entry into the project.
BY MR. GROSCUP:
Q With regard to this gate along South Capitol Street, that would have been confronted with access issues in terms of this open trench excavation as well, right?
**A At certain points in time.**
**And there was another entrance on E Street as well.**
**But the two main points probably would have been I and I-2.**
Q And in view of this gas line excavation running along parallel to South Capitol Street and

143

then bending and turning and running underneath Virginia Avenue for a portion of it, would I-2 have been the most feasible location for point of entry to do the mass excavation?
**A Again most of the mass excavation was done prior to completing the tunnel through that section.**
Q But some portion of the mass excavation was being done concurrently with the tunnel work, right?
**A Yes. Some portion was.**
Q Returning to the map which has been marked Exhibit 9 to your deposition, I will represent to you that a black and white version of this document was provided to me by Mr. Pierce as we simultaneously handed one another boxes of documents relevant to this project and in my box this colored map was contained and in Mr. Pierce's box a black and white version of this document was in Mr. Pierce's box.
MR. PIERCE: Bill, could I just go on record?
I have not seen such a document. The only possibility I can think of is that I did send a copy of that to Mark Dachille, but it was after the

144

deposition.
No. I guess we exchanged documents before the deposition.
Didn't we?
MR. GROSCUP: Yes.
MR. PIERCE: Because I never saw that in our documents. I couldn't find it after you told me you saw it.
MR. GROSCUP: I will go back and look.
BY MR. GROSCUP:
Q I will change my representation to you it was my strong belief --
MR. PIERCE: You can represent it. I just don't think so.
BY MR. GROSCUP:
Q -- that this document, a black and white version of it at any rate, was contained in the box which Joe Pierce gave to me, which was simultaneously with me handing him our box of documents.
If in fact that were true, do you have any knowledge as to when HITT or Anderson may have first obtained this document?

145

A No. I don't.
Q Have you asked HITT whether when they received the March 24, 2003 award from AOC a map such as the one shown in Exhibit 9 was enclosed?
A We have asked. They said they did not receive a map I believe. I don't recall. I know we asked the question.
Q Who did you ask?
A I am not quite sure. I don't know if it was in the Steve Schoenefeldt, John Seeman, David Michaelson era.
To the best of my recollection, I don't believe one was provided. I don't know if there were mixed stories or what because of where the inspection was.
Q Do Seeman and Michaelson still work for HITT?
A I don't believe they do.
Q Neither?
A Neither.
Q At the time you submitted your June 13th, 2003 letter, first of all, do you see in that letter,

146

Mr. Brown, that it states that this inspection has a minimum of 30 minutes per truck round?
A That is correct.
Q As I understand it, that 30 minutes came from Soil Safe.
A That was an estimate provided. Soil Safe provided an estimate of over 30 minutes and that was our estimate as well at least going to and from.
Q Soil Safe's estimate didn't exist until roughly October 2003, right?
A I don't recall exactly when, but that sounds about right.
Q Did you ask Soil Safe for an estimate of the additional trucking time in the wake of that early October 2003 meeting with AOC and HITT?
A I don't recall when it was asked of them.
(Exhibit No. 10 was marked for identification and was attached to the deposition transcript.)
BY MR. GROSCUP:
Q I am handing you what has been marked Exhibit 10 to your deposition, Mr. Brown.

147

Do you recognize this document?
A Yes. I do.
Q What is it?
A It is one of my letters to HITT on the inspection claim.
Q In particular it is a letter to Mr. Schoenefeldt on the inspection claim dated October 14th, 2003?
A That is correct.
Q Do you see in the opening of that letter it states per our last meeting discussing our truck inspections claim at the West Refrigeration Plant Expansion Project on October 1, 2003, the AOC and HITT Contracting both asked that TAC, meaning Anderson, go back and review the truck routes into the project?
A That is correct.
Q Does this refresh your recollection of that meeting that people have been trying to pinpoint the date on was October 1st, 2003?
A It doesn't refresh my recollection, but it is apparent from the letter.
Q Did you yourself keep any notes from what

148

transpired during the course of that meeting?
A Yes. I did.
Q Do you have them?
A I can't find them.
Q It appears that we are both guilty of the same issue.
A Apparently.
MR. GROSCUP: And I will represent, Joe, that I have had my people go back and look for those notes and nobody can seem to find any notes either.
BY MR. GROSCUP:
Q You do recall that the issue of the truck inspection claim came up during the course of the October 1, 2003 meeting, right?
A Yes.
Q And there were representatives of HITT there and there were representatives from AOC there, as well as yourself, right?
A Yes.
Q And who else from Anderson was there?
A Myself and Stuart Himelfarb.
Q And who exactly was there for AOC?

149

A For AOC was Mike Keegan, Mr. Malone. I don't recall Chuck being there, but that is not saying that he was not there.
Q And how about for HITT?
A HITT. I know Steve was there.
I believe David Michaelson was there and possibly John Seeman. They underwent several changes.
Q Do you recall how long roughly the discussion of the truck inspection issue was during the course of the October 1 meeting?
A No.
I don't believe it was extremely long. Probably half an hour to an hour.
Q Do you recall anything of the substance of that discussion in terms of who said what?
A I do recall what Mike Keegan stated. We were talking and he said that they didn't know where it was going to be when they issued the documents for the project.
Q Mike Keegan, then with AOC, indicated during the course of that meeting that Mike Keegan didn't know where the truck inspection locations were

150

going to be when the contract was awarded to HITT?
A It was my interpretation that the AOC did not know where the inspections were going to take place for that project initially.
Q To the best of your recollection, what exactly did Mike Keegan say?
A There was a discussion going on about why it wasn't covered or whatnot and Mike said that they didn't even know where it would be prior to the formulation of the contract and stuff.
Q Did you believe that AOC had a responsibility to determine from the Capitol Police where the truck inspections were to occur?
A I believe it should have been. Yes.
Q We saw earlier in exhibits, and we can go to it if necessary, I think it is Brown Exhibit No. 5, 1.6, Site Security, Section A-2, which directs the contractor to coordinate deliveries with the U.S. Capitol Police.
A That is correct. I assume.
Q I will show you mine.
A Yes.

151

Q Are you with me?
A Yes.
Q In light of the requirement that the contractor coordinate those deliveries with the U.S. Capitol Police, my question to you is why would AOC have been involved in this issue at all?
MR. PIERCE: Objection. Calling for speculation and a legal conclusion.
Go ahead.
THE WITNESS: In my opinion if it was going to be off-site, it should have been dictated that the inspection station would have been in a different location.
BY MR. GROSCUP:
Q Do you believe that AOC had any input as to where the U.S. Capitol Police decided to inspect trucks on the Capitol grounds?
A I don't know.
Q You have no reason to believe that AOC was controlling the location of the inspection locations, right?
A I have no idea how things work between the

152

two.
Q Do you recall seeing correspondence at some point in time from Mr. Keegan indicating that he was told by HITT that your truck inspection claim had no merit?
A I have seen that. Yes.
Q When did you first see that?
A I am assuming somewhere around the time that it was written. I believe it was written in a letter.
Q What was your response upon seeing that?
A We asked HITT. HITT said that that was not the case.
Q So, HITT told you that they had not told AOC that the claim had no merit?
A Yes.
Q Who at HITT told you that?
A I don't recall specifics. Most of my conversations throughout the project were with Steve. The majority of them were.
Q With Steve Schoenefeldt?
A Yes.

**But I had multiple discussions with everyone there from David Michaelson to John Seeman to Josh Resno, Jerry Brandmueller when he became involved.**
Q Was Jerry involved back at that point in October 2003?
A **I don't recall that he was. I don't remember the day when Jerry became involved in the project.**
Q Was it an issue of concern to you when you saw correspondence coming from the owner indicating that the general had expressed a lack of support for your claim?
A **Potentially a little bit.**
Q Did Anderson indicate to HITT at that point in time that if the claim wasn't going to be passed up the chain to the owner, then it was going to be asserted nevertheless against HITT?
A **Yes.**
Q Was it at that point in time that they told you they had never indicated that to AOC?
A **I don't know if it was all in conjunction**



**or not. I don't recall.**
**(Exhibit No. 11 was marked for identification and was attached to the deposition transcript.)**
**BY MR. GROSCUP:**
Q Mr. Brown, I am handing you what has been marked as Exhibit 11 to your deposition.
This is a letter from Mr. Schoenefeldt to Mr. Mologne of HILL International dated September 11th, 2003.
Do you see that?
A **Yes.**
Q And you recall that HILL was AOC's CM on this job?
A **That is correct.**
Q Have you ever seen this letter before?
A **I don't recall seeing it.**
Q Could you read to yourself the contents? It is a very short letter.
A **(Witness complies.)**
**I have.**
Q Do you see in the middle there, Mr. Brown,



where it says currently HITT is attempting to mitigate this issue with Anderson Company to avoid submitting a claim to the owner?
A **Yes. I do.**
Q What is your recollection of Anderson's efforts to mitigate this issue with the Anderson Company?
A **HITT at one time had mentioned that possibly for $50,000 if we could make it go away, they could probably resolve it.**
**To my recollection that is the only time.**
Q So, at some point in time HITT indicated to you they may be willing to pay $50,000 on this claim to make it go away?
A **That is correct.**
Q Do you recall whether that was wrapped up in the whole contaminated soil issue?
A **No. I don't recall specifically.**
Q Was there any discussion of attempting to wrap-up the truck inspection claim in the discussions concerning the contaminated soil?
A **I don't recall.**



Q Was there any discussion of attempting to do a lump sum Change Order that would address both the contaminated soil and the truck inspection claim?
A **Not other than, like I said, the $50,000. That is my only recollection.**
Q $50,000 from the Anderson Company's standpoint wasn't a sufficient amount of money at that point in time?
A **That is correct.**
Q And at that point in time Anderson was understanding that its claim was going to be worth in excess of $300,000, correct?
A **That is correct.**
Q And today the claim is worth, according to your recent calculation, $185,000?
A **As submitted at this point.**
Q Is it going to get bigger?
A **Hopefully.**
Q Bigger against AOC?
A **I would hope so.**
Q When are we going to get the revised damage computations?

157

We have a Hearing apparently, according to your counsel, coming up here pretty soon?
A I am not sure. If it is going to be, it would be pretty soon. I know it would have to be.
Q Who is working on that?
A We are currently kind of talking about it with counsel.
Q What are you thinking about adding?
A Inspection time at the inspection facility.
Q In terms of adding inspection time at the inspection facility, didn't the contract itself require truck inspections?
A Yes. It did.
Q And so wouldn't truck inspections have been something that you are going to have to endure as part of your base contract scope?
A Yes.
Q So how then can you add that?
A Well, with the location of the inspection facility we were required to get in line with hundreds of other trucks from another project.
Q So, because this was a joint inspection

158

facility it is Anderson's position they are thinking about supplementing its $185,000 claim?
A Yes.
Q You mentioned a moment ago that you had some discussions with HITT about mitigating the claim and there was a discussion about them potentially throwing you 50 grand, right?
A That is correct.
Q Who were those discussions with at HITT? Michaelson? Seeman?
A I am trying to recall. I believe I would be probably speculating.
I think it was Michaelson. It might have possibly been Jerry. I don't remember at that time who it was with. It could have been John Seeman as well. I don't specifically recall who it was with.
Q The letter that has been marked as Exhibit No. 11 to your deposition is dated September 11, 2003.
Were the discussions about the $50,000 coming your way roughly contemporaneously with those mitigation efforts?

159

A I think so. But again I am speculating a little bit. I don't exactly recall.
I do recall the conversations or the content of them. I don't exactly recall who they were with.
Q Was there anybody on Anderson's end that were involved in those discussions other than yourself?
A Just myself and Stuart when this discussion occurred.
Q So, there was a meeting that occurred between you and your general contractor HITT relative to attempting to mitigate the truck inspection claim?
A That is correct.
I don't know if it was solely for mitigating the truck inspection claim, but there was a meeting that occurred where it was brought up.
Q And that would have been after the October 1, 2003 meeting, right?
A I believe so.
Q During that meeting to attempt to mitigate the truck inspection claim with the GC HITT, were

160

there any notes taken during the course of that meeting?
A Not that I can find. No.
Q Do you have any notes at all relative to the truck inspection claim in terms of any conversations you had with anyone at HITT or anyone at AOC?
A No notes that aren't memorialized into letters.
Q Was there ever any concern on behalf of Anderson that HITT was failing to prosecute the claim on a timely basis?
A I don't know if it was a concern or not.
I was concerned that we hadn't received anything back, you know, any information regarding the claim.
Q Did you believe that AOC was dragging its feet on this claim?
A I don't really recall who we thought was dragging their feet on it or what was going on with it. We knew it was a delicate situation.
Q Do you recall a letter from Mr. Keegan in

roughly the May 2004 time frame that HITT didn't respond to until late September 2004?
A **I don't recall it off the top of my head.**
**I know there was various correspondence. I am sure you have a copy that I can review.**
**(Exhibit Nos. 12 and 13 were marked for identification and was attached to the deposition transcript.)**
**BY MR. GROSCUP:**
Q Mr. Brown, I am handing you what has been marked as Exhibits 12 and 13 to your deposition.
Can you tell me whether you have ever seen these documents before?
A **Yes.**
Q For record identification purposes, Exhibit No. 12 is a letter from Mike Keegan formerly with AOC to Jerry Brandmueller dated May 25, 2004 concerning the off-site inspection claim.
A **Yes. It is.**
Q You don't have to read the entire contents of the letter. It is several pages long.
But generally speaking, do you see that



Mr. Keegan is asking HITT for additional information relative to this claim?
A **Yes. I do.**
Q And in turning to Exhibit 13, for record identification purposes, it is letter from Mr. Brandmueller back to Mr. Keegan dated September 22nd, 2004.
A **Yes.**
Q In this September 22nd, 2004 letter he expressly references that he is writing with regard to Mr. Keegan's letter of November 25, 2004.
Do you see that?
A **Yes. I do.**
Q And he is purporting to provide certain of the information that Mr. Keegan was requesting on May 25, right?
A **Apparently. Yes.**
Q Do you know why it took HITT four months to get back to AOC?
A **No. I don't.**
Q Do you see that you yourself were involved in responding to Mr. Keegan's May 25, 2004 letter?



A **Yes. I was.**
Q And in particular I am looking at the September 1st, 2004 letter from yourself, which is attached to Mr. Brandmueller's September 22nd letter.
Do you see that?
A **Yes. I do.**
Q So, you were involved in this process in terms of assembling information to get back to AOC, right?
A **Yes.**
Q Why the delay of four months in getting back?
A **I do not know. I don't recall.**
Q Do you recall whether it was a concern on behalf of Anderson that HITT was not promptly responding to AOC's inquiries with regard to the truck inspection claim?
A **I don't specifically recall that. I don't recall why it took so long.**
Q This letter doesn't refresh your recollection that that was a concern on behalf of Anderson?



A **No. It does not.**
Q Were there further mitigation efforts going on between HITT and Anderson during that four month interval?
A **I don't really recall. That could have easily been the time frame where the offer was made of the $50,000 as well. I don't recall.**
Q You may have spoke to this earlier.
Your $35 unit rate for contaminated soil never changed, right?
A **I don't believe it did. No.**
Q So, the quantity went up from 140 tons to 42,000 plus tons, but the unit rate remained the same, right?
A **That is correct.**
Q That contaminated soil rate of $35 a ton, can you describe for me what all is included within that?
A **It was a premium for moving contaminated soil.**
Q And that included the excavation of the soil, any manifesting obligations, the transport of

165

the soil, everything?
A Yes.
Q Including the disposal and treatment of the soil, if necessary?
A **That is correct.**
Q Did HITT perform any role whatsoever relative to the contaminated soil removal, extraction, processing, on the West Refrigeration Plant Expansion Project?
A **Other than monitoring it.**
Q What form of monitoring was it doing?
A **It monitored all of our work out there.**
Q So, they had an on site project manager, a superintendent and foreman and so forth that was watching you all perform your work?
A **That is correct.**
Q Who was doing the manifesting of the contaminated soil?
A **The manifesting we did.**
Q Did HITT perform any paperwork function at all relative to contaminated soil removal on the project?

166

A **I am sure they had to process all of our paperwork coming in on it. I am not sure what else.**
Q When you say process your paperwork, what do you mean?
A **Processing the manifest is fairly tedious. I mean, there is a lot of them. And also going through them and stuff.**
Q So, they had to process the manifest in terms of figuring out how much to pay you all for the contaminated soil, right?
A **That is correct.**
Q Other than figuring out how much they had to pay you, are you aware of any role that HITT had relative to contaminated soil?
A **No. I am not aware.**
MR. GROSCUP: Off the record for a second.
(Discussion off the record.)
MR. GROSCUP: Back on the record.
BY MR. GROSCUP:
Q Just winding up here, Mr. Brown.
A moment ago we were talking about the manifest on the contaminated soil.

167

Do you recall that?
A Yes.
Q And you indicated that Anderson was the one preparing the manifest, right?
A Yes.
Q And the only tracking then that HITT would have done relative to the contaminated soil was strictly look at the manifest prepared by you to determine the amount of money to pay you in terms of the tonnage, right?
A Yes.
MR. GROSCUP: Let's mark this as Exhibit No. 14.
(Exhibit No. 14 was marked for identification and was attached to the deposition transcript.)
BY MR. GROSCUP:
Q I am handing you what has been marked as Exhibit No. 14 to your deposition, Mr. Brown.
Have you ever seen this document before?
A **Yes. I have.**
Q Do you see it is a letter from Mr. Pierce

168

to Mark Dachille, counsel for HITT, related to the off-site security claim?
A Yes.
Q In the middle paragraph Mr. Pierce is inquiring of Mr. Dachille as to the actions HITT has taken or plans to take to prosecute this claim. HITT has a fiduciary duty to Anderson with respect to this claim. Continuing on: If Hitt's actions or inactions impair Anderson's ability to receive payment, Anderson will hold HITT directly responsible for the claim.
A Yes.
Q Does this refresh your recollection that there was a certain concern in any event on the part of Anderson as to whether HITT was doing all that was necessary to prosecute this claim?
A **Apparently we had a concern in March of 2006.**
Q Right.
Do you recall what that concern was?
A **Not specifically. No.**
Q Do you recall anything at all about concerns you might have had in terms of HITT pressing

169

this issue forward on your behalf?
A **I think we were just concerned that we hadn't received any information on it. It is a lot of money. We were trying to get the thing on center.**
Q Well, by March 2006 we had already had the Contracting Officer's final decision, right?
A **I believe so. Yes.**
Q What is it you were looking for them to do? File a claim with the Board?
A **I would have to ask my attorney. But I believe so.**
Q In the last paragraph Mr. Pierce notes that: Also, Anderson has informed us that HITT has refused to make final payment of undisputed money due while the claim is pending. This is not justified.
A **Yes.**
Q Was HITT holding final payment to Anderson because of the fact this claim was pending?
A **I believe at this time it was my impression that we weren't being paid our retention monies because the claim was pressing. And we have been informed since that is not the case.**

170

Q Who informed you that was not the case?
A **Jerry.**
Q Did this letter result in the release of additional funds from HITT to Anderson?
A **I don't believe so, but I would have to check the records. I don't recall our last payment.**
Q Why are they withholding the money?
A **For retention?**
Q Yes.
A **They haven't been released by the owner yet.**
Q So, is it your belief that all the retention money that is being held by HITT against Anderson is strictly the corollary to the money that AOC is holding against HITT?
A **That is our belief. Yes.**
Q And you understand that HITT is not allowed pursuant to your subcontract to withhold a retainer except to the extent that the owner is withholding out against HITT, right?
A **That is correct.**
Q Have you made any inquiry to determine

171

whether and to what extent that the retainer monies are being released by AOC or actually funneling their way down to you?
A **We have inquired with HITT.**
Q And what, if anything, has HITT provided you in that regard?
A **Actually I am just going to rely on their verbal comments.**
Q What is HITT currently withholding against Anderson as it relates to the retainer? Is it five percent or ten percent?
A **I don't believe either. I believe it is less than that. I believe they have reduced the retention down. I know they reduced it once. I think they reduced it twice.**
Q You believe that the current retainage withholding is less than five percent?
A **Yes. It is.**
Q And that will be shown in your pay reqs, right?
A **Yes. It should.**
Q Have you all produced your pay reqs as part

172

of this process, discovery process?
MR. PIERCE: I don't believe so.
THE WITNESS: I don't remember.
BY MR. GROSCUP:
Q I don't need all the pay reqs, but I would like the last couple.
A **I can testify that they are a little screwy. I don't remember if the last time we received compensation if the pay req reflects what we received. It should, but I am not 100 percent sure.**
**I believe we are being within $120,000 in retention.**
Q So, in terms of your total contract value which you indicated earlier in your deposition is a little bit over $4 million --
A **Around $4 million.**
Q -- around $4 million, you believe that the total amount of money that HITT is currently withholding in the form of a retainer is about 120 grand?
A **I believe so.**
Q Other than the payment applications which

173

you indicated a moment ago were a little screwy, would there be another document that would show me that?

A I do have some notes from a meeting with Steve, and I believe Jerry, showing what was being withheld.

Q Do the notes from that meeting provide an accounting in terms of what was being withheld and why?

A I believe so.

Q Other than retainer, is there anything else being withheld?

A I don't believe so. I think that is about it.

Maybe a few minor Change Orders. I don't recall them if there are. There is a possibility that they would be. And if they are, shame on me for not getting them finalized up.

MR. GROSCUP: Off the record for a second.

(Discussion off the record.)

MR. GROSCUP: That is all.

I think we are good.

MR. PIERCE: I don't have any questions.

174

(Signature having not been waived, the deposition of JASON BROWN was concluded at 12:50 p.m.)

175

* * *

ACKNOWLEDGMENT OF DEPONENT

I, JASON BROWN, do hereby acknowledge that I have read and examined the foregoing testimony, and the same is a true, correct, and complete transcription of the testimony given by me, and any corrections appear on the attached Errata Sheet signed by me.

(DATE) (SIGNATURE)

176

CERTIFICATE OF SHORTHAND REPORTER - NOTARY PUBLIC

I, Paula J. Eastes, Registered Professional Reporter, the officer before whom the foregoing proceedings were taken, do hereby certify that the foregoing transcript is a true and correct record of the proceedings; that said proceedings were taken by me stenographically and thereafter reduced to typewriting under my supervision; and that I am neither counsel for, related to, nor employed by any of the parties to this case and have no interest, financial or otherwise, in its outcome.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this day of 2006.

My commission expires: September 30, 2007

NOTARY PUBLIC IN AND FOR THE
COMMONWEALTH OF VIRGINIA

ERRATA SHEET

IN RE: APPEAL OF HITT CONTRACTING INC.

RETURN BY: ____________________

PAGE LINE CORRECTION AND REASON

**A**

**abbreviate** 7:9
**ability** 168:9
**able** 26:7 58:18 126:3 141:11
**about** 11:10 13:18,19 16:11 18:2 19:6 20:9 23:9 28:5,5 29:20 30:4 32:10 33:3 37:22 38:3,4 38:20 47:9 51:3,14 64:14 66:4,8 76:19 90:20 91:5 96:14 107:7 108:22 112:2,5 112:7 125:14 138:17,18 146:12 149:4 150:7 157:6,8 158:2,5,6,20 166:21 168:21 172:19 173:12
**above** 32:17 119:7
**absolutely** 87:8
**access** 124:19 125:16,19 126:1,3,5 141:11,19 142:14
**accommodate** 10:8
**according** 156:14 157:1
**account** 113:3 115:20 116:22
**accounting** 173:7
**accuracy** 123:21
**acknowledge** 175:3
**ACKNOWLE...** 175:2
**actions** 168:5,8
**actual** 22:5 24:16 30:6,11 30:17 31:5 52:15 53:8 74:19
**actually** 7:16 33:13 35:13 46:4 56:15 58:9,13 61:22 66:8 73:11 76:11 78:15 79:11 81:8 83:20 112:14 116:9 136:11 138:15 171:2,7
**actuals** 31:1
**add** 157:18
**added** 92:10 109:17
**adding** 157:8,10
**addition** 111:12 111:13
**additional** 20:11 20:14 41:1 51:1,13 53:3 112:12 117:15 121:10,16 131:6 146:14 162:1 170:4
**address** 156:2
**advance** 29:19 42:2 85:20
**advise** 68:12
**affecting** 54:5
**affirmatively** 36:19
**affixed** 176:13
**after** 12:8 18:2 34:16 38:1,2,7 38:9 39:1 46:4 55:5 56:6 78:12 113:14 127:17 140:18 143:22 144:7 159:18
**again** 48:19 106:8 127:1 131:12 143:5 159:1
**against** 37:18 153:18 156:19 170:13,15,20 171:9
**agent** 39:20
**agents** 40:3
**ago** 8:14 28:14 28:18 30:4 31:9 50:12 54:15 84:18 131:19 158:4 166:21 173:1
**agree** 59:12
**agreeing** 27:3
**agreement** 2:18
**ahead** 10:2 21:19 36:16 37:6 90:6 95:18 96:5 105:4 108:2 110:21 131:4 132:7 133:22 142:7 151:9
**airport** 99:15,16 99:17,21 100:4 100:8 101:21
**allowed** 71:19 104:3 115:2 124:20 135:19 142:10 170:17
**along** 69:13 121:17 140:21 142:12,22
**already** 17:19 18:7 71:15 77:6 78:12 116:11 169:5
**alter** 25:7
**alternating** 45:11,12
**ambiguity** 128:21 129:6
**amendment** 5:14 84:17 85:3 89:16
**amount** 14:9 23:3 25:6,7,10 25:15,17 26:1 27:8 40:22 41:1 48:21 53:3,15 58:21 62:12 63:6 109:1,9 119:6 156:7 167:9 172:18
**analysis** 61:21 62:3
**analyze** 35:11 40:21 42:8 44:12,14
**analyzing** 34:19 34:21 35:3,21
**Anderson** 1:6 3:12 8:20 10:18,20 11:2 11:20 12:16 13:20 14:14 15:6,11 16:5,9 16:16,19 17:1 17:5,6,7,8 21:4 22:3,7,16 24:9 25:21 26:3,10 26:15,22 27:9 27:11,16 28:8 28:14 29:9 30:9,14 31:18 32:7 33:20 34:16 36:3 37:10,17 39:9 40:3 41:9,13 42:13,20 45:1 46:13 47:7 52:6,13 55:9 64:18 65:21 66:20 68:11 71:15 72:5 76:14,20 77:5 77:10 78:12 79:4,11,18,22 80:4 81:9 82:1 82:15,16 86:15 86:21 87:3,11 92:2,17 93:1 95:10,14 96:21 97:3,8,22 98:6 98:8 105:1 110:7 111:3 116:9 122:3 124:6 128:8 129:5 130:10 130:16 131:15 137:11 138:2 138:22 144:21 147:14 148:20 153:15 155:2,6 156:6,10 160:11 163:15 163:22 164:3 167:3 168:7,9 168:14 169:13 169:17 170:4 170:14 171:10
**Anderson's** 12:6 12:12,19 21:2 28:19 29:10,16 33:14 35:3 36:11 44:19 49:8 52:9 57:3 66:11 68:8 78:5 80:17 100:4 101:5 103:15 104:18 122:2 125:8,15 126:19 136:1 136:10 141:2 155:5 158:1 159:6 168:9
**Anderson/Hitt** 35:11

**Annino** 3:15 8:19 41:7,8,10 41:11
**Annino's** 43:9
**another** 48:13 65:14 125:18 140:7 142:17 143:14 157:21 173:2
**answer** 9:13 10:1,2,10 78:8 80:21 95:18 108:2 113:20 117:5 137:13
**anticipated** 118:10 120:1
**anybody** 16:19 39:20 40:2 41:13 42:12,16 42:19 82:16 93:4 95:10,11 123:15 138:2 159:6
**anyone** 20:5 39:4,8,9 40:3 57:13 91:22 92:3 98:4 160:6,6
**anything** 10:14 26:9,14 39:17 104:4 149:14 160:15 168:21 171:5 173:10
**anywhere** 94:10 124:22
**AOC** 1:7 7:10 7:11 15:12 28:9 33:7 36:1 39:20,21 40:2 53:9 64:4 97:9 133:15 135:12 138:22 145:3 146:15 147:13 148:17,22 149:1,20 150:2 150:11 151:5 151:15,19 152:15 153:21 156:19 160:7 160:17 161:16 162:19 163:8 170:15 171:2
**AOC's** 154:13 163:16
**AOC/Hitt** 35:18 37:13
**apologize** 21:10
**apparent** 147:21
**apparently** 78:14 130:19 131:22 148:7 157:1 162:17 168:16
**APPEAL** 1:4 177:2
**APPEALS** 1:1
**appear** 83:21 136:13 175:7
**appeared** 45:20
**appears** 83:20 148:5
**applications** 172:22
**apply** 29:1
**appreciate** 18:20
**approved** 71:15
**approximate** 13:11
**approximated** 31:6
**approximately** 10:21 13:6,7 14:3,6,17 23:2 25:22 59:2,9 59:11 109:10
**approximation** 66:15
**Architect** 3:3 4:9 7:5,9,12 9:7 13:20
**area** 32:14 57:18 106:13 106:17 124:12 124:13 139:16 139:17
**areas** 141:21
**Army** 101:2,3,4
**around** 29:12 34:12 68:21 69:6 70:17 75:20 104:7,9 152:8 172:16 172:17
**arranged** 85:19
**arrangements** 85:18
**arrival** 85:20
**arrive** 56:20 68:13
**arrived** 105:4 113:2 117:21 118:3
**arriving** 82:14 117:18 118:9
**artistic** 140:20
**asked** 35:7 56:8 77:4 97:20 137:1,2,3,18 145:2,5,7 146:16 147:14 152:12
**asking** 9:12 19:6 26:8 96:14 131:2 162:1
**aspect** 55:18 102:15
**assembling** 163:8
**asserted** 153:18
**assisted** 24:5 32:5,5
**associated** 120:19 140:12
**assume** 61:17 79:8 150:20
**assumed** 15:9 126:12 128:8
**assuming** 61:3 101:14 152:8
**assumption** 128:11
**attached** 5:7 6:2 40:8 67:15 72:15 79:21 83:10 88:21 108:15 134:3 146:18 154:3 161:7 163:4 167:15 175:7
**Attachments** 64:15,17
**attempt** 122:16 159:21
**attempting** 155:1,19 156:1 159:13
**attend** 97:21 98:2
**attended** 97:8 98:6,9
**attorney** 169:10
**audibly** 9:14
**available** 78:20 80:4 86:12,15
**Avenue** 34:18 56:8 65:8,9,15 69:14,22 70:9 72:2 77:1 106:20 107:21 115:9 130:21 132:16 135:2 136:5,14 140:21 141:1,7 141:13 143:2
**avoid** 155:2
**award** 127:4 130:11 131:16 145:3
**awarded** 130:16 150:1
**aware** 15:6,9 17:19 18:1 20:19 21:1,16 21:21 22:1,16 24:12,17 30:18 33:4 50:2 57:14,20 58:13 58:15 59:1 76:9,12,21 92:4,20 93:3,5 99:7 100:11 106:14 116:16 123:6 137:14 166:13,15
**away** 50:9 68:2 75:3 155:9,14
**A-2** 85:17 91:10 150:17
**a.m** 1:15

**B**

**B** 5:6 6:1 94:18 94:19
**back** 18:21 45:10 48:21 72:20 73:12 75:21 79:2 94:14 101:18 106:3,7 125:5 125:10 128:17 138:14 139:18 144:9 147:15 148:9 153:5 160:15 162:6 162:19 163:8 163:12 166:18
**background** 42:9,13 44:10 65:2
**backhoes** 63:2
**backtrack** 72:18
**back-up** 113:6
**Baltimore** 54:8 54:10 55:22

57:18 72:21 73:3 74:21
**base** 14:5 25:22 109:22 110:6,9 110:10,18 141:2 157:16
**based** 22:6 81:16 101:10 116:18,19 128:8 138:16 140:19
**Basically** 24:21
**basis** 51:21 52:2 54:17,20,21 57:21 103:2 117:14 118:5 160:12
**bear** 121:21 123:2
**bears** 126:19
**became** 76:21 153:3,8
**becoming** 96:20
**before** 2:18 7:15 7:16 8:8 26:13 33:3,3 34:7,11 40:15 42:4 43:1 62:4,5 64:3 71:19 76:19 79:11 86:9 88:16 89:14 91:9 108:19 113:13 127:16 134:7 144:2 154:16 161:13 167:20 176:3
**beginning** 69:20
**behalf** 3:3,12 16:15 78:5 137:10,10,12 160:10 163:15 163:21 169:1
**being** 19:22 20:3 20:18 21:3 23:2 28:21 34:5 47:15 50:1 71:9 92:12 100:6 115:12 122:4 130:1 140:15 141:2,5,8 143:8 149:2 169:20 170:13 171:2 172:11 173:4,7,11
**belief** 122:18 144:12 170:12 170:16
**believe** 11:22 12:22 13:14 14:22 15:1,3,5 21:20 22:1 23:4,5,8 27:17 27:20 29:22 30:1,20 31:5 32:2,21 33:17 33:19 34:1,5 35:19 36:2,7 36:17,18,19 38:21 42:4,18 43:22,22 44:6 46:2,7,19 56:4 56:16 66:4,5 68:15,17 69:1 69:4,5,15,18 70:1,4,6,7,10 70:12,15,18,18 71:20 74:5,22 75:1 76:17 81:6 83:2 88:7 88:10 89:22 93:8,19 94:2 95:9 96:9,15 98:3,6,15 104:6,12 105:7 105:9,19 108:5 122:20 123:5 123:19 126:3 128:15 130:12 132:8,19 137:12 138:9 138:12 139:16 140:2 145:6,13 145:18 149:6 149:12 150:11 150:14 151:15 151:19 152:9 158:11 159:20 160:17 164:11 169:7,11,19 170:5 171:12 171:12,13,16 172:2,11,17,21 173:4,9,12
**believes** 124:6
**below** 92:7 127:21
**Belvoir** 99:18,21 100:5,13,15,21 101:11,21
**bending** 143:1
**besides** 35:1
**best** 10:16 67:20 71:22 81:10 134:12,14 145:12 150:5
**better** 41:2 62:14
**between** 16:9 25:11 30:5 36:1 43:20 66:20 71:8 74:10,14 135:1 136:14 151:22 159:12 164:3
**beyond** 119:7
**bid** 23:13 24:12 24:20 26:21
**bidder** 127:22
**bidding** 23:15 36:3 93:6 96:14
**big** 107:17 112:9
**bigger** 156:17 156:19
**Bill** 7:8 143:18
**bit** 72:18 117:20 153:14 159:2 172:15
**black** 143:12,16 144:16
**blocks** 50:8
**Board** 1:1 37:12 37:19 169:9
**bold** 92:7,10
**book** 24:15,18 24:19 26:20
**borders** 65:7
**bore** 122:17
**borrowed** 48:12
**both** 24:2 36:19 89:4,5 147:14 148:5 156:2
**bottom** 89:15 135:15
**box** 143:15,16 143:17 144:17 144:19
**boxes** 143:14
**Brandmueller** 4:11 6:7,9 113:19 153:3 161:17 162:6
**Brandmueller's** 163:4
**break** 10:5,11 75:15,16 76:19 108:11
**bring** 19:2 48:21
**bringing** 48:12 90:20
**broke** 76:19
**broker** 47:11
**brought** 49:4 138:22 159:17
**Brown** 1:12 2:1 5:2,16,21 7:2,7 8:1,5 10:22 22:7 30:4 36:11 39:5 40:11 55:12 67:18 78:16 79:4 83:13 84:10 89:2 97:21 102:21 108:18 114:4 121:19 122:21 130:9 134:6 136:18 140:10 146:1,22 150:16 154:6 154:22 161:10 166:20 167:19 174:3 175:3
**budget** 24:21 28:22
**building** 1:1 139:22 140:1 140:18
**built** 13:20 135:12
**bulk** 28:13,16 66:21 67:2 140:16,18
**burn** 63:12
**business** 50:1

C

**C** 3:1,5 4:1 5:1 7:1 78:17 81:16,21
**CAB** 1:5
**calculation** 156:15
**call** 20:12 33:4
**Calling** 37:4 82:11 93:22 107:22 109:14 110:19 121:1 121:13 132:5 133:20 142:5 151:7
**Calls** 21:5 36:14 80:19 87:16

90:4 95:16 96:3 111:4 120:11
**came** 18:2 20:10 33:13 50:20 64:12,18 69:18 113:20 140:8 141:4,13 146:4 148:13
**cameras** 106:12
**canine** 70:13,15
**Capitol** 3:3 4:7 4:9 7:5,9,12 9:8 13:21 18:9 20:20 29:10,21 33:8,14,18 34:2,17 39:5 48:8 49:8 56:7 65:7 67:5,11 67:19 68:6,12 68:16 69:17,19 70:2,5,8,12 74:6 76:21 84:5 85:21,22 86:4 90:2 91:14 92:12,13 92:17 93:17 98:14 99:1,6 101:12 104:1 105:12,14 106:11,13,18 106:18 107:1 114:6 124:17 135:2,14,18 141:7 142:10 142:13,22 150:12,19 151:5,16,17
**care** 12:9
**carve** 19:18 20:5
**case** 50:5 62:6 68:11 111:2 112:18 115:12 118:4,8 152:13 169:22 170:1 176:10
**caused** 28:10
**causing** 27:22 28:1
**caveat** 10:9
**center** 169:4
**cents** 56:9,11,12 56:15,19,21 58:1,5,8,12
**certain** 48:20 49:7,9 51:12 63:6 84:18 96:22 97:4 105:5 106:2 113:11 114:22 142:16 162:14 168:13
**certainly** 87:3 88:15
**CERTIFICA...** 176:1
**certify** 176:4
**chain** 153:17
**change** 9:2 13:5 13:8,12 15:10 16:2 20:16 34:20,22 35:5 35:13,17 36:9 36:11,12,19,20 37:2,3,13,20 38:5,10 39:12 82:15 83:6 120:18 122:19 123:3 124:18 125:9 126:20 129:20 130:1 130:22 131:11 132:3,11,14,18 132:22 133:4,5 133:7,13,19 137:4,10 139:4 139:5 144:11 156:2 173:14
**changed** 20:19 25:5,12 65:14 164:10
**changes** 94:18 149:7
**changing** 17:16
**characterizing** 83:18
**charge** 52:4
**charged** 58:22
**charges** 60:1,3,4 60:5
**charging** 56:19 117:14
**CHARLES** 4:5
**check** 15:1 50:19 99:13 114:12 170:6
**Christmas** 18:20
**Chuck** 149:2
**Church** 3:17
**claim** 8:22 18:18 19:19 20:7,12 21:2,17 22:2 28:5,8 29:16 34:14 37:11,18 40:21 41:2,6 42:7,10 44:11 44:17 47:20,22 48:2 50:15,22 50:22 53:8 56:14,22 57:22 59:17,20 60:2 60:17,21 62:2 82:15 87:9 115:21 120:9 120:15,17,19 120:21 122:2,3 124:8 125:15 126:19 129:17 136:20 137:19 138:2,7 139:4 147:5,7,12 148:13 152:4 152:15 153:13 153:16 155:3 155:13,20 156:3,11,14 158:2,5 159:13 159:16,22 160:5,11,16,18 161:18 162:2 163:17 168:2,6 168:8,10,15 169:9,15,18,21
**claimed** 61:6
**claiming** 59:1 60:22 61:2
**clause** 94:18 125:3,6,11
**clauses** 123:12 124:5
**clear** 20:10
**Clearance** 85:18
**client** 49:17 50:9
**close** 12:22 27:20 30:22 31:8
**closed** 12:16
**closer** 74:21,22 75:1
**CM** 154:13
**Coal** 86:18,22 87:7 135:11
**coffee** 10:7
**college** 11:3,5,8 11:10
**colored** 143:15
**combination** 33:11
**come** 11:2 29:2 38:7 39:1 44:12,14 51:13 58:16,18 60:8 60:11 62:4 63:10 64:1 69:21 101:18 113:2 114:11 115:1,5 127:9 127:16
**comes** 62:17,19
**coming** 38:1 48:1,2,13 49:13,14,15,18 62:2,5 67:12 69:12 70:5,7 71:10 99:9 100:8,14 101:5 116:4,5,6 153:11 157:2 158:21 166:2
**commensurat...** 25:18
**commentary** 123:22
**comments** 64:9 171:8
**commission** 1:1 176:16
**common** 102:18
**commonplace** 45:7
**Commonwealth** 2:20 176:21
**communicated** 38:12
**companies** 46:18 47:3,7 47:14,18 51:16 51:19 52:5 75:11 112:2 116:10
**company** 1:6 3:12 17:13 24:11 50:6 117:13 155:2,7
**Company's** 156:6
**compared** 52:13
**compensate** 121:16
**compensation** 20:11 51:13 172:9
**compilation** 121:21

**complain** 112:5 112:11
**complained** 112:2,7
**complaining** 51:14
**complete** 95:3 175:5
**completed** 30:19
**completing** 143:6
**complies** 77:14 94:20 134:22 135:4 136:8 154:20
**comprising** 78:19
**computations** 156:22
**compute** 57:20
**concern** 153:10 160:10,13 163:14,21 168:13,16,19
**concerned** 160:14 169:2
**concerning** 21:2 21:17 155:21 161:17
**concerns** 168:22
**concluded** 174:3
**concluding** 102:18
**conclusion** 36:15 37:5 80:20 82:12,14 90:5,9 94:1 95:17 96:4 109:15 110:20 111:5 120:12 121:2,14 127:16 151:8
**concurrently** 143:8
**conditions** 79:14
**conduct** 135:19
**conducted** 45:19 104:15 128:1,6
**conducting** 67:5 68:7 76:22 101:4,13
**conference** 107:7
**confronted** 142:13
**conjunction** 153:22
**connection** 134:16
**consequence** 87:8
**consider** 87:14 90:19,21
**considered** 101:11
**consistent** 46:6 138:17
**Constitution** 31:16 33:15 34:18 56:8 62:1 65:15 72:2 77:1 102:22 103:22 105:2 106:20 114:5 115:8 130:7,21 132:3 132:16 133:3 133:11,16 136:5,6,14 137:15
**construction** 8:12 11:7,11 11:15
**construed** 91:7
**contact** 41:5 68:12 92:17
**contacting** 92:14
**contained** 24:19 95:1 143:15 144:17
**contains** 24:15 24:19
**contaminated** 13:9,12 14:3,6 14:9,11,15,17 15:4,8,13,21 16:6,10,17 17:18 18:7,14 19:13 20:6,15 20:16 21:3,12 22:3,14,17 23:1 25:6,12 25:15 54:7,12 55:6,13 56:15 56:21 58:5,8 58:14 59:6 72:22 75:3,9 76:6,10,11 109:1,18 110:12,14,17 155:17,21 156:3 164:9,16 164:19 165:7 165:18,21 166:10,14,22 167:7
**contamination** 76:13
**contemplate** 57:4
**contemporane...** 158:21
**content** 159:4
**contents** 127:13 154:18 161:20
**context** 89:3 91:4,5
**Continuing** 168:8
**contract** 1:1,7 5:15 12:19 13:1 14:4 18:18 20:16,18 25:5,22 26:11 34:19,22 35:2 35:17,18,20,22 36:4,5,8,9,13 37:3,13,20 39:13,14,18 51:19,22 65:4 78:19,19 79:5 79:14,17,22 82:2 93:6 94:10 95:2,5 95:14 96:11 97:1 109:22 110:6 111:14 111:16 121:21 122:17,19 123:1,11,12 124:5,14,18 127:12,17 128:12,22 130:2,12,16,18 131:1,17 132:14 135:12 141:2 150:1,10 157:11,16 172:13
**Contracting** 1:5 4:12 128:20 147:14 169:6 177:2
**contractor** 9:3,4 12:17 124:12 127:4 128:1 150:18 151:4 159:12
**controlling** 151:20
**conversations** 38:17,19 152:19 159:3 160:6
**coordinate** 92:13 93:17 150:18 151:4
**copy** 26:19 35:19,22 36:4 143:21 161:5
**corner** 77:16 79:11 136:9 141:7,8
**corollary** 170:14
**correct** 8:3,21 12:5,15 13:22 14:8,13,19 16:1 18:4,11 20:22 21:14 22:20 23:14 27:11 28:7,12 28:17 29:18 31:19,20 41:4 44:20 47:5 48:4,9,10 50:3 52:8 53:18 54:9 55:21 56:5,13 57:1 58:2,9 59:4 60:14 61:10,14 61:20 64:19 67:7 73:1,5 77:11,22 78:2 78:5,13 80:22 83:8 85:10 86:6 87:4,5,10 88:14,17 91:16 98:1,11 101:1 101:22 102:20 103:20 105:16 106:10 108:9 109:7,12 110:2 110:14,15 111:11,15,19 111:22 112:4 112:22 115:3 115:11 118:16 120:8 125:22 126:13 127:5 128:3,10 129:14,15,18 129:21 130:8 131:18 133:9