81

BY MR. GROSCUP:
Q Turning to page 33, do you see where it lists Specifications there?
A **Yes. I do.**
Q Were these specifications which are dated 9/30/03, but I will represent to you I believe that to be a misprint because the specifications on this job were actually dated 9/30/02, were these specifications provided to Anderson as indicated here in the subcontract to the best of your knowledge?
A **I am sure they were.**
MR. PIERCE: Objection. Lack of foundation.
BY MR. GROSCUP:
Q And was it part of Hitt's responsibility, based upon what we saw in Recital paragraph C, to review those specifications and to familiarize themselves with them?
A **It was part of Hitt's responsibility?**
Q I'm sorry. I may have misspoke.
Under paragraph C on page 4, the Recitals.
A Yes.

82

Q Do you see where Anderson represented it examined and familiarized itself with the contract documents?
Do you see that?
A Yes.
Q So, one of the items for which they would have been responsible to examine and familiarize themselves with would have been say, for example, the Specification Section 01100 summary?
A Yes.
MR. PIERCE: Objection. Calling for a legal conclusion.
BY MR. GROSCUP:
Q In arriving at the conclusion that the truck inspection claim was a change to the Anderson subcontract, did you ask anybody at Anderson whether they had reviewed the September 30th, 2002 specification provision?
A **We had reviewed them. I reviewed them.**
Q You reviewed them?
A Yes.
Q Did you review the September 30, 2002

83

specifications for 01100?
A **I believe so. I don't recollect specifically off the top of my head. But I did review the specs.**
Q That would have been something you would want to look at to determine whether this was a change to your subcontract, right?
A **That is correct.**
**(Exhibit No. 4 was marked for identification and was attached to the deposition transcript.)**
**BY MR. GROSCUP:**
Q Mr. Brown, I am handing you what has been marked as Exhibit No. 4 to your deposition.
You see that this is the Section 01100 specification dated September 30th, 2002 on the West Refrigeration Plant Expansion Project?
MR. PIERCE: Objection to characterizing it as such. There is no foundation for that and it actually appears to me that it is not.
MR. GROSCUP: Why does it appear to you it is not?

84

MR. PIERCE: Well, everything I have ever seen on this.
On page 01100-4, in paragraph A, it has the language that says the police inspection station is on P Street and South Capitol Street, Southeast, and has that crossed out.
MR. GROSCUP: We will get to that in a moment.
BY MR. GROSCUP:
Q Mr. Brown, I will represent to you that this is the September 30th, 2002 specification section for Section 01100 on the West Refrigeration Plant Expansion.
Okay?
A **Okay.**
Q I will also represent to you that in Amendment Number 3 it was modified, as your counsel indicated a moment ago, and certain language was interlinear in the paragraph that Joe was referring to.
Okay?
A **Okay.**

Q And we will get to that version of the specification section in a moment, that subsequent amendment.
Have you ever seen the original specification section which is reflected in your subcontract dated 9/30/02?
A **I don't recall it.**
Q This was a document though in terms of original specifications that you were supposed to familiarize yourself with, correct, under the terms of your subcontract with HITT?
A **Possibly. Yes.**
Q Could you look at page 01100-4, and in particular paragraph 1.6, Site Security?
Do you have that in front of you?
A **Yes. I do.**
Q Under Site Security, under paragraph A-2, it states under Clearance: Special arrangements for all deliveries shall be arranged a minimum of 48 hours in advance of arrival to permit inspection by the United States Capitol Police. The Police inspection station is on P Street and South Capitol Street,



Southeast.
Do you see that?
A **Yes. I do.**
Q P Street and South Capitol Street, Southeast, would be an off-site inspection location, correct?
A **Yes. It would.**
Q But to your knowledge you have never seen this before?
A **No. I have not.**
Q Do you recall whether HITT made this available to you?
A **I don't recall.**
Q Do you know whether HITT made this available to Anderson?
A **I don't recall.**
Q Did you ever ask HITT what its experiences were relative to the Interim Coal Handling Facility Project?
A **No. I did not.**
Q To your knowledge did Anderson ever ask HITT what its experiences were on the Interim Coal



Handling Facility Project?
A **I don't have any knowledge of that.**
Q And certainly Anderson was not involved in that particular project, correct?
A **That is correct.**
Q So, whether Hitt's trucks were inspected on site or off-site on the Interim Coal Handling Facility is absolutely no consequence to you in terms of your claim?
A **That is correct.**
Q In terms of whether Anderson would have been on notice of the possibility of an off-site inspection location, would you at least want to consider what is listed on Exhibit 4 under 1.62, Site Security?
MR. PIERCE: Objection. Calls for speculation.
THE WITNESS: I don't know.
I mean, the one that I saw had this crossed out of it.
BY MR. GROSCUP:
Q So, the only version that HITT ever



provided to you had that language crossed out of it?
MR. PIERCE: Objection. Lack of foundation.
THE WITNESS: The one I saw had that. I am not 100 percent what had been provided to us.
BY MR. GROSCUP:
Q Do you have any reason to believe that HITT did not provide to you the document that I have marked as Exhibit 4 to your deposition here today?
A **I don't have any reason to believe it didn't. I don't know.**
Q You just don't know whether they did one way or the other?
A **That is correct.**
Q But you certainly don't recall having ever seen it before?
A **That is correct.**
MR. GROSCUP: Why don't we mark this as Exhibit 5?
(Exhibit No. 5 was marked for identification and was attached to the deposition transcript.)

A That is correct.
Q Remind me. Is that Army or Navy?
A Army.
Q Was the Army itself conducting the inspections of Anderson's trucks coming on to the project?
A **I don't know if they are military personnel or not. They had police officers at a gate entering the project.**
Q And so based upon your experience at Fort Belvoir, that was one of the factors you considered in determining that it was likely that the Capitol Police would also be conducting their inspections on site?
A **I didn't determine that, but I am assuming. It is not typical for us. It is untypical for us. We have never had a situation where they would have to go off-site. We couldn't imagine why you would have to go off-site to be inspected and come back.**
Q When you say you never had a situation like that, the only two projects you can recall are Dulles Airport and Fort Belvoir, right?
A **That is correct.**



Q So, your universe that you are drawing from on that is the total of two projects?
A **No. There is more projects than that. I just can't think of them off the top of my head.**
Q Do you recall how many more projects there were other than those two?
A **No. I don't.**
Q Do you have any training in security procedures?
A **Training?**
Q Yes.
A **No.**
Q You have no expert knowledge in terms of where inspection locations should be or shouldn't be in terms of the security aspect of it, right?
A No.
Q You are simply just drawing upon your common sense in concluding that the inspection should have been on site; is that right?
A **That is correct.**
Q Mr. Brown, did you ever go to the 3rd and Constitution inspection facility yourself?



A **Yes. I did.**
Q Did you go there on a regular basis?
A **No. I did not.**
Q What was your purpose in going?
A **Just to see what was involved there at the site.**
Q When did you go? In roughly June of 2003?
A **It would have been in that neighborhood. Yes.**
Q How long did you spend there?
A **I don't recall. Probably half-hour to an hour.**
Q You simply wanted to familiarize yourself with the inspection procedures that were going on relative to Anderson's trucks?
A **I just wanted to see the inspection facility, what was entailed there.**
Q And there was more to it than simply dogs sniffing the truck at that inspection facility, right?
A **That is correct.**
Q Describe for me what those inspection procedures entailed at the 3rd and Constitution



location for the Capitol Police.
A **The truck would pull-up to an x-ray machine and was x-rayed and allowed to pass.**
Q Anything else in terms of just the x-ray or was there more to it?
A **I don't recall. I believe they walked around with mirrors. I don't recall if the dogs were there or not.**
Q So, there were individuals walking around with mirrors, there was an x-ray machine and there may have been dogs there as well?
A **I believe. Yes.**
Q In terms of the x-ray machine and so forth, was this more elaborate than the procedures that had been conducted at the location which you marked with an X on the project site?
A **Yes.**
Q None of Anderson's trucks that were inspected perhaps during that first ten days or two weeks or so of June 2003 were inspected with x-ray machines?
A Not to my knowledge. No.

105

Q Were the trucks for Anderson tagged at the 3rd and Constitution site such that there was a departure time for those trucks and then a radioing ahead to insure that the trucks arrived within a certain period of time?
A **They were given a slip from the police I believe.**
Q A slip showing what?
A **I believe the time that they left the inspection facility.**
Q And then they would take that slip from the Capitol Police showing the time they left the inspection facility, they would give that to the Capitol Police stationed at the on site security gate, right?
A **That is correct.**
Q Would there be further inspection of the trucks there at the on site security gate?
A **I don't believe so.**
Q Did you understand what the purpose was in providing the slips?
A **Yes. I do.**

106

Q What was your understanding?
A **They had a certain time frame that they were to get from the inspection facility back to the project.**
Q And what would happen if they didn't make it within that time frame?
A **They would have to go back to the inspection facility again.**
Q To be reinspected?
A **That is correct.**
Q Do you know whether the Capitol Police had any surveillance cameras that were tracking the movement of trucks in the area of the Capitol?
A **No. I am not aware.**
Q You don't know one way or the other?
A **No. I don't.**
Q Did you ever see driving in this area of the U.S. Capitol the Capitol Police walking the streets that the trucks would have traveled from the 3rd and Constitution site to the Virginia Avenue job site?
A **I don't recall seeing them. No.**

107

Q You don't recall seeing any Capitol Police walking the streets?
A **No.**
**I see police on the streets. I don't recall them on a specific route.**
Q This x-ray equipment for these trucks is about the size of this conference room?
A **I am not sure of the exact size. It was large. Dump trucks are very large.**
Q Sure.
And so the dump trucks go through this x-ray equipment, right?
A **Yes.**
Q So, the x-ray machines are effectively a tunnel of some sort that the trucks drive into?
A **I don't remember if there was an exact tunnel or what. But they drove up to it. It is a big facility.**
Q Would it have been feasible in your view to set up that x-ray equipment there at the Virginia Avenue location?
MR. PIERCE: Objection. Calling for an

108

expert opinion.
You can go ahead and answer.
THE WITNESS: For that machine I am not sure if it would have been feasible or not. I don't believe so.
BY MR. GROSCUP:
Q So, to the extent that they wanted to use x-ray equipment, it may have been necessary to use an off-site location then, correct?
A **Possibly.**
MR. GROSCUP: Could we take a break for a second?
(Recess.)
(Exhibit Nos. 6, 7 and 8 were marked for identification and were attached to the deposition transcript.)
BY MR. GROSCUP:
Q Mr. Brown, while we were off the record I pre-marked 6, 7 and 8. But before we get to that, I just want to ask a few follow-up questions from earlier this morning.
You recall we talked generally about how

Q You mentioned earlier that each truck was essentially yours for the day.
Is that fair?
A Yes.
**Let me rephrase my answer.**
**We paid them a little more for the initial trip the first thing in the morning. We signed them in earlier for that. And then they were paid for the hour the rest of the day. So, whether they went to Kentucky or Florida or straight down the road they were paid by the hour.**
Q So, there wasn't per se a premium paid to the trucking company, but rather it was strictly that they were charging you on a time and materials basis and you were paying the additional time.
Is that right?
A Yes.
Q And the trucking resource was arriving to the job site one half-hour earlier roughly, I am swagging a bit, a half-hour early relative to when they would have arrived at the job site in view of the trucking inspection requirement?



A **They would be signed in earlier because they had to go to the inspection facility. Once they arrived at the site they were loaded.**
Q So, wouldn't it be the case then that the impact on a per truck basis for that day would have been only one 22-minute interval?
Do you see what I am getting at?
A **No. That would not be the case.**
Q The trucks, for example, are arriving 22 minutes earlier than anticipated, right, because of this inspection issue?
A **For the initial loading.**
Q For the initial loading.
And you have the truck for the entire day, right?
A **That is correct.**
Q So, you are going to pay -- I will just pick a number -- $1,000 for the truck for that day. I know it is different than that, but just to pick a number. Let's say $1,000 for the day under my hypothetical. And let's say that is eight hours under my hypothetical for the $1,000 for eight hours.



Okay?
A Okay.
Q For the trucking resource.
Now you have the truck for eight and a half hours because of this truck inspection requirement and you are going to have to pay them some amount of money above and beyond the $1,000, right, because they have an extra half-hour, right?
A Okay.
Q Right?
A **I follow what you are saying.**
Q Right.
So, what I am trying to figure out is wouldn't it be just 8.5 hours?
A **No. It would not. Because every round they would have to go to and from and it would increase the truck time for the day for the truck.**
**Potentially if the inspection wasn't there, they could have gotten an extra round trip for the day.**
Q So, the trucking resource, there would have been a lack of productivity relative to what it would



have anticipated had there been no truck inspection requirement, right?
A **Yes. There was also a loss of production. Yes.**
Q So, each trucking resource in terms of making its return trips would lose 30 minutes of otherwise productive time?
A **That is correct.**
Q Do you regard that to be a claim for loss of productivity?
MR. PIERCE: Objection. Calls for a legal conclusion.
THE WITNESS: I feel that it could be.
BY MR. GROSCUP:
Q You feel that this claim could be viewed as one for loss of productivity, right?
A **No. I feel that this claim is a straightforward change. I feel that there also could be a claim of loss of productivity associated with the inspection.**
Q But isn't the 22 minutes itself a claim for loss of productivity?

Q Well, you are referring to now 1.4(B)?
A **I guess I was.**
Q With regard to the first clause that you have referenced there, meaning paragraph 1.3(B).
A **I'm sorry. I would have to go back and look at the clause.**
Q As you sit here today, you don't know why paragraph 1.3(B) would support Anderson's position that this is a change?
A **I would have to go back and review the clause. I don't remember the entire specs off the top of my head.**
Q Sure.
How about 1.4(B)? Can you explain to me how that provision supports Anderson's claim?
A **It just denotes where access will be to the site. Nowhere does it say you are going to go off to another site.**
Q It references site access in 1.4(B) in the first two words there.
Do you see that?
A **That is correct.**



Q Did you regard site access to be the same as the location for inspection?
A **I believe I regarded site access to be able to inspect on the site.**
Q In your view was site access synonymous with the location for inspection?
A **The inspection we felt would be at the site.**
Q Why?
A **Nothing says it wouldn't be.**
Q So, because nothing said that it wouldn't be, you assumed that it would?
A **That is correct.**
Q The next provision that Mr. Himelfarb included in his letter is paragraph 3.5.
Do you see that?
A **Yes.**
Q Could you read that to yourself and tell me how, if at all, this bears upon Anderson's claim that the location of the truck inspection was a change to the subcontract?
A **It just says it will be subject to**



**inspection. Again it doesn't say that it will be at a different location.**
Q And it states that instructions and maps will be provided to the contractor upon award.
A **That is correct.**
Q What did you understand the purpose of providing those instructions and maps to be?
A **It could have been a map of the site saying come in through this gate and leave through this gate and inspection will be at this location on site.**
Q When you read that provision when you originally looked at the contract to familiarize yourself with the contents, is that what you understood that provision to mean?
A **Yes. That is what I understood it to be.**
Q Did you come to that conclusion before or after the contract was signed by Mr. Himelfarb on June 13th, 2003?
A **I don't recall.**
Q Do you see in Mr. Himelfarb's letter just below that he states a review of Section 3.5 could only leave the bidder to understand that inspection



would be conducted when the contractor enters or leaves government property?
A **That is correct.**
Q And you say there is nothing in the documents indicating that inspections would be conducted at remote locations, right?
A **That is right.**
Q And based upon that, Anderson assumed that the inspections would occur on the job site, right?
A **Yes. That is correct.**
Q And it had to make an assumption because the contract itself did not specifically indicate that the inspections were to occur on the job site, right?
A **Essentially.**
**There was no reason to believe that they would not be on site in our minds.**
Q Turning back to Exhibit 6, under Interpretations, do you see where it states under 4.1 that prospective offerors shall request the Contracting Officer, in writing, for an interpretation or correction of any ambiguity, inconsistency, or error in the contract documents which they may

Q And with regard to those contaminated soil modifications, do you see on the first page of Exhibit 3 there's an amount of $420,000. Do you see that?
A Yes.
Q And that relates to the increase of the amount of contaminated soil from approximately 160 tons to 12,000 tons; is that right?
A Correct.
Q Okay. And there was a unit rate that was going to be paid relative to the tonnage of $35 a ton; is that right?
A Correct.
Q And $35 a ton was the unit rate included in Anderson's subcontract with HITT; is that fair?
A Yes.
Q And even though there was a unit rate of $35 a ton relative to contaminated soil in your subcontract, the dollar value of contaminated soil in the prime contract with AOC was $90 a ton; is that right?
MR. DACHILLE: Objection.



THE WITNESS: I believe so. It's been a while since I looked at that figure. Is that in Exhibit 2?
BY MR. GROSCUP:
Q Sure. Why don't we take a look at Exhibit 2 for a moment.
A Yes.
Q Okay. So the unit rate in the prime contract for contaminated soil, when you entered into the contract -- when HITT into the contract was 90 bucks a ton; is that right?
A Yes.
Q And in your subcontract with Anderson, the unit rate was $35 a ton; is that right?
A Yes.
Q At any point in time, did -- strike that.
To your knowledge, Mr. Schoenefeldt, at any point in time did HITT ever share with AOC what the unit rate was for the contaminated soil that it had negotiated in the subcontract with Anderson?
A At one point in time a former employee of the AOC got -- somehow ordered a contract between



Anderson and HITT to their possession, so we gave them the subcontract.
Q Is that Mike Mologne?
A No, Mike Keegan.
Q Mike Keegan?
A Yes.
Q Okay. Do you recall when you gave Mr. Keegan a copy of the Anderson subcontract?
A No.
Q Do you recall what year that was?
A I would say 2003, but 100 percent sure, no.
Q Was it prior to the negotiation of the job modifications that are referenced in Exhibit 4 to your deposition?
A Was it prior to?
Q Yes.
A I don't know.
Q Okay. And you see that in Exhibit 4 to your deposition, there is a series of job modifications, the first one being job mod No. 3, the second one being job mod No. 10, and the third one being job mod No. 26, right?



A Correct.
Q And these are the job mods that relate to the issue of contaminated soil on the project, right?
A Among other things.
Q Okay. The first one relates -- strike that.
The first one, which is Amendment No. 10 -- excuse me. The first one, which is Amendment No. 3, has a dollar amount of $780,000. Do you see that?
A Yes.
Q And that relates exclusively to contaminated soil, correct?
A Yes.
Q And the date that that's signed by Mr. Seeman of HITT is August 22nd, 2003, correct?
A Yes.
Q At that point in time HITT already knows of the location of the off-site inspection station at Third and Constitution Avenue, correct?
MR. PIERCE: Objection, foundation.
THE WITNESS: Yes.

BY MR. GROSCUP:
Q Yes, HITT already knew of the off-site location at the time this mod was entered into?
A Yes.
Q And obviously Anderson already knew of the off-site inspection location at the time this mod was entered into as well then, correct, sir?
MR. PIERCE: Objection calling for speculation on somebody else's knowledge.
THE WITNESS: Yes.
BY MR. GROSCUP:
Q And in fact, sir, you recall receiving correspondence from Mr. Brown, seated at the end of the table there, on June 13th, 2003, notifying you of a claim with regard to the off-site truck inspection location, correct?
A **The date I'm not sure about but, yes, I remember it was about that time period.**
Q About mid-June 2003?
A **Correct.**
Q Okay. Were you involved in the negotiations of the mods with AOC, the mods being



the modifications referred to in Exhibit 4?
A **Yes.**
Q At any time during the course of those negotiations with AOC, did you ever exclude or make any reference to an exclusion of the off-site inspection location?
MR. DACHILLE: I'm sorry. Which mod are we talking about?
BY MR. GROSCUP:
Q Yeah, let's start with modification No. 3, which was entered into on August 22nd, 2003. Do you see that?
A **Mm-hmm.**
MR. DACHILLE: I'm going to object, not to get in the way. I don't -- did you ask him whether he was involved in the negotiation of this mod (indicating)?
MR. GROSCUP: Yes.
MR. DACHILLE: Okay.
BY MR. GROSCUP:
Q Let me go back and make sure I'm clear. Were you involved in the negotiation of job



modification No. 3 with AOC?
A **In terms of negotiation, let me -- let me -- let me clarify what it was. It was a unit price. There was no -- there was just quantifying units per delivery tickets. I mean, there was no --**
Q Well, there was a changing of the unit rate, based upon page 2, from $90 a ton to $65 a ton, right?
A **Yes.**
Q So there was a negotiation in terms of what the unit rate was going to be, right?
A Yes.
Q Okay. Were you involved in those negotiations?
A No.
Q No, you were not. Who was?
A **David Michaelson and John Seeman.**
Q Did you have any involvement at all in Amendment No. 3 to the HITT contract?
A **Please clarify that.**
Q Well, you have in front of you --
MR. DACHILLE: Objection, ambiguous.



THE WITNESS: No, I don't understand the question.
BY MR. GROSCUP:
Q That's fine. I had a ground rule at the beginning of the deposition. If you ever don't understand one of my questions, ask me to rephrase it and I will. You have in front of you Exhibit 4 to your deposition. The first document there is Amendment No. 3 to the HITT/AOC contract, correct?
A **Correct.**
Q Did you have any involvement in that job modification whatsoever?
A **Yes. More administratively entering it into our contract, then in turn writing subcontracts off of that, yes.**
Q Is it HITT's position that the truck inspection -- off-site truck inspection requirement was excluded from the negotiations leading up to Amendment No. 3?
MR. PIERCE: Objection.
MR. DACHILLE: I'm going to object to that question. It's not -- we went through previously

33

whether there was a process for a designated representative or not a designated representative, and there is no provisions in the board's rules for deposition by designate and so I don't -- I mean, you're asking him to speculate to something that he can't speculate to. I mean, you can ask him what he thinks or what he doesn't think.

MR. GROSCUP: I'm not looking for a corporate designee here.

BY MR. GROSCUP:

Q I'm trying to understand whether it's your understanding, sir, that there was an exclusion from Amendment No. 3 to the AOC/HITT contract relative to off-site inspection?

MR. PIERCE: Objection.

MR. DACHILLE: Same objection.

MR. PIERCE: My objection is that it calls for a legal conclusion.

THE WITNESS: There -- it was my understanding that we were tracking the costs for truck inspection separately, aside from any other change. It stood on its own grounds. Is there any

34

specific exclusion in this contract modification, no.

BY MR. GROSCUP:

Q There's no specific exclusion in this modification relative to the truck inspection issue, correct?

MR. DACHILLE: Objection. Same grounds stated previously by both lawyers.

THE WITNESS: Correct, there's no objection -- there's no --

BY MR. GROSCUP:

Q Exclusion?

A -- exclusion.

Q Let me see if we can clarify this for the record. You have several modifications in front of you which are put together as Exhibit 4 to your deposition, the first one being Modification No. 3, correct?

A Correct.

Q And page 2 describes that modification in some detail, correct?

A Correct.

35

Q Okay. And in that description it states, "pursuant to the negotiations on August 6th, 2003, the unit price for removal and disposal of approximately 12,000 tons of contaminated soil was changed from $90 a ton to $65 a ton." Do you see that?

A Yes.

Q Okay. To your knowledge, sir, during those negotiations which took the price from $90 a ton down to $65 a ton, was there any discussion with anyone at AOC that the truck inspection claim wasn't part of this whole process?

MR. PIERCE: Objection, foundation.

BY MR. GROSCUP:

Q To your knowledge.

A To my -- I -- to my knowledge, no.

Q Okay. And removal and disposal of 12,000 tons of contaminated soil, that removal and disposal would have involved going through the off-site truck inspection location, correct?

MR. DACHILLE: I'm sorry. Could you --

BY MR. GROSCUP:

36

Q Sure. You see that this document is referring to the removal and disposal of 12,000 tons of contaminated soil?

A Yes.

Q And to remove and dispose of 12,000 tons of contaminated soil, Anderson's trucks would have had to go through the off-site truck inspection location at Third and Constitution Avenue, correct?

A Correct. Possibly not all of them though.

Q Okay. The vast bulk of Anderson's trucks would have had to go through that Third and Constitution facility as part of the transport and removal of the 12,000 tons referenced in this mod, correct?

A Yeah. Pending when we start removing contaminated soil and pending when we started doing off-site inspections, yes.

Q Okay. And you recall that the off-site inspections must have occurred sometime by June -- mid-June 2003, inasmuch as that's when Jason Brown wrote to you relative to that issue, correct?

A Correct.

153

Q At some point in time, you learned that the truck inspections were going to be at Third and Constitution Avenue, correct?
A Correct.
Q Do you recall when it was that you learned that?
A The June -- mid-June time period.
Q That June 9th or June 13th period we've been talking about?
A Yes.
Q Okay. And how'd you learn about that?
A If my memory is accurate for 3 years ago -- bear with me -- I believe it came up through -- the channels went through the field side first. It was Hill's quality control or our site guy telling our superintendent saying we got to start doing this with our trucks and got to fill these forms out, and then a couple days later we got a letter from -- and actually that happened and I was unaware of anything, and then a couple of days later we got a letter from Jason Brown, which being June 13th.
Q Okay.

154

A Then we started coming full circle.
Q When you got this letter from Jason Brown on June 13th, did you ask AOC if they could intervene with the Capitol Police and get the truck inspections to occur on site?
A Yes.
Q And --
A No. I'm sorry. I don't know if I specifically asked, but HITT in general asked.
Q Okay. Who at HITT asked? Was that Mr. Seeman, Mr. Michaelson?
A Yeah. It was talked about -- it was one of our weekly meeting minute discussions. So there was -- it was roundtable discussions every week. Is there any way to sniff this thing out? Can we bring inspections --
MR. DACHILLE: No pun intended. I'm sorry. I'm sorry.
THE WITNESS: You know, it was a -- it was a roundtable discussion once a week on ways to mitigate this --
BY MR. GROSCUP:

155

Q Okay.
A -- with the AOC.
Q Right. And did AOC ever indicate to you that they had that type of sway with the Capitol Police, to be able to change the location of the Capitol Police's inspection stations?
A I don't know if they said they had the sway, but I believe they said that they tried to do that.
Q Okay. So your recollection is that AOC went to the Capitol Police and asked if the truck inspections could occur on site is what you recall?
MR. DACHILLE: Objection as to lack of foundation, but you can answer.
THE WITNESS: Yes, that's what I recall.
BY MR. GROSCUP:
Q Okay. Was that Mike Mologne that did that or was it Mike Keegan?
A You know, I don't think it would have been Mike Mologne. At that time there was a guy named Steve Kuchner with the AOC. He used to hold, like, a weekly security coordination meeting on site. I

156

think it was weekly. I don't know if it was biweekly. There was a standard -- somewhat standard meeting where he met with the Capitol Police, and he may have been the one that did that. I don't -- I don't know.
Q Do you recall having attended the precon meeting on this job in the spring of 2003?
A The one at the Ford building?
Q Yes.
A Yes.
Q And Mr. Michaelson would have also been there during that meeting as well?
A Yes.
Q During the course of that meeting, sir, did either you or Mr. Michaelson raise any issue with regard to the location of security inspections?
A I didn't, and I don't recall --
Q You don't recall that being discussed?
A I know I didn't discuss it, and I don't recall David bringing it up.
Q Do you believe that the contract provisions regarding where the truck inspections were to occur

157

were ambiguous on this job?
MR. DACHILLE: Objection.
BY MR. GROSCUP:
Q In your view?
MR. DACHILLE: Objection, calls for a legal conclusion.
MR. PIERCE: Objection, calls for a legal conclusion.
MR. GROSCUP: All together now.
MR. PIERCE: We'll do the next one in harmony.
BY MR. GROSCUP:
Q Do you regard -- do you regard them as being ambiguous, sir?
A Yes.
MR. PIERCE: Same objection.
BY MR. GROSCUP:
Q You do, okay. Did you ever seek any clarification with the owner relative to that ambiguity prior to -- prior to executing the contract?
A **I wasn't involved with executing it.**

158

Q I'm not talking about whether you were involved in executing the contract. I'm saying prior to the execution of the AOC and HITT contract in this case, to your knowledge, did anybody at HITT seek any clarification with the owner relative to the site inspection requirements?
A **To my knowledge, no.**
Q Prior to June 13th, 2003, when you received the claim letter from Jason Brown, had there been any discussion with Anderson relative to what HITT's experiences had been on interim coal handling facility, to the best of your knowledge?
A **Prior to that letter, there may have been discussions about it. I don't specifically remember any such discussion, but -- I don't remember any such discussion.**
Q Do you recall one way or the other whether you had any discussions with anyone at Anderson regarding truck inspections prior to June 13th, 2003?
A **No. I don't recall ever really talking to them about it before that.**

159

Q Okay. Turning back to Exhibit 4 -- actually -- yes, Exhibit 4 to the contract.
MR. DACHILLE: I'm sorry. Which one are we looking for?
MR. GROSCUP: Exhibit 4, which is a grouping of mods which are job mods 3, 10, and 26, I believe.
BY MR. GROSCUP:
Q Is that right, Mr. Schoenefeldt, 3, 10, and 26?
A **I'm looking for it.**
**Yes.**
Q In particular, focusing on mod No. 10, earlier in your deposition you recall on page 2 we talked about that bottom sentence there, "In terms of the modification agreed to herein is a fair and equitable adjustment," and then it continues on?
A Yes.
Q And this particular modification refers to contaminated soil and not the truck inspection claim in your view; is that right?
A Yes.

160

Q Okay. Does this modification -- or strike that.
Did any of the modifications in terms of modifications 3, 10, and 26 have to do with anything other than contaminated soils -- well, that's a bad question because 26 relates to a broader issue. Let me just start with three and ten.
Do Amendment -- or Modification No. 3 and 10 have to do with anything other than contaminated soil?
A **No.**
Q So these mods have nothing to do with the movement, say for example, of noncontaminated soil right?
A **No, they don't.**
Q Okay. All right. At Mr. Brown's deposition around Christmas, I think there was agreement amongst the parties that there was about 160 tons of base contract contaminated soil that would have been included within your scope, right?
A **Yeah.**
Q Okay. And ultimately the amount of

**CONTRACT APPEALS BOARD**
**HOUSE OFFICE BUILDING COMMISSION**
**441 G Street, N.W.**
**Washington, D.C. 20548**

| | | |
|---|---|---|
| **APPEAL OF:** | : | |
| **HITT CONTRACTING, INC.** | : | |
| **(The Anderson Company, L.L.C.,** | : | **CAB No. 2006-1 (HOBC)** |
| **Subcontractor)** | : | |
| **AOC Contract No. 0300012** | : | |

AFFIDAVIT OF Cynthia Bennett, being duly sworn, deposes and states as follows to the best of her knowledge:

1. I am over eighteen years of age and have first hand knowledge of all facts and statements set forth herein.

2. I currently serve as the Director in the Procurement Division for the Architect of the Capitol ("AOC"). In this capacity, I oversee Architect of the Capitol contracts and contractors.

3. The Capitol Police have made long-standing use of centralized inspection facilities for purposes of inspecting all vehicles entering the Capitol Grounds. All trucks entering the Capitol Grounds are subject to this security procedure, on information and belief..

4. At any given time, the Capitol Grounds may have several ongoing construction projects. During the period relevant to the instant litigation, every truck used by every contractor on every one of these projects had to pass through a centralized checkpoint facility located on or within a few blocks of the Capitol Grounds.

Dated: February 23, 2007

[signature]

CONTRACT APPEALS BOARD
HOUSE OFFICE BUILDING COMMISSION
441 G Street, N.W.
Washington, D.C. 20548

| | |
|---|---|
| APPEAL OF:<br>HITT CONTRACTING, INC.<br>(The Anderson Company, L.L.C.,<br>Subcontractor)<br>AOC Contract No. 0300012 | CAB No. 2006-1 (HOBC) |

## AFFIDAVIT OF MICHAEL MOLOGNE

Michael Mologne, being duly sworn, deposes and states as follows:

1. I am over eighteen years of age and have first hand knowledge of all facts and statements set forth herein.

2. As noted in my earlier affidavit in this matter, I served as the Senior Project Manager for the Architect of the Capitol on the West Refrigeration Plant Expansion and the Interim Coal Handling Facility Project. Hitt Contracting, Inc. ("Hitt") served as the general contractor for both of these AOC Projects.

3. Anderson notified Hitt of its "truck inspection claim" on June 13, 2003. AOC's Construction Manager (Hill) learned of this claim during the course of a job meeting in July 2003.

4. After learning of this claim, AOC and Hitt entered into protracted negotiations concerning the unit rate for excavating and transporting contaminated soil.

5. By way of background, Hitt's contract with AOC originally called for the excavation of only 300 tons of contaminated soils with quantities above this amount to be excavated and removed at a unit price of $90/ton. Notably, however, the scope of contaminated soil removed from the WRPE Project ultimately ballooned from 140 tons to over 42,000 tons –

an increase of over 29,000%. This dramatic increase in the quantity of contaminated soil extraction and removal was accomplished through a series of Jod Modifications ("Job Mods") with the following table identifying the date of the Job Mod, the quantity of contaminated soil involved, the negotiated unit rate for contaminated soil excavation and removal, and the resulting increase in Hitt's contract value.

| **Contaminated Soil Job Modification** | **Quantity** | **Negotiated Unit Price** | **Mod Value (Add to the Contract)** |
|---|---|---|---|
| Mod No. 3 *(8/22/03)* | 12,000 tons | $65/ton | $780,000 |
| Mod No. 10 *(1/27/04)* | 29,000 tons | $49.50/ton | $1,435,500 |
| Mod No. 26 *(9/30/04)* | 1,903 tons | $49.50ton | $94,199 |
| | | | ***$2,309,699 (total add)*** |

True and correct copies of the foregoing Job Mods were attached to my January 16, 2007 affidavit as Exhibit A.

6. I was directly involved in the negotiation of these Job Mods. Negotiations were based on the definition of unit prices listed in the contract, specification 01270. By this definition, the unit prices "include all necessary material, plus cost for delivery, installation, insurance, applicable taxes, overhead, and profit".

7. At no time did Hitt (or anyone else) indicate that the unit price definition was exclusive of Hitt/Anderson truck costs. Rather, Hitt negotiated an "all in" rate for contaminated soil excavation and transportation.

Dated: February 22, 2007

Michael Mologne

CONTRACT APPEALS BOARD
HOUSE OFFICE BUILDING COMMISSION
411 G Street, N.W.
Washington, D.C. 20548

| | |
|---|---|
| APPEAL OF: : <br> HITT CONTRACTING, INC. : <br> (The Anderson Company, L.L.C., : <br> Subcontractor) : <br> AOC Contract No. 0300012 : | CAB No. 2006-1 (HOBC) |

**AFFIDAVIT OF JASON BROWN**

1. I am over the age of 18 and competent to testify as to the matters set forth herein.

2. I am currently employed by The Anderson Company, LLC ("Anderson") as a Division Manager. Prior to that, I was a Project Manager with Anderson.

3. By subcontract dated May 15, 2003, Hitt hired Anderson to perform earthwork and demolition on the West Refrigeration Plant Expansion project. I served as Anderson's project manager on that project.

4. Anderson's scope of work required it to remove large quantities of soil material from the project. This material was removed by dump truck. The dump trucks were not operated by Anderson's employees. Anderson hired the trucks and drivers either directly, or through a trucking broker who would supply an agreed number of trucks on a given day. The trucks that were hired to participate in the hauling operation would report to the job site in the morning. After being loaded, they would haul their load to a dump site located in southern Maryland and return to the project to pick up another load. Before reporting to the site in the morning, and before returning to pick up each load, the dump trucks were required to be inspected. Anderson paid for all of the

trucking of non-contaminated soil based on hourly rates established with its trucking subcontractors. Contaminated soil was hauled based on a unit price per ton.

5. Anderson commenced performance of its subcontract work on or about May 22, 2003.

6. From May 22, 2003 until approximately June 12, 2003, the vehicle security inspections required by Hitt's general contract took place at the guarded security station at the entrance to the project along Virginia Avenue using dogs and mirrors.

7. On or about June 13, 2003, the inspection requirements changed. On that day, The United States Capitol Police directed Anderson to send all vehicles entering the project site to the Capitol Police inspection station for the Capitol Visitor Center project located at 3rd St. and Constitution Avenue NW. The new inspection station was located several blocks from the entrance to the West Refrigeration project. It was not within sight of the project After being inspected, each truck would be provided with a placard showing the time of inspection. The truck then had 15 minutes to report to the project site. If it took the truck more than 15 minutes to get to the project entrance, it would have to return to the inspection station.

8. The 3rd St and Constitution Avenue inspection facility was manned by the Capitol Police during defined hours. Anderson did not coordinate deliveries with the Capitol Police.

9. The change in inspection location required Anderson's truckers to take a substantially different and longer route to the project site. As a result, the time required to dispose of each load of material increased. Because Anderson paid the trucks by the

hour, its direct costs increased as well. For the contaminated soil, Anderson was required to pay a premium of $.50 per ton.

10. By letter of a June 13, 2003, Anderson notified Hitt that the change in inspection location constituted a change to its subcontract.

Jason Brown

COMMONWEALTH OF VIRGINIA:
COUNTY OF Prince William

Subscribed, sworn, and acknowledged before me, a Notary Public in the above referenced jurisdiction, on this 7 day of February, 2007 by Jason Brown.

Notary Public

My Commission Expires: 8-31-07


Joins Map
77°00'00"
800,000 FT
Gonzaga College
Superintendent of Documents
Judiciary Sq
Georgetown Univ Law Ctr
Union Sta (VRE) (MARC)(AMTRAK)
Union Sta
National Capitol Postal Museum
Japanese American Mem
US Capitol Police Hdq
Union Sta Plaza
J Marshall Park
CONSTITUTION
AVENUE
Supreme Court
US Capitol
Union Sq
Library of Congress
MARYLAND
Capitol
Saint Peters Cath
WASHINGTON
VIRGINIA
NEW JERSEY
SOUTH CAPITOL
Brent ES
Stanton Pk
Peabody ES
Seward Square
FREEWAY
SOUTHWEST
Randall
Amidon
MANNING PL
I (EYE)
DC Motor Vehicle Inspection Sta
Waterside Mall
Arena Stage
SOUTHEAST
ELLEN WILSON PL
Marion
Giddings
Southeast
ACKER ST
LEXINGTON
BROWNS CT
DUDDINGTON PL
CANAL
DEPOSITION EXHIBIT
PENGAD 800-631-6989

2.1.3 The Contractor shall deliver the following submittals no later than 45 days of proposed installation or use:

2.1.3.1 "As-Built or Installed" wiring and piping diagrams (Specification Section 14212, Article 1.4.E)
2.1.3.2 Electronic Schematics
2.1.3.3 Maintenance Manuals
2.1.3.4 Electronic media submittal
2.1.3.5 Keys
2.1.3.6 Accessories
2.1.3.7 Redundant Parts
2.1.3.8 Project Warranty

3. SPECIAL SECURITY REQUIREMENTS

3.1 All personnel provided by the Contractor and employed on the site of the work will be subject to a security background investigation. Each employee will be required to fill out an I.D. Request Form and U.S. Capitol Police Request for check of Criminal History Records and each employee will be photographed and fingerprinted. The Contractor shall provide any assistance required by any of its employees in completing the forms.

3.2 Prior to commencement of work, the contractor and all designated on-site employees will be required, on a one-time basis, to be fingerprinted in Washington D.C. The location for the Electronic Fingerprinting Service is the U.S. Capitol Hill Police Headquarters, 119 D Street, N.E.

3.3 While security background investigations are in process, the Contractor's employees will NOT be allowed temporary permission to work at the site. Any of the Contractor's employees who are perceived by the Contracting Officer as a security risk as a result of evidence discovered in the background security investigation, will not be issued an Identification Card, will be denied access to the site of the work, and the Contractor will be directed to remove such employee from performance of any of the contract work, whether it be on or off the work site.

3.4 An identification card, with photograph, will be prepared for each employee of the Contractor requiring access to the site. The identification card shall be dated to indicate the period of time for which it is to remain valid - from the date the employee reports for duty until the applicable date which occurs first: the expiration of the contract, or the last date of the employee's tour of duty with the Contractor.

3.5 All vehicles, and contents, used by the Contractor or his subcontractors, which enter or leave United States Government property during performance of the work, will be subject to clearance, inspection and identification procedures conducted by the United States Capitol Police. Instructions and map(s) will be provided to the contractor upon award.

3.6 All persons entering the Legislative Branch Buildings shall gain access to the building by passing through a magnetometer. In addition, all handbags and all hand-carried items shall be screened by x-ray devices prior to their entry into the building.

3.7 The Contractor is fully responsible to return:

- The ID badge of any individual employee, including subcontractor personnel, who is removed for any reason including but not limited to illness, or dismissal:

H. Staging Plan: The A/E has indicated in plan where the Contractor can stage the construction and locate the construction trailer. Submit a Staging plan indicating specifically location of the superintendent's trailer, storage and loading of materials, traffic direction and control concept and signage, security perimeter of staging area, locations of informational construction signage, locations of temporary toilets and other temporary construction, emergency facilities and resources and any other construction facilities required.

I. Storage of Materials: Materials shall be stored in a dry location, off the ground and in such manner as to prevent damage or intrusion of foreign matter and avoid interference with the activities of the Government. All materials which, in the opinion of the CM or A/E, have become damaged or otherwise unfit for use during delivery or storage shall be immediately removed from the site of the work and replaced by the Contractor at no additional cost to the Government.

1. Materials, equipment, tools and appliances shall only be stored at locations previously approved by the CM.

J. Signs and Advertising: No signs, other than safety signs, may be erected at the site. The Contractor agrees not to refer to awards in commercial advertising in such manner as to state or imply that the product or service provided is endorsed or preferred by the Federal Government or is considered by the Government to be superior to other products or services.

1.6 SITE SECURITY

A. Use of the Site: During the construction period, the Contractor shall have use of the premises for construction activities as described below and elsewhere in the specifications.

1. All personnel entering the Capitol Power Plant grounds will be required to check in at a security gate.
2. Clearance: Special arrangements for all deliveries shall be arranged a minimum of 48 hours in advance of arrival to permit inspection by the United States Capitol Police. ~~The Police inspection station is on P Street and South Capitol Street S.E.~~ Coordinate deliveries with the US Capital Police by contacting them at 202-224-0908.
3. All temporary security entrances established by the contractor must be coordinated with the United States Capitol Police.

B. All personnel working at the site shall display an identification badge. Badging shall be provided by the Government.

1.7 WORK UNDER OTHER CONTRACTS

A. Currently there are two other contracts under way at this site. They are the Interim Coal

B. Temporary shutdown or isolation of portions of systems may be allowed when appropriately planned and requested. Appropriate planning shall include insuring adequate heating and cooling services as required by seasonal demands throughout the duration of the project.

C. The primary construction completion requirement shall be to have new chilled water generation capacity, Chiller Nos. 7, 8 and 9 fully operational as well as the supporting equipment available for continuous use on or before 30 April 2005.

D. The Contractor area of work is defined on the Contract Drawings. The area has been defined to allow the daily operation of the plant with minimal disruption due to construction activities; however, the Contractor shall cooperate to the fullest extent to avoid disruption of plant operations.

E. Ongoing plant operations shall include, but ~~out~~ not be limited to the following:

1. Generation and distribution of adequate chilled water capacity.
2. Generation and distribution of adequate steam capacity.
3. Firm electric capacity to serve all systems required to generate and distribute adequate chilled water and steam capacity. A primary source of power as well as an alternate source shall always be available for use in case of primary source failure.
4. Fuel oil delivery and storage to the existing underground bulk storage tank. Transfer from the bulk tank to the boiler plant.
5. Coal delivery and storage.
6. Coal Ash processing and removal.
7. Sewer main operation
8. Domestic Water Service.
9. Comprehensive Site Security
10. Delivery of Materials

1.4 SITE USE BY CONTRACTOR AND SITE ACCESS

A. The construction drawings indicate space available for Contractor use.

B. Site access for the Contractor shall primarily occur from Virginia Avenue with limited use of the service entrance from E Street. All access shall be through guarded gates and allowed only to secure personnel.

1.5 OPERATING HOURS FOR CONSTRUCTION ACTIVITIES

A. Typical construction period operating hours shall commence at 7:00 a.m. and continue until 6:00 p.m. Monday through Friday. Extended hours of operations, Saturday and Sunday working hours may be requested in writing. Requests will be reviewed and approval may be granted based on project benefit.

CONTRACT APPEALS BOARD
HOUSE OFFICE BUILDING COMMISSION
411 G Street, N.W.
Washington, D.C. 20548

| | | |
|---|---|---|
| APPEAL OF: | : | |
| HITT CONTRACTING, INC. | : | |
| (The Anderson Company, L.L.C., | : | CAB No. 2006-1 (HOBC) |
| Subcontractor) | : | |
| AOC Contract No. 0300012 | : | |

## AFFIDAVIT OF JOHN F. SEEMAN

1. I, John F. Seeman, am over 18 years of age and am competent to testify.

2. I was the Senior Project Manager for HITT Contracting, Inc. ("HITT") on the Architect of the Capitol's interim Coal Handling Facility Project.

3. The Interim Coal Handling Facility Project involved work on two physically distinct sites, i.e. in the coal yard, which was on the south side of Virginia Avenue, and in the U.S. Capitol Power Plant compound which was on the north side of Virginia Avenue.

4. The coal yard was not a secure site and no truck inspections whatsoever were performed in connection with HITT's work at the coal yard site.

5. In connection with HITT's work on the Interim Coal Handling Facility Project that was performed at the U.S. Capitol Power Plant compound, the truck inspections were performed at the U.S. Capitol Power Plant compound. The Capitol Police would bring dogs to the entrance of the compound where the trucks would be sniffed and inspected.

I solemnly swear under the penalty of perjury and upon knowledge that the foregoing is true and correct.

[signature]

John F. Seeman

12/18/2006 11:06 2024845776 HILL PAGE 02

Hitt 4

Architect of the Capitol
April 1997

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE | PAGE 1 OF PAGE 2

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 03 | August 20, 2003 | PP30073 | 900257 |

6. ISSUED BY
ARCHITECT OF THE CAPITOL
United States Capitol
Washington, D.C. 20515

7. ADDRESS AMENDMENT/MODIFICATION TO
Procurement Division
Ford House Office Building
Second and "D" Streets, SW
Washington, DC 20515

8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code)
HITT Contracting, Inc.
2704 Dorr Avenue
Fairfax, Virginia 22031

9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (See Item 11)
X 10A. MODIFICATION OF CONTRACT/ORDER NO. AOC-0300012
10B. DATED (See Item 13) 3/24/03

CODE | FACILITY CODE

SUBJECT: West Refrigeration Plant Expansion for U.S. Capitol Power Plant

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

____ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of offers ______ is extended, ______ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and return __copies of the amendment; (b) By acknowledging receipt of this amendment in Block 12 of Page 1 of the solicitation package, giving amendment number and its date; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter make reference to the solicitation and this amendment, and is received prior to the opening/receipt hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA ~~XX~~ 2003 2007 C0133 900257 CONTRACT 2540 IA65050000 6525

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT/ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: FAR 52.243-04 Changes |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ____ is not, _X_ is required to sign this document and return it to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION

Pursuant to the negotiations on August 6, 2003, the unit price (for removal and disposal of approximately 12,000 tons of contaminated soil) is changed from $90/ton to $65/ton.

In consideration of the modifications agreed to herein as complete equitable adjustments for the above change, the contractor hereby releases the Government from any and all liability under this contract for further equitable adjustments attributable to such facts or circumstances giving rise to the "proposals for adjustment".

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

CONTRACT BALANCE:

| | |
|---|---|
| Previous Contract Amount | $43,637,381.00 |
| Increase/Modification No. 03 | $ 780,000.00 |
| New Contract Total | $44,417,381.00 |

15A. NAME AND TITLE OF SIGNER (Type or print)
John Seeman
Senior Project Manager- HITT Contracting, Inc.

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
Alan M. Hantman, FAIA
Architect of the Capitol

15B. CONTRACTOR/OFFEROR
John J. Seeman
(Signature of person authorized to sign)

15C. DATE SIGNED
8/22/03

16B. UNITED STATES OF AMERICA
[signature]
(Signature of Contracting Officer)

16C. DATE SIGNED
9/16/03

12/18/06 MON 11:08 [TX/RX NO 7574] 002

AOC-0300012

MOD #03/PCO #14

Pursuant to the negotiations on August 6, 2003, the unit price (for removal and disposal of approximately 12,000 tons of contaminated soil) is changed from $90/ton to $65/ton.

The scope of work should proceed according to the base contract specifications 01270, 01352 and 02071 and per the clarifications listed in Hill-Hitt correspondence No. 018 dated July 24, 2003 and No. 024 dated August 13, 2003.

The estimated quantity of contaminated soil is anticipated to be 12,000 tons. At $65/ton, the estimated value of this modification is 12,000 tons X $65/ton = $780,000.

Total increase amount is $780,000.

Progress payments for this scope will be based on signed copies of manifests indicating net weight of disposed contaminated soil.

CMR #030828-13-02

Architect of the Capitol
April 1997

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | PAGE OF PAGE |
|---|---|
| | 1 2 |

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 10 | January 27, 2004 | PP 40086 | 900257 |

| 6. ISSUED BY | 7. ADDRESS AMENDMENT/MODIFICATION TO |
|---|---|
| ARCHITECT OF THE CAPITOL<br>United States Capitol<br>Washington, D.C. 20515 | Procurement Division<br>Ford House Office Building<br>Second and "D" Streets, SW<br>Washington, DC 20515 |

| 8. NAME AND ADDRESS OF CONTRACTOR (No., Street, County, State and Zip Code) | | 9A. AMENDMENT OF SOLICITATION NO. |
|---|---|---|
| HITT Contracting, Inc.<br>2704 Dorr Avenue<br>Fairfax, Virginia 22031 | | 9B. DATED (See Item 11) |
| | X | 10A. MODIFICATION OF CONTRACT/ORDER NO.<br>AOC-0300012 |
| CODE / FACILITY CODE | | 10B. DATED (See Item 13)<br>3/24/03 |

SUBJECT: West Refrigeration Plant Expansion for U.S. Capitol Power Plant

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

____ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of offers ______ is extended, ______ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and return _copies of the amendment; (b) By acknowledging receipt of this amendment in Block 12 of Page 1 of the solicitation package, giving amendment number and its date; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter make reference to the solicitation and this amendment, and is received prior to the opening/receipt hour and date specified.

ACCOUNTING AND APPROPRIATION DATA - 2003 2007 C0133 900257 CONTRACT 2540 LA65050000 6525

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT/ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: FAR 52.243-04 Changes |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ____ is not, _X_ is required to sign this document and return it to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION

SEE CONTINUATION PAGE

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

CONTRACT BALANCE:

| | |
|---|---|
| Previous Contract Balance | $70,250,667.00 |
| Increase/Modification No. 10 | $ 1,435,500.00 |
| New Contract Total | $71,686,167.00 |

| 15A. NAME AND TITLE OF SIGNER (Type or print) | | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print) | |
|---|---|---|---|
| David R. Michaelson<br>Senior Vice President | | RICHARD McSWEENEY<br>CHIEF OPERATING OFFICER | |
| 15B. CONTRACTOR/OFFEROR | 15C. DATE SIGNED | 16B. UNITED STATES OF AMERICA | 16C. DATE SIGNED |
| [signature]<br>(Signature of person authorized to sign) | 1/29/04 | [signature]<br>(Signature of Contracting Officer) | 2-24-04 |

MOD #10/PCO #14A/14B

Quantities of contaminated soil, exceeding MOD 03 amount (12,000 tons) and up to an estimated total quantity of 41,000 tons, is 29,000 tons.

Pursuant to the negotiations on October 24, 2003, the unit price (for removal and disposal of approximately 29,000 tons of contaminated soil) is changed from $65/ton to $49.50/ton.

At $49.50/ton, the estimated value of this modification is 29,000 tons X $49.50/ton = $1,435,500.

Total amount is $1,435,500.

The modification agreed herein is a fair and equitable adjustment and settlement for the Contractor's direct and indirect costs under the above cited scope as mutually agreed upon between all parties.

CMR: 0311131303

12/18/2006 11:06 2024845776 HILL PAGE 06

Architect of the Capitol
April 1997

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

| 1. CONTRACT ID CODE | PAGE 1 OF PAGE 2 |
|---|---|

| 2. AMENDMENT/MODIFICATION NO. | 3. EFFECTIVE DATE | 4. REQUISITION/PURCHASE REQ. NO. | 5. PROJECT NO. (If applicable) |
|---|---|---|---|
| 26 26 | September 30, 2004 | PP30073 | 900257 |

**6. ISSUED BY**
ARCHITECT OF THE CAPITOL
United States Capitol
Washington, D.C. 20515

**7. ADDRESS AMENDMENT/MODIFICATION TO**
Procurement Division
Ford House Office Building
Second and "D" Streets, SW
Washington, DC 20515

**8. NAME AND ADDRESS OF CONTRACTOR** (No., Street, County, State and Zip Code)
HITT Contracting, Inc.
2704 Dorr Avenue
Fairfax, Virginia 22031

CODE | FACILITY CODE

9A. AMENDMENT OF SOLICITATION NO.
9B. DATED (See Item 11)
X 10A. MODIFICATION OF CONTRACT/ORDER NO. AOC-0300012
10B. DATED (See Item 13) 3/24/03

SUBJECT: West Refrigeration Plant Expansion for U.S. Capitol Power Plant

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

____ The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of offers ______ is extended, ______ is not extended.

Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods:

(a) By completing Items 8 and 15, and return __copies of the amendment; (b) By acknowledging receipt of this amendment in Block 12 of Page 1 of the solicitation package, giving amendment number and its date; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter make reference to the solicitation and this amendment, and is received prior to the opening/receipt hour and date specified.

ACCOUNTING AND APPROPRIATION DATA: 2003 2007 C0133 020257 CONTRACT LA65050000 6593 32,367; 2004 0133 PM01 AHAND LA65050000 6593 $70,000; 2004 0133 PM01 AND 2540 LA65050000 6593 $70,000; 2003 2007 C0133 900257 CONTRACT 3230 LA65050000 6593 $111,767

## 13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14.

| | |
|---|---|
| | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: (Specify authority) THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN THE CONTRACT/ORDER NO. IN ITEM 10A. |
| | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation date, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| X | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: FAR 52.243-04 Changes |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor ____ is not, _X_ is required to sign this document and return it to the issuing office.

**14. DESCRIPTION OF AMENDMENT/MODIFICATION**

SEE CONTINUATION PAGE

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

CONTRACT BALANCE:

| | | | |
|---|---|---|---|
| Previous Contract Balance | $ 78,190,149.00 | Previous Contract Completion Date | December 31, 2005 |
| Increase/Modification No. 26 | $ 190,384.00 | Time Increase/Decrease | 0 Calendar Days |
| New Contract Total | $ 78,380,533.00 | New Contract Completion Date | December 31, 2005 |

15A. NAME AND TITLE OF SIGNER (Type or print): Jerry Brandmueller Project Manager

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print): RA McSweeney

15B. CONTRACTOR/OFFEROR: Jerry Brandmueller (Signature of person authorized to sign)

15C. DATE SIGNED: 10-1-04

16B. UNITED STATES OF AMERICA: [signature] (Signature of Contracting Officer)

16C. DATE SIGNED: 10/22/04

12/18/06 MON 11:08 [TX/RX NO 7574] 006

MOD #26/PCO #14C, 86, 110A, 130, 137 & 152

*PCO #14C*:
Quantities of contaminated soil, exceeding MOD 10 amount (41,000 tons) is 1,903 tons. This represents the final quantities of contaminated soil removal within the WRPE and WASA sewer footprints.

At $49.50/ton, the estimated value of this modification is 1,903 tons X $49.50/ton = $94,199.

| | | |
|---|---|---|
| PCO 14C | Contaminated Soil | $ 94,199 |
| PCO 86 | Custom 30"CW Pipe Support | $ 5,250 |
| PCO 110A | Teflon Joints & Chains (Catwalk North Side) | $ 12,318 |
| PCO 130 | RTD's & Velometers at WRPE | $ 76,250 |
| PCO 137 | Additional Site Fencing | $ 0 |
| PCO 152 | Transformer Space Heater | $ 2,367 |

*TOTAL* *$ 190,384*

The modification agreed herein is a fair and equitable adjustment and settlement for the Contractor's direct and indirect costs under the above cited scope as mutually agreed upon between all parties.

CMR: 040831-13-01

Q So we know at that point in time the off-site inspections are occurring relative to Anderson's trucks, right, as of mid-June 2003?
A Correct.
Q Okay. So with that in mind, at the time that this modification is being entered into for the removal and disposal of approximately 12,000 tons of contaminated soil, Anderson's trucks had to go through that off-site inspection location, didn't they, sir?
A Like I said, not -- there's a possibility that not all of them did because the off-site inspections did not start at the beginning of the job. If we start hauling contaminated soil off before we started doing off-site inspections, then no. I don't have that time line established.
Q Sure, okay. I think I understand what you're saying.
A If we start -- if we start having contaminated soil prior to mid-June and prior to the initiation of the off-site inspections, then not all of these were going through there.



Q Okay. You'd agree though that the vast majority of the 12,000 tons of contaminated soil were being moved at a time when Anderson's trucks had to go through the off-site inspection location, correct?
MR. PIERCE: Object to the use of "vast majority." It's vague.
Go ahead.
THE WITNESS: Yes.
BY MR. GROSCUP:
Q Earlier in your deposition -- and I may not be remembering this right and, Mr. Schoenfeld, did you indicate that you were not involved at all in negotiating any of the contaminated soil modifications with AOC?
A The reduction in value, no.
Q Okay.
A The reduction in dollar value per ton, no. That was not handled by me.
Q And the reason I'm inquiring about that is Mike Mologne and I were talking about this issue last night, and he recalled sitting down with you



and specifically negotiating what the rate would be for the contaminated soils. Is that inconsistent with your recollection?
A I guess -- I guess what I'm trying to say is I didn't pull the trigger on going from 95 to 65. I didn't pull the trigger on that decision. Was there conversations that I was privy to in the same conference room with, yes. Did I have the authority to negotiate it, no. Did I have the authority to make the call on it? No.
Q Okay.
A That's kind of what I'm saying. There was negotiations going on, as there was for a number of different things. I've been privy to them, but I didn't have the authority, nor was the lead to make that call.
Q Okay. Let me see if I can understand what you're saying. You did have conversations with Mike Mologne, who was the construction manager for AOC on this project relative to the price, the unit rate for the contaminated soil; is that fair? You had discussions with him about it?



A I've had to have discussions with him over the years.
Q Okay. With regard to this specific issue of the contaminated soil pricing?
A Yes. I would have had to have had those discussions.
Q Okay. But you weren't the ultimate go-to person within HITT who was going to make the call as to what the ultimate rate would be on that issue; is that fair?
A Correct.
Q Okay. And who would that person have been? Would that have been Mr. Seeman?
A It would have been either Mr. Seeman or Michaelson, one of the two.
Q During any of the discussions, whether they be informal, whether they included a larger group of people that you had relative to any of those contaminated soil modifications, did you ever hear anyone say that this doesn't include the truck inspection claim?
A Me.

41

Q You?
A Yes.
Q Who'd you tell that to?
A I don't specifically ever remember saying it to any one person or time frame, but that's been my belief since day one, since this issue come up, that it's -- that the trucking inspections are being handled separately.
Q Okay. Let me make sure I'm understanding what you're saying. It's your belief that the truck inspection claim was going to be handled separately from the contaminated soil modification issues; is that fair?
A Yes.
Q Okay. That's your belief. Was that belief ever voiced to anyone at AOC?
A I would imagine that they would have been -- had to have been -- for same instance, they would have had to have been privy in discussions where they would have overheard me say that too.
Q So to the extent that AOC knew that it was your belief that this was being excluded, that would

42

have been based on overhearing something that you would have said?
MR. DACHILLE: Object to the characterization, but you can answer.
THE WITNESS: Yes.
BY MR. GROSCUP:
Q Did you ever tell AOC directly that the truck inspection claim was being excluded from the contaminated soil mods?
A I don't recall.
Q Did you ever send a letter to anybody at AOC, and I'm including Mr. Mologne in that or anyone else at Hill, so with that caveat, did you ever send a letter, a document, an e-mail, a fax, anything to anyone at AOC indicating that the truck inspection claim was being excluded from the contaminated soil mods?
A Yes.
Q You did, okay. And when did you do that?
A Looking through documents earlier this week, it was one of these modifications. We had marked up and crossed through the language that said

43

all costs, direct and indirect, or similar language -- similar language on these we crossed and sent it back to Hill International to try to have that language stricken from the modification.
Q Right. I looked at that language last night actually myself, and nothing in that language indicated anything about a truck inspection claim. Do you recall differently than that?
A No, I don't recall differently than that.
Q Okay. So earlier I was asking you whether there was any document that you sent to anyone at AOC, including its construction manager, notifying them that the truck inspection claim was to be excluded from any of the contaminated soil mods, and you said that you did send them such a document; is that fair?
A You know what, no. I guess it isn't, because I did not reference -- that letter did not reference contaminated soil. It referenced all costs direct and indirect, the language I'm talking about.
Q Let me make sure I'm clear about this for

44

the record. Was there ever any document that you, Steve Schoenefeldt, sent to anyone at my client AOC indicating that the truck inspection claim was to be excluded from the contaminated soil mods?
MR. DACHILLE: I'm going to object only because I think you're talking past one another a little bit. I think he tried to answer the question, so I suppose the objection is it's ambiguous or it calls for a legal conclusion, one or the other.
BY MR. GROSCUP:
Q Actually, let me ask a better question. Mr. Schoenefeldt, did you ever send a letter to my client indicating to them that the truck inspection claim was to be excluded from the contaminated soil mods?
A No.
Q Okay. Did you ever send them a fax to that effect?
A Not that I'm aware of.
Q Did you ever send them a memo to that effect?

137

request for pricing was never issued.
BY MR. GROSCUP:
Q Okay. I think I understood what you just said, that there was no request for pricing ever issued by the owner relative to the off-site inspection requirement. Is that fair?
A It was one of the things.
Q One of the many things you just said, right?
A Yes.
Q Okay. And so let's take this one step at a time. Is it fair to say that there was no request for proposal ever issued by AOC relative to the off-site inspection claim?
A Correct.
Q Okay. But that would not be the only method in the contract for triggering a change. In other words, there were contract negotiated changes as well, correct?
A Yes.
Q And for contract negotiated changes, perhaps you get an RFI response back and that might

138

be deemed to be a change by the general contractor or one of the subs, right?
A Correct.
Q And under that set of circumstances, you get the RFI response back and you submit it to the impacted subs and you ask them for their pricing relative to that particular issue, right?
A Yeah, that's one of the routes, correct.
Q Okay. When you received notification that all of the trucks were to be inspected at Third and Constitution Avenue, did you submit a global contract-initiated change or request for pricing data from your subcontractors on that issue?
A Subcontractor-wide? You mean all the subcontractors?
Q All the subcontractors who had to go to the off-site inspection facility.
A No. At that point in time, we didn't have any subcontractors on site --
Q Okay.
A -- nor contracted at that point in time.
Q As I understand your earlier testimony, you

139

do regard the off-site inspection requirement to be a change to the prime contract. Is that fair?
A Yes.
Q Okay. What did you do to notify your subcontractors of that change to the contract and to request pricing information from them relative to that issue?
A Other than --
MR. DACHILLE: I'm going to object. I think that puts the cart before the horse.
But go ahead, you can answer.
THE WITNESS: You're referring to contractors other than Anderson?
BY MR. GROSCUP:
Q Sure. Yes.
A I believe -- I believe every other subcontractor written other than Anderson's was after we were aware of the off-site inspections and therefore had a clause in our subcontract to the subcontractors saying that they have to abide by off-site inspections.
Q Right. Well what I'm trying to figure out

140

is that you, HITT, made the determination that there'd been a change to its contract relative to the off-site inspection claim, right?
A Yes.
Q All right. And when you made that determination, was there anything that you did to let the subcontractors know we invite you to submit costs or pricing claims relative to that off-site inspection claim?
MR. DACHILLE: I'm going to object. I think that's misleading in the context of what he testified to.
THE WITNESS: No. We didn't invite other subcontractors to submit pricing for off-site inspection.
BY MR. GROSCUP:
Q Was Anderson the only subcontractor on this project involved in excavation?
A No.
Q Did you send anything to the other subcontractors who were involved in excavation on WRPE to ask them what their cost would be for this